IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| BPP TEXAS, LLC, *ET AL.*, | § | Case No. 10-44378 |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |

---

## DISCLOSURE STATEMENT IN SUPPORT OF
## DEBTORS' JOINT CONSOLIDATION PLAN OF REORGANIZATION

---

Joseph J. Wielebinski, Esq.
Texas Bar No. 21432400
Davor Rukavina, Esq.
Texas Bar No. 24030781
Zachery Annable, Esq.
Texas Bar No. 24053075
Jonathan L. Howell, Esq.
Texas Bar No. 24053668
**MUNSCH HARDT KOPF & HARR, P.C.**
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

**ATTORNEYS FOR THE
DEBTORS-IN-POSSESSION**

**DATED: MAY 15, 2011**

# TABLE OF CONTENTS

INTRODUCTORY DISCLOSURES ........................................................................................1

DEFINITIONS ....................................................................................................................3

I. INTRODUCTION ........................................................................................................10

II. OVERVIEW OF THE PLAN ......................................................................................13

III. SUMMARY OF TREATMENT UNDER THE PLAN ...................................................15

    A. CLASSES AND DISTRIBUTIONS ...........................................................................15
    B. PLAN FUNDING ...................................................................................................17
    C. SUBSTANTIVE CONSOLIDATION ........................................................................18
    D. DISCHARGE .........................................................................................................19
    E. CLASS TREATMENT UNDER THE PLAN ...............................................................20
        1. Unclassified Claims ..................................................................................20
        2. Classified Claims ......................................................................................21
    F. ASSUMPTION OF EXECUTORY CONTRACTS .........................................................23
    G. GUARANTORS ......................................................................................................23

IV. VOTING PROCEDURES AND REQUIREMENTS .......................................................24

    A. VOTING DEADLINE ..............................................................................................24
    B. CREDITORS SOLICITED TO VOTE ........................................................................24
    C. DEFINITION OF IMPAIRMENT ..............................................................................25
    D. CLASSES IMPAIRED UNDER THE PLAN ...............................................................25
    E. VOTE REQUIRED FOR CLASS ACCEPTANCE ........................................................25
    F. VOTING IS ON A COMBINED BASIS .....................................................................26

V. CONFIRMATION OF THE PLAN ...............................................................................26

    A. OVERVIEW OF CHAPTER 11 ...............................................................................26
    B. CONFIRMATION HEARING ...................................................................................27
    C. MODIFICATION OF THE PLAN ..............................................................................27
    D. REQUIREMENTS FOR CONFIRMATION OF THE PLAN ...........................................27
    E. CRAMDOWN .........................................................................................................29
    F. EFFECTIVE DATE OF THE PLAN ..........................................................................30

VI. DEBTORS' BACKGROUND INFORMATION .............................................................31

    A. THE DEBTORS AND THEIR BUSINESSES .............................................................31
    B. CAPITAL STRUCTURE ..........................................................................................32
    C. RECEIVERSHIP PROCEEDINGS ............................................................................33
    D. OBLIGATIONS TO THE FRANCHISORS .................................................................33
    E. CORPORATE RESOLUTIONS PRIOR TO BANKRUPTCY ..........................................33

VII.  SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE ..................................... 34

    A.  FIRST DAY PLEADINGS AND HEARING ........................................................ 34
    B.  USE OF CASH COLLATERAL ON FINAL BASIS ............................................. 34
    C.  RETENTION OF AND PAYMENTS TO MUNSCH HARDT ................................ 34
    D.  COURT ORDERED PAYMENTS TO LENDER .................................................. 35
    E.  RETENTION OF OTHER PROFESSIONALS ..................................................... 35
    F.  INCREASE IN HOTEL REVENUES ................................................................ 35
    G.  EXTENSION OF EXCLUSIVITY AND LEASE ASSUMPTION DEADLINE ............ 36
    H.  THE ADVERSARY PROCEEDING ................................................................. 36
    I.  MEDIATION ............................................................................................. 36

VIII.  LIQUIDATION ANALYSIS AND PLAN ALTERNATIVES ........................................ 37

    A.  LIQUIDATION ANALYSIS ........................................................................... 37
    B.  ALTERNATIVES TO CONFIRMATION OF THE PLAN ...................................... 39
    C.  LIQUIDATION ALTERNATIVE THROUGH CHAPTER 7 .................................... 39
    D.  ALTERNATIVE IF PLAN IS NOT CONFIRMED ............................................... 40
    E.  FUTURE PROJECTIONS .............................................................................. 40

IX.  RISK FACTORS .......................................................................................... 41

    A.  ESTIMATED RECOVERY RISKS .................................................................. 41
    B.  BANKRUPTCY RISKS ................................................................................ 42

X.  CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN .......................................... 43

XI.  CONCLUSION ............................................................................................. 43

## INTRODUCTORY DISCLOSURES

THIS DISCLOSURE STATEMENT IN SUPPORT OF THE DEBTORS' JOINT CONSOLIDATED PLAN OF REORGANIZATION (THE "DISCLOSURE STATEMENT"), FILED BY THE DEBTORS (DEFINED BELOW), SUMMARIZES CERTAIN PROVISIONS OF THE DEBTORS' JOINT CONSOLIDATED PLAN OF REORGANIZATION (THE "PLAN"), INCLUDING PROVISIONS RELATING TO THE PLAN'S TREATMENT OF CLAIMS AGAINST THE DEBTORS. THE DISCLOSURE STATEMENT ALSO SUMMARIZES CERTAIN FINANCIAL INFORMATION CONCERNING THE DEBTORS AND THE CLAIMS ASSERTED AGAINST THE DEBTORS IN THE BANKRUPTCY CASE. WHILE THE DEBTORS BELIEVE THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION WITH RESPECT TO THE INFORMATION SUMMARIZED, CREDITORS SHOULD REVIEW THE ENTIRE PLAN AND EACH OF THE DOCUMENTS REFERENCED HEREIN, AND SHOULD SEEK THE ADVICE OF THEIR OWN COUNSEL BEFORE CASTING THEIR BALLOTS.

EXCEPT FOR THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, NO REPRESENTATIONS CONCERNING THE DEBTORS, THE DEBTORS' ASSETS AND LIABILITIES, THE PAST OR FUTURE OPERATION OF THE DEBTORS, THE PLAN, OR ALTERNATIVES TO THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN, OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, ARE UNAUTHORIZED AND SHOULD BE REPORTED TO THE DEBTORS' COUNSEL.

THE APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT, EXPRESS OR IMPLIED, IS INTENDED TO GIVE RISE TO ANY COMMITMENT OR OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED AS

CONFERRING UPON ANY PERSON ANY RIGHTS, BENEFITS OR REMEDIES OF ANY NATURE WHATSOEVER. THE DISCLOSURE STATEMENT IS INFORMATIONAL ONLY. ADDITIONALLY, CREDITORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH CREDITOR SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY MATTER CONCERNING THE PLAN, INCLUDING THE TREATMENT OF CLAIMS UNDER THE PLAN, THE RELEASES PROVIDED BY AND PROPOSED UNDER THE PLAN, THE TRANSACTIONS AND INJUNCTIONS PROVIDED UNDER THE PLAN, AND THE VOTING PROCEDURES AND ELECTIONS APPLICABLE TO THE PLAN.

# DEFINITIONS

In addition to the defined terms listed above and defined elsewhere in this Disclosure Statement, the following terms, as used in this Disclosure Statement, shall have the following meanings, and such meanings shall be equally applicable to the singular and plural forms of the terms defined, unless the context otherwise requires. Further, terms which are used in this Disclosure Statement which are defined in the Plan shall have the meaning ascribed to them in the Plan.

**"Administrative Claim"** means a Claim for any cost or expense of administration of the Bankruptcy Case under section 503(b) of the Bankruptcy Code, including, without limitation, any fees or charges assessed against the Consolidated Estate pursuant to 28 U.S.C. § 1930, and further including a Professional Claim.

**"Administrative Claims Bar Date"** means the day that is thirty (30) days after the Effective Date.

**"Adversary Proceeding"** means that adversary proceeding commenced on April 7, 2011 by the Debtors against the Lender and T.R. Engle Group, LLC in the Bankruptcy Court, styled *BPP Texas, LLC, et al. v. Citizens Bank of Pennsylvania and T.R. Engle Group, LLC* and assigned adversary proceeding number 11-04070.

**"Allowed"** as it relates to any type of Claim provided for under the Plan, means a Claim: (i) which has been scheduled as undisputed, noncontingent and liquidated in the Schedules in an amount other than zero or unknown, and as to which: (a) no proof of Claim has been timely filed, and (b) no objection has been timely filed (as determined by applicable deadlines contained in the Plan, including the Claims Objection Deadline); (ii) as to which a proof of Claim has been timely filed and either: (a) no objection thereto has been timely filed (as determined by applicable deadlines contained in the Plan, including the Claims Objection Deadline), or (b) such Claim has been allowed (but only to the extent allowed) by a Final Order of the Bankruptcy Court; (iii) which has been expressly allowed under the provisions of the Plan; or (iv) which has been expressly allowed by Final Order of the Bankruptcy Court.

**"Allowed Administrative Claim"** means: (i) an Administrative Claim that has been Allowed (but only to the extent Allowed), if approval from the Bankruptcy Court is required in order to Allow the same; and (ii) an Administrative Claim which: (a) is incurred by the Debtors after the Petition Date in the ordinary course of business operations or pursuant to an order entered by the Bankruptcy Court granting automatic Administrative Claim status; (b) is not disputed by the Debtors or the Reorganized Debtors; and (c) does not require approval from the Bankruptcy Court to become Allowed.

**"Allowed Priority Claim"** means a Priority Claim that has been Allowed (but only to the extent Allowed).

**"Allowed Secured Claim"** means a Secured Claim that has been Allowed (but only to the extent Allowed).

**"Allowed Unsecured Claim"** means an Unsecured Claim that has been Allowed (but only to the extent Allowed).

**"Avoidance Actions"** means any and all rights, claims or actions which the Debtors may assert on behalf of the Estates under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of sections 542, 544, 545, 546, 547, 548, 549, 550, 551 and/or 553 of the Bankruptcy Code, except to the extent that any such rights, claims, or actions are released or waived in the Plan.

**"Ballot"** means the ballot, the form of which has been approved by the Bankruptcy Court, accompanying the Disclosure Statement provided to each holder of a Claim entitled to vote to accept or reject the Plan.

**"Bankruptcy Case"** means the jointly administered bankruptcy case of the Debtors, pending in the Bankruptcy Court under jointly administered Case Number 10-44378, and includes, as necessary, each member case of the Debtors that is jointly administered under the above case number.

**"Bankruptcy Code"** means 11 U.S.C. §§ 101, *et. seq.*, in effect as of the Petition Date and as may have been or may be amended or supplemented since, to the extent that any such amendment or supplement is automatically applicable to the Bankruptcy Case by operation of law and not by operation of any election or choice.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division or, if such court ceases to exercise jurisdiction, the court or adjunct thereof that exercises jurisdiction over the Bankruptcy Case.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, together with the local bankruptcy rules for the Bankruptcy Court as now in effect or as the same may from time to time hereafter be amended.

**"Bar Date"** means the date set by the Bankruptcy Court for the filing of proofs of claims against the Debtors, which date is April 21, 2011 for creditors other than Governmental Units, and, with respect to Governmental Units, which date is June 21, 2011.

**"Business Day"** means any day which is not a Saturday, a Sunday, or a "legal holiday" within the meaning of Bankruptcy Rule 9006(a).

**"Cash Collateral"** has the meaning assigned to it in section 363(a) of the Bankruptcy Code.

**"Claim"** means a claim against one or more of the Debtors, one or more of the Estates, and/or property of one or more of the Debtors or the Estates, as such term is otherwise defined in section 101(5) of the Bankruptcy Code, arising prior to the Effective Date.

**"Claims Objection Deadline"** means the date by which parties authorized by the Plan may file any objection to a Claim, which date shall be sixty (60) days after the Effective Date, except with respect to Administrative Claims as otherwise provided for herein.

**"Class"** means one of the categories of Claims and Interests established under Article II of the Plan.

**"Confirmation Date"** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

**"Confirmation Hearing"** means the hearing(s) before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing(s) may be continued, rescheduled or delayed.

**"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended, modified, or supplemented.

**"Consolidated Estate"** means the substantively consolidated estate of the Debtors created pursuant to section 6.6 of the Plan.

**"Creditor"** means the holder of any Claim entitled to distributions with respect to such Claim.

**"Cure Claim"** shall refer to the payment or other performance required to cure any existing default under an Executory Contract in accordance with section 365 of the Bankruptcy Code.

**"Debtor Notice Person"** has the meaning assigned to it in section 12.14 of the Plan.

**"Debtors"** means BPP Texas, LLC, BPP Wisconsin, LLC, BPP Michigan, LLC, BPP Minnesota, LLC, BPP Illinois, LLC, and BPP Iowa, LLC.

**"Disallowed Claim"** means, as it relates to any type of Claim provided for under the Plan, a Claim or portion thereof that: (i) has been disallowed by a Final Order of the Bankruptcy Court; (ii) is identified in the Schedules in an amount of zero dollars, unknown dollars, or as contingent, unliquidated, and/or disputed, and as to which a proof of Claim was not filed by the Bar Date; or (iii) is not identified in the Schedules and as to which no proof of Claim has been filed or deemed filed by the Bar Date, if the filing of such proof of Claim is otherwise required.

**"Disputed Claim"** means any Claim or any portion thereof which is neither Allowed nor is a Disallowed Claim as of the close of the Claims Objection Deadline. In the event that any part of a Claim is a Disputed Claim, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under the Plan unless the party responsible for the payment thereof, the objecting party, and the holder thereof agree otherwise or unless otherwise ordered by the Bankruptcy Court; *provided*, *however*, that nothing in this definition of "Disputed Claim" is intended to or does impair the rights of any holder of a Disputed Claim to pursue its rights under section 502(c) of the Bankruptcy Code. Without limiting any of the foregoing, but subject to the provisions of the Plan, a Claim that is the subject of a pending application, motion, complaint, objection, or any other legal proceeding seeking to disallow, limit, subordinate, or

estimate such Claim, as of the Claims Objection Deadline, shall be a Disputed Claim unless and until the entry of a Final Order providing otherwise.

"**Effective Date**" means the first Business Day fourteen (14) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least fourteen (14) days after the Confirmation Date, and upon which the conditions to the effectiveness of the Plan set forth in Article X of the Plan are satisfied.

"**Estates**" means the estates created for the Debtors pursuant to section 541 of the Bankruptcy Code and any other applicable provision thereof, prior to the Effective Date.

"**Executory Contract**" means, collectively, "executory contracts" and "unexpired leases" of the Debtors as of the Petition Date as such terms are used within section 365 of the Bankruptcy Code.

"**Federal Postjudgment Interest Rate**" means the rate of interest provided for in 28 U.S.C. § 1961(a).

"**FFC**" means FFC Capital Corporation.

"**FFC Agreements**" means the agreements, or any amendments or modifications thereto, between the Debtors and FFC under which FFC provides asset management services to the Debtors.

"**FFE Reserve**" means the reserve created pursuant to section 6.4 of the Plan.

"**Final Decree**" means the final decree entered by the Bankruptcy Court on or after the Effective Date pursuant to Bankruptcy Rule 3022.

"**Final Order**" means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal having jurisdiction over the subject matter thereof which judgment, order, ruling, or other decree has not been reversed, stayed, modified, or amended and as to which: (i) the time to appeal or petition for review, rehearing or certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari is pending; or (ii) any appeal or petition for review, rehearing or certiorari has been finally decided and no further appeal or petition for review, rehearing or certiorari can be taken or granted.

"**Franchise Agreements**" means, collectively, the agreements, or any amendments or modifications thereto, between the Debtors and the Franchisors under which the Debtors hold franchise rights regarding the Hotels.

"**Franchisors**" means Days Inn Worldwide, Inc., Baymont Franchise Systems, Inc., Travelodge Hotels, Inc., Super 8 Worldwide, Inc., and Howard Johnson International, Inc.

"**Guarantors**" means Fine Capital Associates, L.P. and FFC Partnership, L.P.

**"Governmental Unit"** means a governmental unit as such term is defined in section 101(27) of the Bankruptcy Code.

**"Hotels"** means, collectively, the twenty-two (22) Wyndham branded hotels owned and operated by the Debtors, including real property, improvements, furniture, fixtures, and equipment, generally located at the following locations: (i) 9625 S. 76th Ave., Bridgeview, Illinois 60455; (ii) 1000 W. Devon Ave., Elk Grove Village, Illinois 60007; (iii) 2881 Touhy Ave., Elk Grove Village, Illinois 60007; (iv) 2501 52nd Ave., Moline, Illinois 61265; (v) 1585 Naperville, Naperville, Illinois 60563; (vi) 540 Milwaukee Ave., Prospect Heights, Illinois 60070; (vii) 220 S. Lyford Rd., Rockford, Illinois 61108; (viii) 616 33rd Ave., Cedar Rapids, Iowa 52404; (ix) 6310 N. Brady St., Davenport, Iowa 52806; (x) 4855 28th St., Grand Rapids, Michigan 49512; (xi) 1739 Old Hudson Rd., St. Paul, Minnesota 55106; (xii) 2711 Interstate-35, Austin, Texas 78741; (xiii) 4211 Interstate-35, Denton, Texas 76207; (xiv) 210 Westhill Blvd., Appleton, Wisconsin 54914; (xv) 2305 Craig Rd., Eau Claire, Wisconsin 54701; (xvi) 2870 Ramada Way, Green Bay, Wisconsin 54304; (xvii) 2150 Rose St., La Crosse, Wisconsin 54603; (xviii) 4202 East Towne Blvd., Madison, Wisconsin 53704; (xix) 5485 N. Port Washington Rd., Glendale, Wisconsin 53217; (xx) 1201 W. College Ave., Oak Creek, Wisconsin 53154; (xxi) 115 N. Mayfair Rd., Wauwatosa, Wisconsin 53226; and (xxii) 116 S. 17 Ave., Wausau, Wisconsin 54401.

**"Hotel Management Agreements"** means, collectively, the agreements, or any amendments or modifications thereto, between the Debtors and Interstate or between the Debtors and Janus under which either Interstate or Janus provides hotel management services, employees, and other services to the Debtors for the Hotels.

**"Interest Guarantee"** has the meaning assigned to it in section 6.3 of the Plan.

**"Interests"** means any ownership of any equity in the Debtors, including, as may be applicable, any membership interest, stock, share, or other equity ownership.

**"Interstate"** means Interstate Management Company, LLC.

**"Janus"** means Janus Hotel Management Services, LLC.

**"Lender"** means Citizens Bank of Pennsylvania.

**"Lender Claim"** means any and all Claims, liens, security interests, and rights held by the Lender against any and all of the Debtors and the Estates, and their property, including as asserted by the Lender in proofs of claim filed by the Lender against the Debtors.

**"Person"** means and includes natural persons, corporations, limited partnerships, general partnerships, joint ventures, trusts, land trusts, business trusts, unincorporated organizations, or other legal entities, irrespective of whether they are governments, agencies or political subdivisions thereof.

**"Petition Date"** means December 21, 2010.

**"Plan"** means this *Debtors' Joint Consolidated Plan of Reorganization*, either in its present form or as it may be altered, amended or modified from time to time.

**"Plan Funder"** means BPP Plan Funding, LLC, a Delaware Limited Liability Company. The Plan Funder is an insider of the Debtors and of the Guarantors.

**"Plan Funding"** means the amount of funds contributed by the Plan Funder to the Plan, as specified in section 6.1 of the Plan.

**"Priority Claim"** means any Claim entitled to priority in payment under section 507(a) of the Bankruptcy Code, excluding any Claim that is an Administrative Claim or that is a Secured Tax Claim.

**"Professional"** means any Person employed or to be compensated pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code.

**"Professional Claim"** means a Claim by a Professional for compensation and/or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Bankruptcy Case.

**"Rejection Claim"** means a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any Executory Contract.

**"Reorganized Debtors"** means the Debtors on and after the Effective Date.

**"Schedules"** means the Schedules of Assets and Liabilities and the Statements of Financial Affairs filed by the Debtors with the clerk of the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

**"Secured Claim"** means a Claim that is alleged to be secured, in whole or in part, (i) by a lien against an asset of the Debtors or the Estates to the extent such lien is valid, perfected and enforceable under applicable non-bankruptcy law and is not subject to avoidance or subordination under the Bankruptcy Code or applicable non-bankruptcy law, but only to the extent that such Claim is secured within the meaning of section 506(a) of the Bankruptcy Code; or (ii) as a result of rights of setoff under section 553 of the Bankruptcy Code.

**"Secured Tax Claim"** means a Claim of a Governmental Unit for the payment of *ad valorem* real property and business personal property taxes that is secured by property of the Debtors or the Estates.

**"Substantial Consummation"** means the earliest day on or after the Effective Date on which any of the following occurs: (i) the Reorganized Debtors make any payment required by the Plan; (ii) the Reorganized Debtors execute new loan documents with the Lender regarding the modification of the Lender's claims under the Plan; (iii) the Court enters a Final Order on the Professional Claim of the Debtors' general bankruptcy

counsel; or (iv) the Court otherwise finds that Substantial Consummation within the meaning and understanding of the Bankruptcy Code has occurred.

"**<u>Unsecured Claim</u>**" means any alleged Claim against one or more of the Debtors that is not secured by a valid, enforceable, and unavoidable lien against any asset of the Debtors or the Estates, but excluding any Administrative Claim, Priority Claim, Secured Claim, but including a Secured Claim to the extent not an Allowed Secured Claim but otherwise an Allowed Claim.

"**<u>Voting Deadline</u>**" means the period established by the Bankruptcy Court within which Ballots may be cast on the Plan.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| BPP TEXAS, LLC, *ET AL.*, | § | Case No. 10-44378 |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |

## DISCLOSURE STATEMENT IN SUPPORT OF
## DEBTORS' JOINT CONSOLIDATED PLAN OF REORGANIZATION

BPP Texas, LLC, BPP Illinois, LLC, BPP Iowa, LLC, BPP Michigan, LLC, BPP Minnesota, LLC, and BPP Wisconsin, LLC (collectively, the "Debtors"), hereby submit this Disclosure Statement (the "Disclosure Statement") in support of the *Debtors' Joint Consolidated Plan of Reorganization*, a copy of which is attached hereto as **Exhibit "A".**

## ARTICLE I.
## INTRODUCTION

On December 21, 2010, the Debtors filed their petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division, thereby initiating their respective bankruptcy cases, which the Bankruptcy Court has ordered to be jointly administered, for procedural purposes, under Bankruptcy Case No. 10-44378.

On May 15, 2011, the Debtors filed the Plan with the Bankruptcy Court. The Plan proposes, among other things, the means by which all Claims against the Debtors will be finally resolved and treated for distribution purposes, consistent with the provisions and priorities mandated by the Bankruptcy Code. The Plan is essentially a new contract between the Debtors and their Creditors, proposed by the Debtors to their Creditors for their approval. Creditors approve or disapprove of the Plan by voting their Ballots on the Plan, if they are in a Class entitled to vote, and, if appropriate, by objecting to the confirmation of the Plan. However, the Plan can be confirmed by the Bankruptcy Court even if less than all Creditors or Classes accept the Plan and, in such an instance, the Plan will still be binding on those Creditors or Classes that rejected the Plan. Approval and consummation of the Plan will enable the Bankruptcy Case to be finally concluded.

The Debtors hereby submit this Disclosure Statement in connection with the solicitation of votes on, and providing information regarding, the Plan. On _____ ___, 2011, after notice and a hearing, the Bankruptcy Court, the Honorable Brenda T. Rhoades presiding, approved the Disclosure Statement as containing information of a kind and in sufficient detail, to enable Creditors whose votes on the Plan are being solicited to make an informed judgment on whether to accept or reject the Plan. The Bankruptcy Court's approval of the Disclosure Statement does not constitute the Court's approval or disapproval of the Plan.

This Disclosure Statement, which includes the Plan as Exhibit "A", is being mailed to each holder of a Claim (or potential Claim) against the Debtors that has not been disallowed (in addition to other persons entitled to notice thereof). However, the Debtors are only seeking votes on the Plan from Creditors who are entitled to vote. Only those Creditors who have received a Ballot may vote to accept or reject the Plan. All Creditors and parties-in-interest may object to the confirmation of the Plan even if they do not necessarily vote on the Plan. Additionally, the Ballots of certain Creditors are marked so as to provide those Creditors with certain elections of the treatment of their Claims as provided for in the Plan.

With respect to voting on the Plan, pursuant to the Bankruptcy Code, only those Creditors holding Claims within impaired Classes under the Plan are entitled to vote. The purpose of this Disclosure Statement is to enable Creditors to make an informed decision in exercising their right to vote to accept or reject the Plan.

The Debtors have promulgated the Plan consistent with the provisions of the Bankruptcy Code. The Debtors believe that the Plan provides the best means for maximizing recovery to each of the Classes of Claims under the Plan, in the most expedient manner, and in light of the assets available for distribution to Creditors. The Debtors believe that the Plan enables affected Creditors to receive a distribution on account of their Claims that is substantially greater than what they would receive if the Bankruptcy Case was converted to a Chapter 7 liquidation and assets of the Debtors were liquidated within the parameters of Chapter 7 of the Bankruptcy Code.

This Disclosure Statement is not intended to replace careful review and analysis of the Plan. Rather, it is submitted as an aid and supplement in your review of the Plan, and attempts to explain the terms and implications of the Plan. Every effort has been made to fully explain the various aspects of the Plan as it may affect Creditors. All Persons receiving this Disclosure Statement are urged to review all of the provisions of the Plan, which is attached to the Disclosure Statement as Exhibit "A," in addition to reviewing the text of this Disclosure Statement. If you have any questions, you may contact the Debtors' counsel and every effort will be made to assist you. However, the Debtors' counsel will not provide you with any legal advice, and you are encouraged to seek the advice of separate legal counsel regarding the Plan, and your rights thereunder.

Creditors should read this Disclosure Statement in its entirety prior to voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. No other party has been authorized to utilize any information concerning the Debtors, their operations, and their assets and liabilities, other than the information contained in this Disclosure Statement, to solicit votes on the Plan. Creditors should not rely on any information relating to the Debtors, their operations, or their assets and liabilities, other than the information contained in this Disclosure Statement. However, you are entitled to rely on your own information, analyses, and opinions even if that information is not contained in this Disclosure Statement.

After carefully reviewing this Disclosure Statement and the Plan, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot (if you have been provided with one) and returning the same to the address set forth on the Ballot, in the enclosed return envelope, so that it will be received by the Balloting Agent no later than 5:00 p.m., Central Standard Time, on _____ __, 2011.

If you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim, you may be bound by the Plan if it is accepted by the requisite holders of Claims. See **Article V** of this Disclosure Statement for a discussion of voting procedures and requirements.

**TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 5:00 P.M., CENTRAL TIME, ON _____ ___, 2011**. For detailed voting instructions and the name and address of the person you may contact if you have questions, see **Article V** of this Disclosure Statement.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan on _____ __, 2011, at __:__ _.m., Central Standard Time. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before _____ __, 2011, in the manner described in **Article V.B** of this Disclosure Statement.

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

**THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO VOTE TO ACCEPT THE PLAN.**

**ARTICLE II.**
**OVERVIEW OF THE PLAN**

Parties are cautioned to read the Plan carefully in order to fully understand its terms. This section offers a summary of the Plan only, given in lay and non-technical terms, and is not to be construed as conclusive.

The Debtors own twenty-two (22) Hotels operating under a nationally recognized and well respected Wyndham Hotel Group brand. The Hotels are cash flow positive, and the Debtors were generally current on their trade, vendor, and other obligations prior to seeking relief under Chapter 11 of the Bankruptcy Code on the Petition Date. Moreover, the Debtors' industry and business is improving, and will continue to improve, and the Hotels are appreciating in value rapidly. However, the Debtors recognize that a controlled sale process of select Hotels, which preserves going-concern value, is necessary for an effective reorganization. If liquidated immediately and in entirety, the Debtors and their assets would fail to realize sufficient funds to pay most Creditors in full, while some Creditors would likely receive nothing, especially in light of the presently depressed market. Accordingly, the Debtors believe that by keeping the Hotels open and the Debtors in business, combined with a controlled sale process of the Hotels throughout the duration of the Plan, the Plan provides the best mechanism to optimize recoveries to all Creditors, since the Debtors will be able to use the revenues from the Hotels and sales proceeds to pay substantially higher recoveries to Creditors than would be available from an immediate liquidation of the Debtors.

The cornerstone of the Plan is an orderly sale by the Debtors of the Hotels over a period of four (4) years after the Effective Date, which sale process the Debtors will commence immediately (in other words, the Debtors will not wait until year 4 to sell the Hotels, but rather will have a phased sale process selling the Hotels throughout). In this way, the Debtors will avoid fireside sales, "flooding" the market, and the loss of value that would necessarily result from a lender or bank sale of collateral. The Debtors believe that they can sell the Hotels over four (4) years and generate enough sale proceeds to the pay the Lender in full, and leave funds available for other creditors. The Debtors' professional broker has confirmed this belief. Thus, the Plan is a "sales" plan under which the Debtors commit to sell the Hotels, and use the net proceeds to repay the Lender. Attached hereto as **Exhibit "B"** is the Debtors' summary of anticipated net sale proceed for sales of the Hotels during the life of the Plan.

In the meantime, the Debtors would pay the Lender interest under the Plan at 4.25% (in the event Class 4 is populated with a deficiency claim of the Lender, the deficiency claim would be paid interest at the Federal Postjudgment Interest Rate, which is substantially less). The Hotels will generate sufficient net operating income to make the interest payments to the Lender. However, to ensure the same, the Plan Funder has agreed to guarantee interest payments under the Plan to the Lender, and to provide an irrevocable letter of credit to the Lender to secure said guarantee.

As the Debtors sell Hotels, the Debtors' revenue will decrease. However, the Debtors and their professionals have carefully analyzed the situation, and they have determined that they can sell many of the Hotels in the first two years of the Plan without a material loss of net income, since most of the Hotels sold during the first two years would be Hotels will little to no net operating income. Thus, these Hotels can be used to repay principal with no loss

of net operating income, which would continue to be used to pay interest to the Lender, principal and interest for Secured Tax Claims, and ordinary operating expenses and future taxes. As the Debtors sell the better performing Hotels, mainly in years 3 and 4 under the Plan, the Debtors will have a decline of net operating income and therefore a reduced ability to pay interest to the Lender. However, by that time the Debtors will have repaid a significant amount of principal to the Lender, which would result in lower interest payments. The net operating income at all times will be sufficient to pay said interest, in light of reduced interest payments from lower principal. Furthermore, the Debtors will accumulate cash in the first two years of the Plan, which will remain with the Debtors to ensure full payment to the Lender. An additional benefit of this orderly sale process is that all of the Hotels are appreciating in value, and will continue to appreciate during the life of the Plan. The better performing Hotels will appreciate more rapidly in value. Therefore, by holding the better performing Hotels towards the second half of the term of the Plan, not only are the Debtors able to ensure sufficient net operating income to the pay the Lender and other claims, but the Debtors will be able to maximize the value of the Hotels for the benefit of everyone.

On the front end of the Plan, the Debtors would use the cash on hand (approximately $3 million on the Effective Date), and the additional $1 million of Plan Funding, to pay Administrative Claims, Priority Claims, Cure Claims, and 50% of Class 6 Unsecured Claims (with the balance paid at the conclusion of the sale process). FFC and the Guarantors subordinate their claims, if any, under the Plan to provide additional benefit to non-insider creditors. The $1 million in Plan Funding and the subordination of claims would not be possible outside the Plan.

The Plan Funder is an insider of the Debtors (it is presently being formed in the State of Delaware). It will loan the Debtors $1 million and will guarantee the interest to the Lender on a deeply subordinated basis, meaning that it will not be repaid for its Plan Funding and its Interest Guarantee unless and until all other creditors are paid in full.

Thus, under the Plan all Claims, except potentially Class 7 Subordinated Claims, are paid in full, with interest, within four (4) years of the Effective Date, with many such claims paid in full or in large part shortly after the Effective Date. The benefits of the Plan to all creditors are therefore obvious, especially for Unsecured Creditors: only as a going concern, with the Hotels open for business, together with the sales of Hotels during the four (4) year term of the Plan, do the Debtors generate any income while preserving going-concern value and thus any ability to repay their unsecured obligations to their Creditors in full; conversely, a liquidation of the Debtors will likely result in no recovery for the vast majority of Creditors. The Plan therefore represents the best mechanism to obtain the best and promptest return to all Creditors, especially unsecured Creditors.

Accordingly, the Debtors strongly encourage all Creditors entitled to vote on the Plan to accept the Plan by voting their Ballots in favor of the Plan.

# ARTICLE III.
## SUMMARY OF TREATMENT UNDER THE PLAN

### A.   CLASSES AND DISTRIBUTIONS

As noted above, the assets of the Debtors and the Estates, including the Hotels, are transferred under the Plan to the Reorganized Debtors.  The Reorganized Debtors are obligated and liable to make all payments required by the Plan.  The Plan separates Claims against the Debtors, the Estates, and their property into unclassified Claims and classified Claims.

Unclassified Claims are generally postpetition Claims which must be paid in full and which do not vote on the Plan, and consist of Administrative Claims, including Professional Claims and Cure Claims.

Classified Claims and Interests are classified in the Plan under the provisions of section 1122 of the Bankruptcy Code into the following eight (8) separate Classes:

(1)    Allowed Priority Claims;
(2)    Secured Tax Claims;
(3)    Lender Secured Claim;
(4)    Conditional Lender Deficiency Claim;
(5)    Franchisor Claim;
(6)    General Unsecured Claim;
(7)    Subordinated Claims; and
(8)    Equity Interests.

The chart below graphically demonstrates the classification and treatment of classified and unclassified Claims under the Plan.  In preparing and submitting this chart, the Debtors make clear the following considerations:

- The chart is an estimate only, based on reasonable assumptions, but as an estimate it is subject to change and uncertainty based on future events.

- The deadlines for filing prepetition Claims (except for Claims of Governmental Units) have expired, and the Debtors do not expect any late-filed Unsecured Claims or their allowance.  However, the possibility remains that a prepetition Creditor may attempt to file and recover on a late-filed Unsecured Claim, which, if Allowed, could change the Debtors' ability to fund the Plan.

- The chart is calculated on the basis of Claims that the Debtors believe may be Allowed.  The Debtors contemplate that they will object to various Claims, as they have already, and the Debtors' discussion of the Claims that may potentially be allowed is without prejudice to all such objections.

- The Debtors' ability to fund the Plan is based on available cash, proceeds from the sale of the Hotels, the Plan Funding, and their future business

operations (as well as other potential and contingent sources). Although the Debtors have successfully operated their Hotels since 2007, future business operations and cash flow, like any future endeavor, is subject to risk.

| Category[1] | Class | Impaired | Estimated Claims in Category | Estimated Recovery |
|---|---|---|---|---|
| Administrative Claims | Unclassified | no | $1 million[2] | 100% |
| Allowed Priority Claims | 1 | no | $40,046.82 | 100% |
| Secured Tax Claims | 2 | yes | $850,000.00[3] | 100% |
| Lender Secured Claim | 3 | yes | $75 million (or $55 million)[4] | 100% |
| Conditional Lender Deficiency Claim | 4 | yes | $15 million (conditional)[5] | 100% |
| Franchisor Claim | 5 | yes | unknown[6] | 100% |
| General Unsecured Claims | 6 | yes | $1,550,000[7] | 100% (50% up front and 50% at end of plan) |
| Subordinated Claims | 7 | yes | unknown | 100% |
| Equity Interests[8] | 8 | yes | | retained |

1. Claims listed in this column refer to Allowed Claims.

2. The Debtors believe that all postpetition obligations are current, and that Administrative Claims will consist of the Professional Claims of their counsel, their ordinary course professionals, their broker, their appraiser, and their expert advisor. The other significant category of Administrative Claims consists of Cure Claims, including to the Franchisors, Janus, and Interstate, the amount of which will depend on any potential settlement between the Debtors and the Franchisors or, absent the same, the Bankruptcy Court's adjudication of that claim. The Debtors' counsel (Munsch Hardt Kopf & Harr, P.C.), Jeffer Mangels Butler & Mitchell LLP (an ordinary course professional), their appraiser, and their expert advisor continue to hold retainers. The amount listed in this column includes estimated present and future Professional Claims, less amounts already paid and less the above-mentioned retainers and amounts previously paid.

3. The Debtors asserted various challenges to their *ad valorem* property taxes prior to the Petition Date and they intend to assert additional challenges, including objections to claims, both prior to and after the confirmation of the Plan. Furthermore, the Debtors will resort to section 505 of the Bankruptcy Code to contest assessments and taxes. All of this will require time. The amount listed in this column for Class 2 represents the amount of Secured Tax Claims that the Debtors believe will be ultimately asserted, but does not take into account objections to such taxes and the Debtors' challenges thereto.

4. The size of the Lender Secured Claim will depend on several issues, including the Debtors' objections to the Lender Claim and the valuation of the Lender's secured claim if the Bankruptcy Court rejects the Debtors' valuation of such claim as a fully secured claim, in which case the Lender Claim will be bifurcated and the Secured Lender Claim will be the secured claim as valued by the Bankruptcy Court. In all events, however, the Lender Claim and the Lender Secured Claim will remain subject to the Debtors' objections thereto, which will be transferred under the Plan to the Reorganized Debtors.

5.     The Lender's Class 4 Claim is conditional, in that the Class will be populated only if the Bankruptcy Court rejects the valuation of the Lender Secured Claim as a fully secured claim.  In such an event, the size of the Lender Class 4 Claim will be the amount of the Lender Claim that is Allowed, less the size of the Lender Secured Claim as valued by the Bankruptcy Court.

6.     The Franchisors have asserted prepetition Claims in excess of $930,000.  If the Debtors were to move to assume all of the Franchise Agreements, the Debtors would have to pay this amount, if Allowed, in addition to potential other amounts, as a Cure Claim in order to assume the Franchise Agreements.  The Debtors may not be willing or able to do so, which may affect the Debtors' ultimate decision to assume or reject, or defer any decision on the same, all or some of the Franchise Agreements.  For this reason, the Debtors and the Franchisors have commenced negotiations which, if successful, would result in concessions by the Franchisors to the Debtors in exchange for the benefits of the Plan and the assumption of the Franchise Agreements.  If these negotiations do not succeed, then Class 5 will not be populated and the Franchisors will have their Claims as Class 6 Claim, subject to allowance as otherwise appropriate.

7.     Many of the Claims in this Class relate to Executory Contracts that will be assumed under the Plan, and that will accordingly be treated as Administrative Claims and Cure Claims.  The amount of Class 6 Claims that the Debtors believe will be allowed and will not constitute Cure Claims is approximately $450,000.00.

8.     Although holders of equity interests are retaining their interests under the Plan, the Plan prohibits any distributions or dividends to equity holders unless and until all Claims and Classes under the Plan are paid in full, with interest.

## B.     PLAN FUNDING

Under the Plan, the Debtors will be reorganized and are referred to as the "Reorganized Debtors."  The Reorganized Debtors are responsible for making payments under the Plan.  All property of the Debtors and the Estates will vest in the Reorganized Debtors; thus, the Reorganized Debtors will have the funds and the ability to make all payments and distributions required by the Plan.

The Plan will be funded through five principal sources: (i) sales of the Hotels; (ii) cash on hand; (iii) the Plan Funding; (iv) revenue from future operations of the Hotels; and (v) the Interest Guarantee.

With respect to cash on hand, the Debtors estimate that they will hold approximately $3 million as of the Effective Date.  The Lender has alleged that the Debtors' cash is the Lender's Cash Collateral, which allegation the Debtors have contested in the Adversary Proceeding.  If the Debtors' cash is the Lender's Cash Collateral, the Debtors will be permitted to use it under the Plan, except that the size of the Lender Secured Claim, if bifurcated, will increase, and the Debtors will have to repay the Lender in full, with interest, for the use of its Cash Collateral.

In addition, the Plan Funding is a deeply subordinated loan of $1 million from insiders of the Debtors, which the Debtors and Reorganized Debtors will use to ensure that they have sufficient funds to pay Administrative Claims, amortization and interest for Secured Tax Claims, Priority Claims, 50% of Allowed Unsecured Claims, working capital, the FFE Reserve, and all other requirements of the Plan.  The Plan Funding would not be repaid in any amount unless and until all Claims in Classes 1 through 6 are paid in full, with interest.

As noted throughout this Disclosure Statement, the centerpiece of the Plan is a four-year sale process that the Reorganized Debtors will undertake in order to sell all of their Hotels.  As

evidenced by Exhibit "B" attached to this Disclosure Statement, the Debtors believe that the proceeds of these sales will be sufficient to pay the Lender Secured Claim (and the Class 4 Lender Claim, if populated) in full, even after closing costs and brokerage fees are taken into account. Moreover, as the Reorganized Debtors close sales and use the net sales proceeds to pay down debt to the Lender, the interest payments required by the Plan to the Lender will decrease.

With respect to the Debtors' Hotels and revenue, not all of the Hotels generate net operating income. However, on a combined basis, the Hotels do generate significant net operating income. These funds will be used primarily to make interest payments to the Lender, as well as principal and interest payments on Secured Tax Claims. Furthermore, after payment of the same as well as ordinary operating expenses and future taxes, the Debtors should build cash with operating income remaining after payment of these various obligations. As the Reorganized Debtors sell the Hotels, their net operating income will decrease. However, and with some exceptions, the Debtors intend to first sell underperforming Hotels with no net operating income or very little net operating income, meaning that the first two years of sales of the Hotels will not have a material impact on net operating income. Thereafter, as the Debtors start losing material net operating income with sales of better performing Hotels, the Debtors' principal obligations to the Lender will have been reduced from prior sales and payments, thereby lowering the interest payable to the Lender. Thus, even though net operating income will drop, the amounts payable from the same will also drop. In the event of any deficiency, the cash that will be accumulated as discussed above, and the Interest Guarantee, will be used to ensure payment of the Debtors' obligations to the Lender (and other Plan Classes).

In addition to these direct sources of funding, the Lender has alleged that the Guarantors are liable to the Lender for amounts in excess of $20 million on account of the Lender's loan to the Debtors. The Guarantors have denied this liability and have asserted defenses and counterclaims against the Lender, all of which remain pending. However, the Guarantors are holding assets in excess of $17 million meaning that, if the Lender succeeds on its claims against the Guarantors and collects, the Reorganized Debtors should receive a credit for any such recovery. This would reduce the Reorganized Debtors' obligations to the Lender under the Plan, which would represent an indirect source of funding, and would make more assets available for distribution to other creditors.

Finally, the Estates have other assets that may be used to fund the Plan. These assets include the Avoidance Actions, potential tax refunds stemming from section 505 and other proceedings, and the claims against the Lender in the Adversary Proceeding. Because the viability and value of these assets is uncertain and contingent, the Plan is not dependant on the assets for its execution and the Debtors have not undertaken a thorough review of the potential value of these assets. To the extent that any of these assets are monetized and realized, the benefits will flow to the creditors under the Plan prior to any return to insiders or to equity holder.

C.    SUBSTANTIVE CONSOLIDATION

Under the Plan, the Debtors and the Estates are substantively consolidated into the Consolidated Estate. What this essentially means is that the Debtors are merged for purposes of making payments under the Plan, meaning that each Reorganized Debtor effectively guarantees

the obligation of each other Reorganized Debtor, and the Debtors pool their assets into one Consolidated Estate to pay all claims against all the Debtors. Furthermore, all inter-company claims between the Debtors are released as an effect of substantive consolidation. However, any property of any of the Debtors and the Estates that is subject to a lien remains subject to that lien after consolidation, such that the lien must be paid before the asset may be used for any other obligation, but only to the extent that the lien actually survives the confirmation of the Plan.

The Debtors believe that substantive consolidation is appropriate in this Bankruptcy Case, and that it will benefit unsecured creditors, for multiple reasons, including the Lender Claim which applies to all of the Debtors, and the efficiencies to be realized from one source of payment of Claims. However, as a result of substantive consolidation, it may be that the Debtors' claims against the Lender for fraudulent transfer will be lost since, even if the Debtors succeed in avoiding certain obligations to the Lender in that the benefit received by each Debtor was not reasonably equivalent to the amount of debt secured, the Lender will nevertheless have a full claim against each Debtor anyway as a result of substantive consolidation. The Debtors believe that this loss is worth the benefits of substantive consolidation, and it will avoid substantial fees and expenses to the Debtors and to the Lender to try the Debtors' fraudulent transfer claims.

## D.    DISCHARGE

If the Plan is confirmed by the Bankruptcy Court, the Debtors will receive a discharge under Chapter 11 of the Bankruptcy Code. As part of that discharge, the Bankruptcy Code automatically imposes certain injunctions, which generally prohibit a Creditor from pursuing or collecting on a discharged Claim as against the Reorganized Debtors or their property, except as provided for in the Plan. All Creditors would be able to pursue Claims and seek recovery only under the terms of the Plan, and not against the Reorganized Debtors or their property except as provided for in the Plan. Collection activities on account of discharged Claims could constitute serious violations of the law and could subject the violator to serious penalties, including contempt, money damages, and punitive damages.

> **THE PLAN CONTAINS PERMANENT INJUNCTIONS THAT MAY PREVENT YOU FROM SEEKING TO ASSERT OR COLLECT YOUR CLAIM EXCEPT THROUGH THE PLAN. YOUR RIGHTS MAY BE SEVERELY IMPACTED. STUDY THE PLAN CLOSELY AND CONSIDER CONSULTING WITH LEGAL COUNSEL REGARDING THE PLAN AND YOUR RIGHTS AND LIMITATIONS THEREUNDER.**

Separate and apart from the discharge of the Debtors, the Plan contains injunctions and exculpation provisions which the Debtors believe are standard and necessary for the confirmation of the Plan and the Debtors' future operations. These injunctions and exculpation provisions do not impact any personal, non-derivative Claim that a Creditor has against a non-Debtor party. However, to the extent that a Creditor holds a derivative Claim or a Claim that is otherwise property of the Estates, the future prosecution of those Claims may be barred or enjoined. No Claim that the Estates may have, or that Creditors may derivatively assert, arising from gross negligence or intentional wrongdoing is enjoined or prohibited.

### E.    CLASS TREATMENT UNDER THE PLAN

Treatment of a Claim under the Plan depends on the Class under the Plan that the Claim is classified under.  What follows below is a summary of the treatments under the Plan of the various Classes created under the Plan.  The following is a summary only, and the Plan controls in all events.  Thus, close reference to the Plan is required to fully understand any Class's treatment under the Plan.

#### 1.    Unclassified Claims

Administrative Claim Applications and Deadline.  Holders of Administrative Claims, including Professional Claims and Cure Claims, other than (a) Allowed Administrative Claims as of the Effective Date, (b) Administrative Claims that represent liabilities incurred on or after the Petition Date, but prior to the Effective Date, in the ordinary course of the Debtors' business which may be paid in the ordinary course of the Debtors' business without order of the Bankruptcy Court and (c) Administrative Claims that constitute fees or charges assessed against the Estates under Chapter 123, Title 28, United States Code, must by no later than the Administrative Claims Bar Date: (i) file an application with the Bankruptcy Court for allowance of the Administrative Claim; and (ii) serve a copy of such application on the Debtors and/or Reorganized Debtors, counsel for the Debtors and/or Reorganized Debtors, the United States Trustee, and all other parties otherwise entitled to notice thereof.  Failure to file and serve such application by the Administrative Claims Bar Date shall result in the Administrative Claim being forever barred and discharged.  Except as specifically provided in the Plan, nothing in the Plan alters the law applicable to, and governing, the allowance of Administrative Claims (including Professional Claims) under the Bankruptcy Code.

Treatment of Allowed Administrative Claims.  Unless previously paid, each holder of an Allowed Administrative Claim, including a Professional Claim and Cure Claim, shall receive in full satisfaction, release and discharge of, and in exchange for such Allowed Administrative Claim, from the Reorganized Debtors, jointly and severally: (i) the amount of such Allowed Administrative Claim, in cash, and without interest, attorney's fees (except as Allowed by the Bankruptcy Court), or costs, on the earlier of: (a) ten (10) Business Days after the Effective Date; or (b) the date that is ten (10) Business Days after such Administrative Claim becomes an Allowed Administrative Claim; or (ii) such other treatment as may be agreed upon in writing by the holder of such Claim and the Debtors or the Reorganized Debtors, as applicable; *provided*, *however*, that Allowed Administrative Claims that represent liabilities incurred on or after the Petition Date, but prior to the Effective Date, in the ordinary course of the Debtors' businesses which may be paid in the ordinary course of the Debtors' businesses without order of the Bankruptcy Court, shall be paid by the Debtors and/or the Reorganized Debtors, as appropriate, in accordance with the agreements related thereto, and subject to the Debtors' and/or the Reorganized Debtors', as appropriate, right to contest the allowance or payment of same.

Treatment of Professional Claims.  Professional Claims become Allowed the same as Administrative Claims referenced in section 3.1 of the Plan, and are treated the same as Administrative Claims referenced in section 3.2 of the Plan, except that: (i) a Professional Claim that has been previously Allowed on a final (not interim) basis by Final Order of the Bankruptcy Court is not subject to the requirement for filing an application as provided for in section 3.1 of the Plan; (ii) a Professional Claim that has been Allowed on an interim basis (not final) in whole

or in part shall, with respect to being Allowed on a final basis, be subject to the filing of an application for its allowance as provided for in section 3.1 of the Plan and shall be subject to such law, rules, and procedures as would be otherwise applicable to the same outside of the Plan; (iii) a Professional Claim that has been previously Allowed and paid on a final basis by Final Order of the Bankruptcy Court, but subject to disgorgement in the event of administrative insolvency, shall cease being subject to said disgorgement ten (10) days after the Administrative Claims Bar Date unless, upon motion and notice, the Bankruptcy Court extends such period; (iv) any interim payments on account of a Professional Claim shall be credited against the payment of the final Allowed amount of such Professional Claim; and (v) any retainer provided on account of a Professional Claim may be credited and applied against the payment of the final Allowed amount of such Professional Claim once such Professional Claim is Allowed.

## 2.  Classified Claims

Class 1:  Allowed Priority Claims. Each Allowed Priority Claim shall be paid in full satisfaction, release and discharge of and in exchange for such Allowed Priority Claim by the Reorganized Debtors: (i) the amount of such Allowed Priority Claim, in cash, and without interest, attorney's fees, or costs, on the earlier of: (a) ten (10) Business Days after the Effective Date if by then Allowed or ten (10) Business Days after the Claims Objection Deadline if no objection thereto is timely filed; or (b) the date that is ten (10) Business Days after such Priority Claim becomes an Allowed Priority Claim; or (ii) such other treatment as may be agreed upon in writing by the holder of such Claim and the Debtors or the Reorganized Debtors, as applicable.

Class 2: Secured Tax Claims.  Each Secured Tax Claim, to the extent allowed, will be paid in full at the closing of each sale of the Hotels.  Interest would continue to accrue at the applicable non-bankruptcy rate, and each Secured Tax Claim would continue to be secured by applicable liens.  In the meantime, the Debtors would make principal payments on Allowed Secured Tax Claims based on a four (4) year amortization.  The Reorganized Debtors would make quarterly payments on Secured Tax Claims of such principal and interest until the time of payment in full.

Class 3: Lender Secured Claim.  The Plan treats the Lender Claim as fully secured, to the extent it will be allowed by the Bankruptcy Court.  Even if the Bankruptcy Court allows the full Lender Claim, it will be deemed fully secured.  However, if the Lender contests this valuation and the Bankruptcy Court disagrees with the Debtors, then the amount of the Lender Secured Claim would be $55 million or such other valuation as the Bankruptcy Court orders, and the balance of the Lender Claim, to the extent allowed, would be in Class 4.  The Lender Secured Claim would be repaid in full, within four (4) years, from the proceeds of the Debtors' sales of the Hotels, with all net proceeds thereof being paid to the Lender.  The Debtors would pay the Lender interest at the rate of 4.25% each month during said four (4) years, recalculated based on principal payments.  Furthermore, the Debtors would be able to sell a Hotel only if set amount of minimum proceeds is paid to the Lender at the closing of the sale.  The Lender would retain all of its liens against property of the Debtors and the Estates, with the same validity, extent, and priority as otherwise exists.  Furthermore, the Plan retains all of the Lender's credit bid rights, and the Lender would be able to credit bid its Lender Secured Claim against any sale by the Debtors of the Hotels, in which case the Debtors would sell the Hotel to the Lender in exchange for credit in the amount of the sale against the Lender Secured Claim.

Class 4: Conditional Lender Deficiency Claim.  Class 4 would be populated only if the Bankruptcy Court rejects the Debtors' valuation of the Lender Secured Claim, in which case the Class 4 Claim would be an Unsecured Claim in the amount of the Lender Claim, as Allowed, less the Lender Secured Claim, as Allowed.  The Debtors would pay the Class 4 Claim in full within four (4) years, with interest at the Federal Postjudgment Interest Rate (presently approximately .2%).  The principal amount of the Class 4 Claim would be repaid from sales of the Hotels, after the Lender Secured Claim is paid in full (this is because, even if the Bankruptcy Court values the Lender Secured Claim at less than the Allowed amount thereof, the sale of the Hotels will yield sufficient net proceeds to pay the Class 4 Claim in full.  Thus, the repayment of the principal of the Class 4 Claim would be the same mechanism as the repayment of the Class 3 Lender Secured Claim, after the Lender Secured Claim is paid in full, and the Lender would be deemed to have a lien in any Hotel remaining after payment of the Lender Secured Claim, together with related credit bidding rights and all other protections provided for Class 3 (except as specifically otherwise provided).

Class 5: Franchisor Claim.  The Debtors and the Franchisor have commenced negotiations geared towards a possible resolution of outstanding issues remaining between them, including: (i) the allowance of the Franchisors' claims against the Debtors; (ii) the assumption of the Franchise Agreements; and (iii) the treatment of the Franchisor under the Plan.  If such negotiations result in a settlement, the Debtors shall promptly amend the Plan or file a plan supplement containing any such settlement.  If such negotiations do not result in a settlement by the hearing on the approval of the Disclosure Statement, the claims of the Franchisors against the Debtors shall be included in Class 6 as otherwise appropriate.  If Class 5 is populated, it shall be impaired under the Plan.

Class 6: General Unsecured Claims.  General Unsecured Claims, unless they are converted to Cure Claims with the confirmation of the Plan, are repaid in two parts.  The first part, consisting of 50% of the Allowed amount of each Class 6 Claim, is paid in cash shortly after the Effective Date.  The remaining 50% bears interest at the Federal Postjudgment Interest Rate, and is paid in cash once the Class 3 Lender Secured Claim is paid in full and once the Class 4 Claim, if populated, is paid in full.

Class 7: Subordinated Claims.  FFC has voluntarily subordinated its prepetition claim (but not any Administrative Claim it holds) under the Plan.  Furthermore, to the extent that the Guarantors have a claim against the Debtors, they have agreed to subordinate that claim as well under the Plan.  This means that Class 7 Subordinated Claims will not receive any payment unless and until all other Claims (including the Claims of the Plan Funder) are paid in full.  The Debtors believe that, even absent any recovery by the Lender from the Guarantors, sufficient funds will remain after payment of all other Claims to make a distribution to Class 7 Claims, although the amount of such funds would result in only a fraction of the Claims in Class 7.

Class 8: Equity Interests.  Class 8 shall retain its equity interests under the Plan.  However, the Plan provides that there shall be no distribution or dividend paid to any holder of Class 8 Equity Interests unless and until all payments required by the Plan to be made to any Creditor and any Class are paid in full.

**F.**    **ASSUMPTION OF EXECUTORY CONTRACTS**

Article VI of the Plan provides for the assumption of all Executory Contracts of the Debtors and the Estates, unless the Debtors reject an Executory Contract prior to the Effective Date. This specifically includes the assumption of the Franchise Agreements with the Franchisors, the Hotel Management Agreements with Interstate and Janus, the FFC Agreements with FFC, and the Wisconsin Lease (defined herein below). As a condition of assuming an Executory Contract, the Bankruptcy Code requires the Debtors to pay the counterparty to the contract all defaults under the Executory Contract prior to and after the Petition Date, referred to as a Cure Claim. A Cure Claim is an Administrative Claim that must be paid in full. Accordingly, the Plan contains the various Cure Claims to be paid shortly after the Effective Date to the Franchisor, Interstate, Janus, and FFC, as well as a mechanism for these parties to contest such Cure Claims. Any other counterparty to an Executory Contract being assumed under the Plan must, no later than the Administrative Claims Bar Date, or in the context of the confirmation of the Plan, assert an alleged Cure Claim payable by the Debtors and Reorganized Debtors for the assumption of the Executory Contract.

**G.**    **GUARANTORS**

The Plan in no way prejudices any right that the Lender has against the Guarantors, or any right that the Guarantors have against the Lender. The Lender has sued the Guarantors, and the Guarantors have asserted defenses and counterclaims against the Lender. In the event that the Lender recovers from the Guarantors or the Guarantors make payments to the Lender, the Debtors believe that they will be entitled to a credit against their obligations to the Lender under the Plan. Under the Plan, if Class 4 is populated, any such recovery is first applied to the Debtors' Class 4 obligations, and then to the Debtors' Class 3 obligations. While this would not result in any different payments to creditors under the Plan, it would increase the likelihood that the second half of Class 6 payments will be made and that funds will remain for payment on Class 7 Subordinated Claims.

# ARTICLE IV.
## VOTING PROCEDURES AND REQUIREMENTS

### A.     VOTING DEADLINE

Each Creditor holding a Claim which entitles the Creditor to vote on the Plan has been provided a Ballot along with this Disclosure Statement.  If a Creditor holds Claims in more than one Class entitled to vote under the Plan, such Creditor has been provided a separate Ballot for each such Class.  The Ballot is to be used by the Creditor to accept or reject the Plan and to make any elections which are available to the Creditor as indicated by the Ballot.

To ensure that a Ballot is deemed timely and considered by the Balloting Agent, which shall be the Debtors' attorneys, Munsch Hardt Kopf & Harr, P.C., c/o Davor Rukavina, a Creditor must: (a) carefully review the Ballot and the instructions set forth thereon; (b) provide all of the information requested on the Ballot; (c) sign the Ballot; and (d) return the completed and signed Ballot to the Balloting Agent by the Voting Deadline.  By order of the Bankruptcy Court, the "Voting Deadline" is 5:00 p.m. (Central Standard Time), on ____ __, 2011.  Therefore, in order for a Ballot to be counted for voting purposes and any applicable election, the completed and signed Ballot must be received at the address specified below by no later than the Voting Deadline:

**DEADLINE**:  Must Be **Received** By 5:00 p.m., Central Time,
on _____ __, 2011

**Addressed To:**
Munsch Hardt Kopf & Harr, P.C.
Attn: Davor Rukavina
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201
Facsimile: (214) 978-5359

### B.     CREDITORS SOLICITED TO VOTE

Each Creditor holding a Claim in a Class which is impaired under the Plan is being solicited to vote on the Plan.  As to any Claim for which a proof of claim was filed and as to which an objection has been lodged, however, if such objection is still pending as of the Voting Deadline, the Creditor's vote associated with such Claim will not be counted to the extent of the objection to the Claim, unless and to the extent that the Bankruptcy Court temporarily allows the Claim upon motion by such Creditor in an amount which the Bankruptcy Court deems proper for the purpose of voting on the Plan.  Such motion must be heard and determined by the Bankruptcy Court prior to the date and time established by the Bankruptcy Court for determination of confirmation of the Plan.  In addition, a Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection of the Plan was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## C.      DEFINITION OF IMPAIRMENT

Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims is impaired under a plan <u>unless</u>, with respect to each Claim of such Class, the Plan does one of the following:

1.      leaves unaltered the legal, equitable, and contractual rights to which such Claim entitles the holder of such Claim; or

2.      notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default:

   (a)      cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code;

   (b)      reinstates the maturity of such Claim as it existed before the default;

   (c)      compensates the holder of such Claim for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

   (d)      does not otherwise alter the legal, equitable, or contractual rights to which such claim entitles the holder of such Claim.

## D.      CLASSES IMPAIRED UNDER THE PLAN

Unclassified Claims and Class 1 Claims are not impaired and are therefore deemed to have accepted the Plan without the necessity of voting.  All other Classes (including Claims in Class 4 to the extent Class 4 is populated) are impaired under the Plan and are entitled to vote on the Plan to the extent that a Claim in such Class is not the subject of a pending objection as to allowance, or the holder of any such objected-to Claim has obtained an order from the Bankruptcy Court permitting such holder to vote on the Plan.  Ballots for the acceptance or rejection of the Plan shall be mailed to holders of such impaired Classes only and to holders of such Claims within such Classes only.  Class 7 at present consists only of Insider Claims and, accordingly, the vote of Class 7 would not count for purposes of confirming the Plan on cramdown.  Class 8 is impaired.  However, because Class 8 consists of Insiders, the vote of Class 8 would not count for cramdown purposes.  Because both Class 7 and Class 8 support the Plan, they are deemed to have voted for the Plan without the necessity and expense of actual voting.

## E.      VOTE REQUIRED FOR CLASS ACCEPTANCE

Pursuant to the Bankruptcy Code, a Class of Claims under the Plan shall be deemed to have accepted the Plan if the Plan is accepted by Creditors holding at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims within such Class who are entitled to vote and who actually vote using a properly completed and signed Ballot which is returned to the Balloting Agent by no later than the Voting Deadline.

## F.     VOTING IS ON A COMBINED BASIS

Given the substantive consolidation of the Debtors under the Plan, the Plan shall treat the votes of Classes under the Plan as combined and consolidated for purposes of confirmation of the Plan, meaning that Classes will not vote separately on the Plan on a Debtor-by-Debtor basis but will instead vote on a consolidated basis.  If the Bankruptcy Court rejects this treatment, the Debtors will nevertheless handle the voting on the Plan in such a manner so as to enable the Bankruptcy Court and all interested persons to ascertain the results of voting on a Debtor-by-Debtor basis.  In such a case, the Plan must be accepted separately for each Debtor or otherwise confirmed by the Bankruptcy Court for each Debtor. For the avoidance of doubt, if the Plan is accepted or confirmed for five of the Debtors, but not the sixth, then the Plan will not become effective for any of the Debtors.  Notwithstanding the potential separate voting on the Plan, the Plan provides for unified distributions and for a single satisfaction of Claims, meaning that Creditors will not be able to aggregate Plan treatment and distributions so as to recover more than a single satisfaction of their otherwise Allowed Claims.


## ARTICLE V.
## CONFIRMATION OF THE PLAN

## A.     OVERVIEW OF CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Pursuant to Chapter 11, a debtor-in-possession attempts to reorganize its business for the benefit of the debtor, its creditors, and other parties in interest.  The present Bankruptcy Case commenced with the filing of voluntary Chapter 11 petition by the Debtors on the Petition Dates.   The commencement of a Chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the petition is filed.  Thus, the Estates exist as the Bankruptcy Code estates of the Debtors and their property (and liabilities).  Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession" unless the bankruptcy court orders the appointment of a trustee.  In the present Bankruptcy Case, the Debtors have remained in possession of their property and have continued to operate their businesses as debtors-in-possession.

The filing of a Chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code.  Section 362 of the Bankruptcy Code provides, *inter alia*, for an automatic stay of all attempts to collect prepetition claims from the debtor or otherwise interfere with its property or business.  Except as otherwise ordered by the Bankruptcy Court, the automatic stay remains in full force and effect until the Effective Date of a confirmed plan of reorganization.

The formulation of a plan of reorganization is the principal purpose of a Chapter 11 case. The Plan sets forth the means for satisfying the Claims against the Debtors.  The purpose of this Disclosure Statement is to assist Creditors voting on the Plan with respect to their decision whether to accept (vote for) the Plan, or to reject (vote against) the Plan.  Voting on the Plan is separate from objecting to the Plan by filed document in the Bankruptcy Court.

**B.** **CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) provides that any party in interest may object to confirmation of the Plan. The Confirmation Hearing has been scheduled for _____, 2011 at __:__ .m. in the United States Bankruptcy Court, Courtroom of The Honorable Brenda T. Rhoades.

Any objection to confirmation of the Plan must made in writing, and such written objection must be filed with the Bankruptcy Court and served on each of the following parties by no later than **5:00 p.m. Central Standard Time on _____, 2011**:

Debtors:  
BPP Texas, LLC, *et al.*  
Attn: General Counsel  
625 Liberty Avenue, Suite 3110  
Pittsburg, Pennsylvania 15222

Counsel for the Debtors:  
Munsch Hardt Kopf & Harr, P.C.  
Attn: Davor Rukavina  
3800 Lincoln Plaza  
500 N. Akard Street  
Dallas, Texas 75201-6659

United States Trustee:  
Office of the United States Trustee  
Attn: Timothy W. O'Neal  
110 N. College Ave.  
Suite 300  
Tyler, Texas 75702

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND SHALL BE DEEMED WAIVED.**

**C.** **MODIFICATION OF THE PLAN**

Section 1127 of the Bankruptcy Code generally permits the Debtors to modify the Plan before or after the Confirmation Hearing, assuming that certain requirements are satisfied. The Debtors reserve their right to submit modifications of the Plan, as may be deemed advisable by the Debtors, and under the provisions of section 1127 of the Bankruptcy Code.

**D.** **REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements of section 1129 of the Bankruptcy Code have been satisfied, and in the event that they have been and all other conditions to confirmation set forth in the Plan itself have been met, the Bankruptcy Court will enter an order confirming the Plan. The requirements of section 1129 generally are as follows:

1. The Plan complies with the applicable provisions of the Bankruptcy Code.

2. The Debtors comply with the applicable provisions of the Bankruptcy Code.

3.     The Plan has been proposed in good faith and not by any means forbidden by law.

4.     Any payment made or to be made by the Debtors, by the Reorganized Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Bankruptcy Case, or in connection with the Plan and incident to the Bankruptcy Case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5.     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Creditors and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Reorganized Debtors, and the nature of any compensation of such insider.

6.     Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtors has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.  The Debtors do not believe this requirement is applicable to the Bankruptcy Case.

7.     With respect to each impaired Class of Claims: (a) each holder of a Claim of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date; or (b) if section 1111(b)(2) of the Bankruptcy Code applies to the Claims of such Class, each holder of a Claim of such Class will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such holder's interest in the Estates' interests in the property that secures such Claims.

8.     With respect to each Class of Claims: (a) such Class has accepted the Plan; or (b) such Class is not impaired under the Plan.

9.     Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides: (a) that with respect to a Claim of a kind specified in section 507(a)(1) or 507(a)(2) of the Bankruptcy Code, on the Effective Date of the Plan, the holder of such Claim will receive on account of such Claim cash equal to the Allowed amount of such Claim; (b) that with respect to a Class of Claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a Claim of such Class will receive (i) if such Class has accepted the Plan, deferred cash payment of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim, or (ii) if such Class has not accepted the Plan, cash on the Effective Date of the Plan equal to the Allowed amount of such Claim; and (c) with respect to a Claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such Claim will receive on account of such Claim deferred cash payments, over a period not exceeding four (4) years after the date of assessment of such

Claim, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim.

10.     If a Class of Claims is impaired under the Plan, at least one Class of Claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider.

11.     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

12.     All fees payable under section 1930 of Title 28 (United States Code), as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

13.     The Plan provides for the continuation after its Effective Date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.  The Debtors do not believe this requirement is applicable to the Bankruptcy Case.

There are various other provisions governing the confirmation of the Plan which, on their face, the Debtors do not believe applicable (and are related instead to the confirmation of an individual person's Chapter 11 plan).

If a sufficient number of Creditors and amounts of Claims in the impaired Classes under the Plan vote to accept the Plan, the Debtors believe that the Bankruptcy Court will approve confirmation of the Plan and that the Plan will satisfy all of the applicable statutory requirements of section 1129 of the Bankruptcy Code.

E.     CRAMDOWN

The Bankruptcy Court may confirm the Plan at the request of the Debtors if: (a) all of the requirements of section 1129(a) of the Bankruptcy Code are met, with the exception of section 1129(a)(8); (b) at least one Class of Claims that is impaired under the Plan has accepted the Plan (excluding the votes of Insiders); and (c) as to each impaired Class that has not accepted the Plan, the Plan does not "discriminate unfairly" and is "fair and equitable."

A Chapter 11 plan does not "discriminate unfairly" within the meaning of the Bankruptcy Code if the classification of claims under a plan complies with the Bankruptcy Code and no particular class will receive more than it is legally entitled to receive for its claims.  The Debtors believe that the classifications established under the Plan are proper and that no Class of Claims under the Plan is receiving more than it is legally entitled to receive for its Claims.  "Fair and equitable," on the other hand, has different meanings for Secured and Unsecured Claims.

With respect to a Class of Secured Claims which rejects the Plan, to be "fair and equitable" the Plan must, among other things, either: (a) provide that the holders of such Secured

Claims retain their liens securing such Claims, whether the property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claims, and that each holder of a Secured Claim in such Class receive on account of such Claim deferred cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date of the Plan, of at least the value of such holder's interest in the Estates' interest in such property; or (b) provide for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such Secured Claims, free and clear of such liens, with such liens to attaching to the proceeds of such sale, and the treatment of such liens on such proceeds in accordance with the Bankruptcy Code; or (c) provide for the realization by the holders of such Secured Claims of the indubitable equivalent of such Claims. The Debtors believe that the Plan is fair and equitable to each Class of Secured Claims under the Plan.

With respect to a Class of Unsecured Claims which rejects the Plan, to be "fair and equitable" the Plan must, among other things, either: (a) provide that each holder of an Unsecured Claim in such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim; or (b) not allow the holder of any Claim that is junior to the Unsecured Claims of such Class to receive or retain any property under the Plan on account of such junior Claim; *i.e.* not permit any holder of any equity interest in the Debtors to retain anything under the Plan on account of such interest.

In the event that at least one impaired Class of Claims under the Plan accepts the Plan and one or more Classes of impaired Claims rejects the Plan, the Debtors will seek confirmation of the Plan under the cramdown provisions of section 1129(b) of the Bankruptcy Code. In such event, the Bankruptcy Court will determine, at the Confirmation Hearing, whether the Plan is fair and equitable and whether it does or does not discriminate unfairly against any rejecting impaired Class of Claims.

If the Lender rejects the Plan, the Debtors believe that the payment of the Lender's Secured Claim is fair and equitable within the meaning of the Bankruptcy Code. Specifically, the Plan provides for the retention of the Lender's liens and credit bidding rights, and repayment to the Lender in full within four (4) years at a rate of interest of 4.25% (for the Lender Secured Claim).

## F.     EFFECTIVE DATE OF THE PLAN

The Plan will become effective upon the occurrence of the Effective Date, which is defined in the Plan as the first Business Day fourteen (14) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least fourteen (14) days after the Confirmation Date, and upon which the conditions to the effectiveness of the Plan set forth in Article XI of the Plan are satisfied. Pursuant to the provisions of the Plan, the Debtors will transmit notice of the effectiveness of the Plan if the Bankruptcy Court confirms the Plan and all conditions precedent to the Plan's effectiveness are satisfied. Said notice will additionally specify various other Plan deadlines that are triggered by the Effective Date of the Plan.

# ARTICLE VI.
## DEBTORS' BACKGROUND INFORMATION

## A.    THE DEBTORS AND THEIR BUSINESS

The Debtors own and operate twenty-two (22) Hotels, located in Texas, Illinois, Iowa, Michigan, Minnesota, and Wisconsin.  Each of the Hotels underwent significant renovations in 2008 and now operates under a nationally recognized and well respected Wyndham Hotel Group brand.  The Debtors also own the real property where the Hotels are located, as well as the franchise rights to the Hotels and some personal property, primarily in the form of furniture, fixtures, and equipment ("FFE").

The Hotels were acquired by the Debtors in part with the funds of the Lender's loan, with the intention by the Debtors to rebrand the Hotels with a national brand, impose professional management and oversight, link the Hotels to a national reservation system and rewards program, and ultimately to sell the Hotels after these improvements for a profit, which the Debtors estimated would take between three to five years.  The Hotels were particularly suitable for this business plan because they were previously owned by the same company and because they are inside corridor hotels, meaning that the entrances to the rooms are from interior hallways – particularly valuable in the mid-West winters (where most of the hotels are located) and in light of safety and security concerns.

Almost since the Debtors first purchased the Hotels, the Debtors' assets have been managed by FFC, which is an insider and affiliate of the Debtors.  Interstate and Janus, hotel management companies with extensive hotel management experience, each manage the day-to-day operations of eleven (11) of the Hotels for the Debtors – an arrangement that is ordinary in the industry and done for multiple purposes, including the limitation of liability, sharing of overhead, and expertise.  Interstate and Janus do so pursuant to nine (9) Hotel Management Agreements.  Since Interstate and Janus operate the day-to-day operations of the Hotels, the vast majority of on-site employees at the Hotels, which total over 300 workers, are technically employees of Interstate and Janus.  The Hotels operate as part of the Wyndham franchise, pursuant to the Franchise Agreements between the Debtors and the Franchisor.

The Hotels are budget hotel properties and, in addition to rents derived from the renting of rooms, the Debtors generate revenue from other activities and services.  Such other activities and services include food and beverage, meeting room rentals, phone and internet, and guest laundry.  Regardless of how the revenue is derived, revenue from the Hotels is deposited into operating accounts.  Interstate and Janus use funds held in the operating accounts to pay the Debtors' operating expenses and most of the Debtors' other obligations, including obligations owed to the Franchisor under the Franchise Agreements and to Interstate and Janus pursuant to the Hotel Management Agreements.  Excess funds from the operating accounts are then transferred to the Debtors' ownership accounts on a monthly basis and stored in their DIP accounts unless distributed.

Budget Portfolio Properties, LLC ("Budget Properties") is the sole and managing member of each of the Debtors.  Budget Portfolio Investors, LLC ("Budget Investors") is the managing member of Budget Properties.

**B.    CAPITAL STRUCTURE**

As of the Petition Date, the Debtors had one primary source of capital funding, in addition to the equity contributed by the holders of the Debtors' present equity interests. Specifically, on February 8, 2008, the Debtors entered into a Credit Agreement with the Lender in the original principal amount of $66,000,000.00. Interest under the Credit Agreement accrued per annum at LIBOR plus 165 basis points. The Credit Agreement is allegedly secured by mortgages, assignments of rents, and security agreements, granting liens and security interests against the Debtors' real and personal property, including FFE. On January 30, 2008, the Debtors entered into an ISDA Master Agreement (the "Swap Agreement"), which provided a hedge to the interest paid by the Debtors under the Credit Agreement. The Credit Agreement, the Swap Agreement, the underlying deeds of trusts and security instruments, and other Loan Documents are the basis of the Lender's Claim.

**C.    RECEIVERSHIP PROCEEDINGS**

Beginning in late 2008, with the national recession, hotels and budget hotels of the type owned by the Debtors were hit particularly hard and suffered large losses of clients and revenue. Even worse for budget hotels, select service hotels and even some full service hotels drastically lowered their prices, and clients either stayed at these more luxurious hotels for a small increase in rate or budget hotels were forced to lower their rates even lower. Many budget hotels across the country closed during this period.

The Debtors, however, did all they could to service their obligations to the Lender. The Debtors remained current to the Lender through 2008 and through 2009, but the length of the recession meant that the Debtors could no longer continue to service their obligations to the Lender. Thus, commencing in March, 2010, the Debtors stopped making their debt service payments to the Lender (while the Debtors could have continued doing so under their promissory note, the Swap Agreement led to interest charges substantially higher than interest under the promissory note).

Together with decreases in revenue, the Hotels lost significant value. Whereas at the time of the acquisition the Hotels were professionally appraised at $99 million in value, recent appraisals of the Hotels have been between $45 million and $53 million. The reduced value, together with various lender requirements concerning loan-to-value ratios and debt service coverage ratios, left the Debtors unable to refinance their obligations to the Lender as those obligations approached maturity.

Accordingly, beginning in early 2010, the Debtors approached the Lender to negotiate concessions from the Lender, primarily in the maturity of the Debtors' obligations. While the Debtors were optimistic concerning these negotiations in the beginning, and believed that they had secured a forbearance from the Lender, ultimately the Lender refused to restructure the Debtors' obligations on terms that were acceptable to the Debtors and to the Guarantors. Worse, the Lender retained a purported hotel expert to assess the Debtors' performance, which expert arrived at conclusions negative to and critical of the Debtors, which the Debtors believe worsened their relationship with the Lender. The Lender denies that it at any time granted any

forbearance to the Debtors, and these allegations and issues – concerning the Debtors' claims and defenses against the Lender and the expert, T.R. Engel – are now the subject of the Adversary Proceeding.

Even though the Debtors were able to resume debt service payments to the Lender in October, 2010, and rather than negotiate a consensual out-of-court restructuring of the Debtors' obligations, the Lender filed an emergency petition in Allegheny County, Pennsylvania in October 2010, requesting the appointment of a receiver over the Hotels and the seizure of the Debtors' operating cash. The caption of the suit is *Citizens Bank of Pennsylvania vs. BPP Illinois, LLC, et al.*. The case number is GD 10-18621 in the Court of Common Pleas of Allegheny County, Pennsylvania. The Lender also sued the Guarantors. This litigation was scheduled for trial in early 2011, which was stayed upon the Petition Date.

The Debtors filed this Bankruptcy Case on December 21, 2010 to prevent the potential appointment of a receiver and the foreclosure of the Hotels, which would have destroyed the Debtors' going-concern value and businesses and seriously threatened the termination of the Debtors' franchise rights under the Franchise Agreements.

## D. OBLIGATIONS TO THE FRANCHISORS

Just as the Debtors were unable to service their obligations to the Lender, the Debtors were forced to delay payment to the Franchisors of their royalties. The Franchisors worked with the Debtors and ultimately the parties agreed to a settlement agreement that provided for, among other things, the repayment by the Debtors of their obligations to the Franchisors through two (2) future payments, and a period of reduced royalty payments to the Franchisors. While the Debtors had every intention of making the payments required by this settlement agreement, with the filing of the Bankruptcy Case the Debtors were prohibited from making payments on prepetition debt without authority from the Bankruptcy Court, and were thus unable to make the payments to the Franchisors under the settlement agreement. The Franchisors have filed proofs of claim in the Bankruptcy Case asserting prepetition claims in excess of $930,000.

## E. CORPORATE RESOLUTIONS PRIOR TO BANKRUPTCY

In early October 2010, Budget Portfolio, the sole member of the Debtors, through its managing member, Budget Investors, consented to the adoption of several resolutions (the "Resolutions"), including, but not limited to, the appointment of Fred L. Branovan as President of the Debtors and the conveyance to Mr. Branovan of full authority to manage the Debtors. The Resolutions also provided Mr. Branovan and other officers of the Debtors, such as the Debtors' Vice President, Tom LaVelle, authority to take whatever acts and action as they deemed necessary and advisable on behalf of the Debtors, including the commencement of the Bankruptcy Case.

# ARTICLE VII.
## SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE

## A.     FIRST DAY PLEADINGS AND HEARING

Upon the filing of the Bankruptcy Case, it was critical to the Debtors that they smoothly transition into bankruptcy and operate their businesses in Chapter 11 in compliance with all of the requirements thereof. Accordingly, the Debtors filed multiple so called "first day" pleadings to ensure this purpose. Among other things, the Debtors filed motions requesting the following: (i) the joint administration of the Bankruptcy Case; (ii) procedures to ensure the provision of adequate assurance to utility companies, for the purpose of ensuring that the utility companies would not be permitted to terminate the Debtors' services; (iii) authority to pay the prepetition wages of employees at the Hotels; (iv) authority to retain their prepetition bank accounts for limited purposes; (v) authority to continue using their centralized cash management system; (vi) authority to use Cash Collateral on an interim basis; and (vii) authority to pay sales, use, and occupancy taxes. The Bankruptcy Court granted these motions. Additionally, the Debtors filed their schedules of assets and liabilities, and their statements of financial affairs, which are available for review on the docket of the Bankruptcy Case.

## B.     USE OF CASH COLLATERAL ON A FINAL BASIS

On January 19, 2011, the Bankruptcy Court held a hearing on the Debtors' motion, which requested that the Bankruptcy Court authorize the Debtors' use of Cash Collateral in which the Lender claimed perfected interests on a final basis. On February 15, 2011, the Bankruptcy Court entered an order authorizing the Debtors' use of cash collateral until and through May 31, 2011; provided, however, that, among other things: (i) the Debtors make monthly payments to the Lender (beginning in February) in the aggregate amount of $100,000.00 until May 31, 2011; (ii) the Debtors' use of cash collateral was generally limited to line item expenditures set forth in the budget attached to the order as Exhibit "A"; (iii) the cash collateral remain segregated from the Debtors' other funds; (iv) the Lender be provided with adequate protection in the form of valid, perfected replacement security interests in, and liens and mortgages upon, all of the Debtors' postpetition collateral, to the extent of any diminution in value of its prepetition collateral; and (v) the Lender receive an allowed priority claim under section 507(b) of the Bankruptcy Code to the extent adequate protection proves insufficient in protecting the Lender against diminution of its interest in collateral.

The Debtors do not believe that the Lender has perfected security interests in all or most of the Cash Collateral, and they have requested judgments to this effect in the Adversary Proceeding. The Lender argues that it does have perfected interests in Cash Collateral, and that all of the Debtors' funds constitute the Lender's Cash Collateral. This issue remains unresolved as of the service of this Disclosure Statement.

## C.     RETENTION OF AND PAYMENTS TO MUNSCH HARDT

On the Petition Date, the Debtors filed an application to retain Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt") as their general bankruptcy counsel. By order entered January 21, 2011, the Bankruptcy Court authorized the Debtors to retain Munsch Hardt on a final basis, effective as of the Petition Date, and for the compensation of Munsch Hardt pursuant to interim

and final fee applications to be filed by Munsch Hardt. Prior to the Petition Date, Munsch Hardt received retainers aggregating $475,000.00, of which $206,916.43 was drawn down on for prepetition restructuring, work-out, and bankruptcy preparation services. As of the Petition Date, $268,083.57 remains in retainer, which Munsch Hardt will continue to hold and will not apply without authority from the Court.

## D.  COURT ORDERED PAYMENTS TO THE LENDER

Shortly after the Petition Date, the Lender filed a motion requesting relief from the automatic stay so that it could pursue certain state law remedies against the Debtors and to foreclose its liens against the Hotels, which would have essentially ended the Debtors' Bankruptcy Case. On April 8, 2011, the Bankruptcy Court held a final hearing on the Lender's motion and denied the relief sought therein. The Bankruptcy Court did, however, order that BPP Minnesota, LLC and BPP Michigan, LLC make monthly payments in the amount of $9,620.00 and $8,015.00, respectively, under 11 U.S.C. § 362(d)(3)(B) so long as the automatic stay remains in place. As of the date of this Disclosure Statement, the Debtors have made timely payments to the Lender in compliance with the Bankruptcy Court's order. The Bankruptcy Court left open the issue of how these monthly payments would ultimately be applied by the Lender and against the Debtors' obligations. Under the Plan, however, these payments are applied to the principal amounts owing the Lender.

## E.  RETENTION OF OTHER PROFESSIONALS

Throughout the duration of the Bankruptcy Case, the Debtors filed applications to employ professionals (in addition to Munsch Hardt) pursuant to section 327 of the Bankruptcy Code. Such professionals include: (i) Asset Management and Advisors Division of M&R Valuation Services, Inc. ("HVS"), the Debtors' expert advisor; (ii) U.S. Hotel Appraisals, the Debtors' appraiser; (iii) Hunter Realty Associates, Inc., the Debtors' hotel broker; (iv) Seyfarth Shaw LLP, a law firm employed by the Debtors to contest property taxes, primarily in Illinois; (v) Shuttleworth & Ingersoll, P.L.C., a law firm employed by the Debtors to contest property taxes, primarily in Iowa; and (vi) Jeffer Mangels Butler & Mitchell LLP, a law firm employed by the Debtors to assist with ADA-related claims and compliance issues. The services for the Debtors and the Estates performed by each professional are non-duplicative and distinct and will provide a material benefit to the Debtors and the Estates. Accordingly, the Bankruptcy Court has approved each professional's employment.

## F.  INCREASE IN HOTEL REVENUES

During the pendency of the Bankruptcy Case, the overall revenues of the Debtors have increased significantly. Such increase is due to Debtors' continued efforts to maximize the Hotels' revenues. For the quarter ending March 31, 2011, for example, on average each of the Hotels have experienced a 3.08% increase in revenue per available room ("RevPar") over and above any increase in RevPar experienced by their competition. During the pendency of the Bankruptcy Case, revenue has increased almost 10% over 2010 numbers, and total net monthly income of the Debtors have increased by approximately 359%. Altogether, the Debtors' increased operating performance has resulted in the Debtors increasing their cash position by over $500,000.00 since the Petition Date, while still remaining current on their postpetition obligations and despite the monthly payments to the Lender ordered by the Bankruptcy Court.

## G.    EXTENSION OF EXCLUSIVITY AND LEASE ASSUMPTION DEADLINE

Pursuant to section 1121(b) of the Bankruptcy Code, the Debtors' exclusive period to file a Chapter 11 plan of reorganization in the Bankruptcy Case expired on April 20, 2011. Accordingly, on March 17, 2011, the Debtors filed a motion for an extension of this period, requesting that the Bankruptcy Court extend the April 20, 2011 deadline to July 19, 2011. The Lender opposed the Debtors' requested extension. Ultimately, the Bankruptcy Court ordered that the April 20, 2010 deadline be extended to May 15, 2011; and, if the Debtors filed a plan on or before May 15, 2011, such deadline would be extended through to and including July 27, 2011, such that only the Debtors may file and solicit a Chapter 11 plan during such periods.

Pursuant to section 365(d)(4)(A) of the Bankruptcy Code, BPP Wisconsin, LLC's period to assume its unexpired lease of nonresidential real property (as amended or supplemented, the "Wisconsin Lease"), located at 115 N. Mayfair Road, Wauwatosa, Wisconsin 53226, expired on April 20, 2011. Therefore, on March 17, 2011, the Debtors filed a motion for an extension of this period, requesting that the Bankruptcy Court extend the April 20, 2011 deadline to July 19, 2011. On April 14, 2011, the Court granted the Debtors' motion, thereby extending the deadline for BPP Wisconsin, LLC to assume the Wisconsin Lease from April 20, 2011 to and including July 19, 2011.

## H.    THE ADVERSARY PROCEEDING

On April 7, 2011, the Debtors commenced an adversary proceeding against the Lender and T.R. Engle Group, LLC (collectively, the "Defendants") in the Bankruptcy Court, styled *BPP Texas, LLC, et al. v. Citizens Bank of Pennsylvania and T.R. Engle Group, LLC* and assigned adversary proceeding number 11-04070 (the "Adversary Proceeding"). While the Adversary Proceeding is still in its infancy, and thus neither the Disclosure Statement nor the Plan incorporate the relief sought therein in terms of treatment of Creditors, the Debtors seek the following relief in the Adversary Proceeding: (i) declaratory judgment that the Lender lacks a perfected lien or interest in the Hotels' room rentals, revenue, and cash collateral; (ii) the avoidance of the Debtors' obligations under the Loan Documents, and their resulting transfer of property to secure the same, as constructively fraudulent transfers; (iii) the recovery, for the benefit of the Estates, of all transfers avoided; (iv) the recession of the Swap Agreement; (v) a money judgment against the Lender for breach of contract; (vi) a money judgment against the Lender for tortious interference with contract and prospective contract; (vii) a money judgment against the Defendants, jointly and severally, for civil conspiracy; (viii) a money judgment against TR Engel Group, LLC for tortious interference with contract and prospective contract; (ix) punitive damages against the Defendants; (x) the disallowance of the Lender's Claims; and (xi) reimbursement for reasonable attorney's fees and court costs.

## I.    MEDIATION

Given the multiple issues of dispute between the Debtors and the Lender, the importance of the Lender to the Plan, and the Lender's announced opposition to any plan, the Debtors and the Lender agreed to mediate their disputes with Harold B. Murphy serving as mediator. Mr. Murphy is a shareholder with the law firm of Murphy & King, P.C. and has substantial experience in bankruptcy law and Chapter 11 plan confirmation issues. The parties conducted the mediation in person on April 19, 2011, which failed to result in settlement.

# ARTICLE VIII.
## LIQUIDATION ANALYSIS AND PLAN ALTERNATIVES

### A.    LIQUIDATION ANALYSIS

As a condition to confirmation of a plan, section 1129(a)(7)(A)(ii) of the Bankruptcy Code requires that each impaired class of Claims must receive or retain at least the amount of value it would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. This is frequently referred to as the "best interests" test. The Debtors present this liquidation analysis to demonstrate to their Creditors that the liquidation of the Debtors will result in substantially lower returns for all Creditors.

The Debtors' primary assets are their twenty-two (22) Hotels. Upon a liquidation, the Debtors' businesses at the Hotels will cease, the Debtors will generate no revenue, and the Hotels will "go dark." The Debtors' contracts would have no value. The Debtors' future revenue and ability to repay debt would become zero. This would reduce the value of the Hotels to substantially less than the Hotels are worth if the Debtors continue as a going concern. Furthermore, tax claims and costs of disposition of the Debtors' real property and personal property assets will reduce the liquidation value of the Debtors' assets and will add a layer of expense on top of the Debtors' assets.

The chart below graphically demonstrates the estimated and anticipated results of a liquidation of the Debtors. The Debtors note that this estimation is by definition uncertain. The Debtors and their agents set forth below what their best, educated, and good-faith analysis of the same would be. The Debtors also advise Creditors of the following factors, all affecting their liquidation analysis.

(i)     In the event of liquidation, the Debtors' real and personal property (primarily FFE) would result in proceeds of approximately $30,000,000.00. This would be before substantial costs for taxes, insurance, maintenance, brokers, and other costs of disposition of the Debtors' assets, which would amount to more than $2,000,000.00. These proceeds would be paid to the Lender, and could not be used to satisfy other Creditors. However, the Lender would still be left with a large deficiency claim, allegedly in excess of $40,000,000.00. This large deficiency claim would be added to the body of Unsecured Creditors, thereby diluting any potential recovery to them.

(ii)    In a Chapter 7 case, Chapter 7 administrative claims must be paid in full prior to any other claims being paid. This would mean that the administrative claims of the Chapter 7 trustee and his counsel (and accountant) would have to be paid in full, to the extent allowed by the Bankruptcy Court. Next, unpaid Chapter 11 administrative claims would have to be paid in full before any distribution to Priority Claims and Unsecured Claims. As a result, and depending on the amount of Chapter 7 administrative claims, it is unlikely that Chapter 11 administrative claims would be paid in full, and it is unlikely that Unsecured Claims would be paid anything.

(iii)    In a Chapter 7 case, the trustee would be able to seek a surcharge against the Lender's collateral, unless the trustee abandons that collateral.  Such surcharge claim is difficult to analyze because of the potential for abandonment and because of other factors, including the fact that the Debtors' Hotels would be closed and whether the Lender's collateral, consisting of cash, is fixed as of the Petition Date or can increase thereafter.  Thus, it is exceedingly difficult to estimate how much of the Debtors' present cash holdings would be ordered turned over to the Lender, and how much would be retained for the Chapter 7 estates.

(iv)    In a Chapter 7 case, the Debtors' franchise agreements with the Franchisors would be rejected.  It is unclear whether the Franchisors would be able to assert claims for substantial rejection damages, as an Unsecured Claim, on account of such rejection and, if so, what the damages would be.

(v)    Given the Lender's allegations that all of the Debtors' assets are its collateral, it is a real potential that any Chapter 7 trustee would determine to not administer the Estates and to instead abandon the Debtors' physical assets.  While a trustee may determine to litigate the Debtors' claims against the Lender, without cash or a source to fund such litigation, the Debtors do not believe it realistically likely that the trustee would continue to prosecute those claims.

| DEBTORS' LIQUIDATION ANALYSIS | |
|---|---|
| Cash on Hand | $3,000,000.00 |
| Hotels | $30,000,000.00 |
| Franchise Rights | $0.00 |
| Other Assets | <$1,000,000.00 |
| **Total Assets for Distribution** | **$34,000,000.00** |
| Costs of Disposition (including brokerage and one year of taxes) | [$2,400,000.00] |
| Prepetition *Ad Valorem* Taxes | [$850,000.00] |
| Net Proceeds to Lender | [$30,750,000.00] |
| Chapter 7 Trustee's Commission | [$100,000.00] |
| Chapter 7 Costs of Administration | [$300,000.00] |
| Unpaid Chapter 11 Costs of Administration (excluding ordinary course) | [$500,000.00] |
| Priority Claims | [$40,000.00] |
| **Available for Unsecured Claims** | **$0,000.00** |
| Unsecured Claims (including Lender Deficiency Claim) | $41,500,000.00 |
| **Percent Distribution to Unsecured Creditors** | **0%** |

Thus, in a liquidation, the Lender would receive substantially less than under the Plan, Chapter 11 Administrative Claims may not be paid in full, Priority Claims may not be paid in full as under the Plan, and Unsecured Creditors – who will recover 100% under the Plan – would recover substantially less, if anything, than under the Plan.  Especially if the Lender succeeds on its argument that all cash is the Lender's Cash Collateral, it is unlikely that any distribution would be made to Chapter 11 Administrative Claims, Priority Claims, and Unsecured Claims.  Even if the cash is not the Lender's Cash Collateral and any of the cash remains for unsecured creditors, the recovery, including the Lender's deficiency claim, would be less than 5%.

The Debtors therefore believe that confirmation of the Plan represents the highest and best return to all Creditors, and Unsecured Creditors in particular. Moreover, under the Plan, distributions to many Creditors are made shortly after the Effective Date. In a Chapter 7 case, there would likely be no distribution for a period of 1 to 2 years after conversion of the Bankruptcy Case, and potential substantially longer depending on the trustee's actions. Furthermore, when the Debtors emerge from Chapter 11, significant administrative costs for US Trustee fees and professional fees will cease, thereby further improving their finances and cash flow.

## B.    ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Debtors have evaluated several alternatives to the Plan, including the liquidation of the Debtors. After studying these alternatives, the Debtors concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims, assuming confirmation of the Plan. As noted, liquidating the Debtors will result in substantially lower recoveries for all Creditors, including the Lender. The Plan will also enable the Debtors to continue operations and fund full payments to their creditors, for the benefit of all creditors and interest holders. The following discussion provides a summary of the Debtor's analysis leading to its conclusion that the Plan will provide the highest value to holders of Claims.

## C.    LIQUIDATION ALTERNATIVE THROUGH CHAPTER 7

The Debtors have analyzed whether a Chapter 7 liquidation of the assets of the Debtors would be in the best interest of holders of Claims. That analysis reflects a liquidation value that is materially lower than the value that may be realized through the Plan, as noted graphically above. The Debtors believe that liquidation would result in substantial diminution in the value to be realized by holders of Unsecured Claims because:

(i)     the failure to realize the greater going-concern value of the Debtors' assets;

(ii)    additional administrative expenses involved in the appointment of a trustee or trustees, attorneys, accountants, and other professionals to assist such trustee(s) in the case of a Chapter 7 proceeding;

(iii)   the Lender will have a large deficiency claim of approximately $40 million, thereby increasing the body of unsecured claims, even as the assets available to pay the same are substantially decreased;

(iv)    rejection damages claims, including by the Franchisors, would further increase the body of Unsecured Claims by a significant amount; and

(v)     the substantial time which would elapse before Creditors would receive any distribution in respect of their Claims.

Consequently, the Debtors believe that the Plan provides a substantially greater return to holders of Claims than would liquidation through Chapter 7, and much sooner in time.

**D.  ALTERNATIVE IF PLAN IS NOT CONFIRMED**

If the Plan is not confirmed, the Debtors or any other party in interest in the Chapter 11 Case could attempt to formulate and propose a different plan or plans of reorganization.  Such plans might involve either a reorganization and continuation of the Debtors' business, a liquidation of the Debtors' assets, or a combination thereof.  Further, if no plan of reorganization can be confirmed, the Bankruptcy Case may be converted to liquidation proceedings under Chapter 7 of the Bankruptcy Code.  In a Chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtors. The proceeds of the liquidation would be distributed to the creditors of the Debtors in accordance with the priorities established by the Bankruptcy Code.  The chart above graphically demonstrates what the Debtors believe would be the distribution in such an event.

**E.  FUTURE PROJECTIONS**

For all of these and other reasons, the Debtors believe that continuing their businesses and reorganizing is much preferable to the alternatives and is in the best interests of all constituents, including primarily of unsecured creditors.  The Debtors have internally analyzed their anticipated future financial performance and business operations, and believe that they will be able to fund and pay all obligations required by the Plan, including all future operational expenses, taxes, and other ongoing obligations.  Attached to this Disclosure Statement as **Exhibit "C"** are the Debtors' projections for their future operations and financial performance, assuming the retention of all the Hotels.  However, given that the Debtors will promptly commence selling the Hotels after the Effective Date, the Debtors' projections are not to be considered projections of their ability to fund the Plan.  Rather, they are offered merely to better inform creditors of the viability of the Debtors' business under *present* conditions.

# ARTICLE IX.
## RISK FACTORS

## A.     ESTIMATED RECOVERY RISKS

The Plan will be funded through multiple sources.  The Plan will initially be funded by cash on hand at confirmation, including from the Plan Funding, which cash will be used towards Administrative Claims, Professional Claims, Priority Claims, part of the Secured Tax Claims, and various other claims under the Plan.  Since the cash needed to pay the same will be on deposit with the Debtors in order for the Plan to become effective, there is little risk in these payments being made in full.  Additionally, the Debtors will have the cash to make the first 50% payment to Class 6 Unsecured Creditors.  Thus, there is minimal risk that these up-front payments will not be made.

With respect to Claims to be paid out over time, the Plan Funder will guarantee the Plan interest payable to the Lender and will put up a letter of credit to secure the same.  Thus, even if the Hotels do not generate sufficient net operating income to pay interest to the Lender in full, in light of the guarantee there is minimal risk for the payment of said interest.

With respect to principal payments to the Lender from the sales of the Hotels, the Debtors do not believe that there is material risk as to their ability to promptly sell the Hotels.  However, whether the Debtors are able to realize the proceeds for the Hotels that they and their advisors believe they will is subject to not insignificant risk.  Hotels like the Debtors' are typically traded on a multiple of trailing 12 months of gross revenue.  The multiple is presently depressed, and the trailing 12 month of gross revenue is still suffering from the first half of 2010 revenue.  While both of these measurements will increase, in particular revenue, they may not increase as expected.  Furthermore, many purchasers of the Hotels look to loans from the Small Business Administration to fund their acquisitions, which may be affected by governmental decisions.  Issues such as gas prices affect budget hotels and tourists who travel by car, while continued or renewed economic recession may again lead to more luxurious hotels lowering their prices, thereby driving down the Debtors' revenue.

All of these are risks, but they are ones that the Debtors and their advisors have considered in formulating their opinion that the Debtors can repay their Plan obligations from sales of the Hotels.  Furthermore, if the Lender was to take possession of the Hotels immediately in lieu of the Plan, the Lender would face the same potential difficulties in maximizing sales prices due to unforeseen circumstances.  Thus, while there is risk, the risk is no greater – and it is probably less – to the Lender than if the Lender takes possession of the Hotels.  Moreover, the Debtors' chosen brand (or flag) is strong, nationally recognized, stable, and very well known.  That brand is expected to continue leading the Debtors' market segment, which will serve to mitigate the risk of future sales, especially if buyers of the Hotels are able to acquire the Debtors' franchise rights.

With respect to those Claims that can only be paid after the Lender is paid in full, there is greater risk.  This is primarily for the second 50% payment to Class 6 Unsecured Claims, because the Debtors cannot pay this second half unless and until the Lender is paid in full, with interest.  While the Debtors believe that sufficient cash will remain after the sale of the Hotels, including from operations and the FFE Reserve, to make these payments, the fact that the Lender must first be paid in full necessarily increases the risk for Unsecured Creditors.

Thus, for these and other reasons, the Debtors believe that they will be able to pay in full all obligations under the Plan and, while they advise affected Creditors of the risk of future payment, they encourage those creditors to consider the Debtors' projections, their expertise, the expertise and opinions of the Debtors' professionals, and the other factors discussed above.

## B.    BANKRUPTCY RISKS

Insufficient Acceptances.  For the Plan to be confirmed, each impaired Class of Claims is given the opportunity to vote to accept or reject the Plan.  With regard to such impaired voting Classes, the Plan will be deemed accepted by a Class of impaired Claims if the Plan is accepted by Claimants of such Class actually voting on the Plan who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Allowed Claims of the Class voted. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes.  The Debtors reserve the right to request confirmation pursuant to the cramdown provisions in section 1129(b) of the Bankruptcy Code, which will allow confirmation of the Plan regardless of the fact that a particular Class of Claims has not accepted the Plan.  However, there can be no assurance that any impaired Class of Claims under the Plan will accept the Plan or that the Debtors would be able to use the Cramdown provisions of the Bankruptcy Code for confirmation of the Plan.

Confirmation Risks.  The following specific risks exist with respect to confirmation of the Plan:

(a)    Any objection to confirmation of the Plan can either prevent confirmation of the Plan, or delay such confirmation for a significant period of time.

(b)    Since the Debtors may be seeking to obtain approval of the Plan over the rejection of one or more impaired Classes of Claims, the cramdown process could delay confirmation.

(c)    The Plan may be accepted and confirmed as to one or more of the Debtors, but not for all of the Debtors, in which case the Plan will not be effective for any of the Debtors, as the Plan must be confirmed for all four Debtors in order to become effective.

Conditions Precedent.  Confirmation of the Plan and occurrence of the Effective Date are subject to certain conditions precedent that may not occur.  The Debtors, however, will work diligently with all parties in interest to ensure that all conditions precedent are satisfied.

## ARTICLE X.
## CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN

**THE PLAN AND ITS RELATED TAX CONSEQUENCES ARE COMPLEX. THERE ALSO MAY BE STATE, LOCAL OR OTHER TAX CONSIDERATIONS APPLICABLE TO EACH CREDITOR. CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND OTHER TAX LAWS. NOTHING IN THIS DISCLOSURE STATEMENT OR IN THE PLAN IS MEANT TO PROVIDE ANY TAX ADVICE TO ANY CREDITOR.**

## ARTICLE XI.
## CONCLUSION

The Debtors urge holders of Claims in impaired Classes to vote to **ACCEPT** the Plan and to evidence such acceptance by returning their ballots so that they will be received on or before 5:00 p.m., Central Standard Time, on _____ ___, 2011.

**DATED: MAY 15, 2011.**

**MUNSCH HARDT KOPF & HARR, P.C.**

By: _/s/ Davor Rukavina_____
    Joseph Wielebinski, Esq.
    Texas Bar No. 21432400
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Zachery Annable, Esq.
    Texas Bar No. 24053075
    Jonathan L. Howell, Esq.
    Texas Bar No. 24053668
    3800 Lincoln Plaza
    500 N. Akard Street
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375

**ATTORNEYS FOR THE DEBTORS-IN-POSSESSION**