UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **BPP TEXAS, LLC,** *et al.,* | § | Case No. 10-44378 |
| | § | (Jointly Administered) |
| Debtors[1] | § | Judge Rhoades |
| | § | |
| | § | Chapter 11 |
| | § | |

**OBJECTION OF CITIZENS BANK OF PENNSYLVANIA
TO CONFIRMATION OF DEBTORS' SECOND AMENDED PLAN**

---

[1]   The "Debtors," together with each Debtor's federal tax identification number, are: BPP Texas, LLC (26-1653379); BPP Wisconsin, LLC (26-1653455); BPP Illinois, LLC (26-1652706); BPP Iowa, LLC (26-1653122); BPP Michigan, LLC (26-1653204); and BPP Minnesota, LLC (26-1653304).   The service address for all Debtors is: c/o FFC Capital Corporation, 625 Liberty Avenue, Suite 3110, Pittsburgh, PA 15222.

# TABLE OF AUTHORITIES

FEDERAL CASES

*Bradford v. Crozier (In re Laymon)*,
958 F.2d. 72 (5th Cir. 1992) ................................................................. 15

*Consolidated Rock Prods. Co. v. DuBois*,
312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941) ................................. 13, 14

*Feld v. Zale Corp. (In re Zale Corp.)*,
62 F.3d 746 (5th Cir.1995) ....................................................................... 31

*Good v. RMR Investments, Inc.*,
428 B.R. 249 (E.D. Tex. 2010) ................................................................ 23

*Heartland Fed. Savings & Loan Assoc. v. Briscoe Enters., Ltd., II*
*(In re Briscoe Enters., Ltd., II)*,
994 F.2d 1160 (5th Cir.1993) .................................................................. 23

*In re BearingPoint, Inc.*,
No. 09-10691, 2009 WL 7906745 (Bankr. S.D.N.Y. Dec. 22, 2009) ............. 33

*In re Bernhard Steiner Pianos USA, Inc.*,
292 B.R. 109 (Bankr. N.D. Tex. 2002) ..................................................... 31

*In re Best Prods. Co.*,
168 B.R. 35 (Bankr. S.D.N.Y. 1991) ........................................................ 33

*In re Boston Generating, LLC*,
440 B.R. 302 (Bankr. S.D.N.Y. 2010) ...................................................... 19

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) ...................................................... 22

*In re Coltex Loop Central Three Partners, L.P.*,
138 F.3d 39 (2d Cir. 1998)......................................................................... 9

*In re Consul Restaurant Corp.*,
146 B.R. 979 (Bankr. Minn. 1992) ........................................................... 41

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ......................................................... 15

*In re Credit Indus. Corp.*,
366 F.2d 402 (2d Cir. 1966)...................................................................... 33

*In re D&F Constr., Inc.*,
865 F.2d 673 (5th Cir. 1989) ............................................................. 40, 42

*In re Deep River Warehouse*,
2005 WL 2319201 .................................................................................... 25

*In re Dow Corning Corp.*,
244 B.R. 678 (Bankr. E.D. Mich. 1999) ........................................ 12, 13, 15

*In re Dow Corning Corp.*,
    456 F.3d 668 (6th Cir. 2006) ........................................................................... 15

*In re EFH Grove Tower Assoc.*,
    105 B.R. 310 (Bankr. E.D.N.C. 1989) .......................................................... 41

*In re Ernst*,
    45 B.R. 700 (Bankr. D. Minn. 1985) ............................................................. 40

*In re Gen. Homes Corp.*,
    134 B.R. 853 (Bankr. S.D. Tex. 1991) ......................................................... 33

*In re General Electrodynamics Corp.*,
    368 B.R. 543 (Bankr. N.D. Tex. 2007) ................................................... 16, 22

*In re Good*,
    413 B.R. 552 (Bankr. E.D. Tex. 2009) ......................................................... 15

*In re Good*,
    428 B.R. 235 (Bankr. E.D. Tex. 2010) ........................................................... 8

*In re Gramercy Twins Assocs.*,
    187 B.R. 112 (Bankr. S.D.N.Y. 1995) ......................................................... 25

*In re Griswold Bldg. LLC*,
    420 B.R. 666 (Bankr. E.D. Mich. 2009) ...................................................... 25

*In re Hinderliter Indus., Inc.*,
    228 B.R. 848 (Bankr. E.D. Tex. 1999) ......................................................... 33

*In re Idearc Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009) ............................................ 16, 19, 38

*In re Introgen Therapeutics Inc.*,
    429 B.R. 570 (Bankr. W.D. Tex. 2010) ......................................................... 8

*In re Investors Florida Aggressive Growth Fund, Ltd.*,
    168 B.R. 760 (Bankr. N.D. Fla. 1994) ......................................................... 19

*In re Johns-Manville*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) ........................................................... 38

*In re Kellogg Square Partnership*,
    160 B.R., 343 (Bankr. D.Minn. 1993) .................................................... 39, 40

*In re Lakeside Global II, Ltd.*,
    116 B.R. 499 (Bankr. S.D. Tex. 1989) .................................................. passim

*In re Lighthouse Lodge, LLC*,
    No. 09-52610-SLJ, 2010 WL 5156263 (Bankr. N.D. Cal. Dec. 14, 2010) ................. 19

*In re Made in Detroit, Inc.*,
    299 B.R. 176 (Bankr. E.D. Mich. 2003) ...................................................... 22

*In re Maluhia Eight, LLC*,
    Case No. 10-30986-HDH-11, 2010 WL 4259832 (Bankr. N.D. Tex. Oct. 22, 2010).. 25

*In re Master Mortgage Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) ........................................................ 32

ii

*In re MCorp Financial, Inc.*,
    137 B.R. 219 (Bankr. S.D. Tex. 1992) ....................................... 38

*In re Meadow Glen, Ltd*,
    87 B.R. 421 (Bankr. W.D. Tex. 1988) ....................................... 38

*In re Miami Center Assocs. Ltd.*,
    144 B.R. 937 (Bankr. S.D. Fla. 1992) ....................................... 41

*In re Mirant Corp.*,
    334 B.R. 800 (Bankr. N.D. Tex. 2005) ................................ 23, 26

*In re Montgomery Court Apartments of Ignham County Ltd.*,
    141 B.R. 324 (Bankr. S.D. Ohio 1992) ....................................... 41

*In re Mortgage Inv. Co. of El Paso, Tex.*,
    111 B.R. 604 (Bankr. W.D. Tex. 1990) ....................................... 38

*In re Multiut Corp.*,
    449 B.R. 323, (Bankr. N.D. Ill. 2011) ....................................... 32

*In re Pacific Lumber Co.*,
    584 F.3d 229 (5th Cir. 2009) ....................................... 8, 10

*In re Renegade Holdings, Inc.*,
    429 B.R. 502 (Bankr. M.D.N.C. 2010) ............................ 24, 25, 26

*In re Save Our Springs (S.O.S.) Alliance, Inc.*,
    388 B.R. 202 (Bankr. W.D. Tex. 2008) ....................................... 37

*In re Seatco, Inc.*,
    257 B.R. 469 (Bankr. N.D. Tex. 2001) ....................................... 39

*In re Sherwood Square*,
    107 B.R. 872 (Bankr. D. Md. 1989) ....................................... 40

*In re SJT Ventures, LLC*,
    441 B.R. 248 (Bankr. N.D. Tex. 2010) ................................ 8, 25

*In re Smitty Inv. Group, LLC*,
    Case No. 07–00020–TLM, 2008 WL 2095523
    (Bankr. D. Idaho May 16, 2008) ................................ 17, 21

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D. N.J. 2010) ................................ 33, 34

*In re Trans Max Technologies, Inc.*,
    349 B.R. 80 (Bankr. D. Nev. 2006) ................................ 16, 19

*In re Trinity Meadoes Raceway, Inc.*,
    252 B.R. 660 (Bankr. N.D. Tex. 2000) ....................................... 15

*In re Westwood Plaza Apartments, Ltd.*,
    255 B.R. 194 (Bankr. E.D. Tex. 2000) ....................................... 24

*In re Wool Growers Cent. Storage Co.*,
    371 B.R. 768 (Bankr. N.D. Tex. 2007) ................................ 31, 32

*In re Zenith Electronics Corp.*,
    241 B.R. 92, (Bankr. D. Del. 1999) ........................................................ 22

*Matter of Sandy Ridge Development Corp.*,
    889 F.2d 663 (5th Cir. 1989) ................................................................... 38

*Matter of T-H New Orleans Ltd. P'ship*,
    116 F.3d 790 (5th Cir. 1997) ...................................................... 17, 23, 25

*Northern Pac. Ry v. Boyd.*,
    228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913) .................................... 13

*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture*
    *(In re Greystone III Joint Venture)*,
    995 F.2d 1274 (5th Cir. 1991) ........................................................... 36, 37

*Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*,
    761 F.2d 1374 (9th Cir.1985) ................................................................. 16

*Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*,
    160 F.3d 1954 (5th Cir. 1998) ................................................................ 15

*Till v. SCS Credit Corp.*,
    541 U.S. 465 , 124 S. Ct. 1951, 158 L.Ed.2d 787 (2004) ............ 23, 25, 26, 27

FEDERAL STATUTES

11 U.S.C. § 506(b) ............................................................................................ 12

11 U.S.C. § 510(a) ............................................................................................ 33

11 U.S.C. §1122 ................................................................................................ 36

11 U.S.C. §1123(a)(4) ....................................................................................... 38

11 U.S.C. § 1126(a) .......................................................................................... 30

11 U.S.C. § 1129(b) .......................................................................................... 12

11 U.S.C § 1129(b)(2)(A)(i)(II) ........................................................................ 24

11 U.S.C. § 1129(b)(2)(A) and (B) ................................................................... 12

11 U.S.C. § 1129(b)(2)(B)(i) ............................................................................ 24

OTHER AUTHORITIES

7 Lawrence P. King et al., Collier on Bankruptcy ¶1129.04[4][a] (15th ed. Ev. 2008) .... 10

In re Horseshoe Nail Ranch,
    Case No. 06-41556 (Bankr. E.D. Tex., Dec. 12, 1007) .......................... 21, 36

In re 20 Bayard Views, LLC,
    Case No. 09-50723 (Bankr. E.D.N.Y. Mar. 7, 2011) ................................. 25

Fed R. Bankr. P. 3017(a) ................................................................................. 30

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... i

I. SUMMARY OF OBJECTIONS .................................................................1

II. FACTUAL AND PROCEDURAL BACKGROUND ....................................3

    A. The Debtors' Credit Obligations to Citizens and Prior Proceedings ......................3

    B. The Debtors' Assets and Their Value ..................................................4

    C. Citizens's Claims ........................................................................5

    D. The Debtors' Plan .......................................................................6

III. OBJECTIONS TO CONFIRMATION ........................................................7

    A. Standards for Confirmation and the Burden of Proof ............................7

    B. First Objection - The Plan Violates The Absolute Priority Rule
        And Is Not Fair and Equitable .....................................................8

    C. Second Objection - The Plan Does Not Pay Citizens Required
        Pendency Interest and Other Charges ...........................................11

    D. Third Objection - The Plan Is Not Feasible .....................................15

        1. The Feasibility Standard ...................................................16

        2. The Debtors' Projections Are Extremely Optimistic and
           Hyper-Sensitive, With No Room for Error ............................17

        3. The Debtors' Have a Poor Track Record in Projecting
           Performance ................................................................19

        4. The Plan Assumes that Nothing Bad will Ever Happen,
           Contrary to Common Sense and These Debtors' Own
           History .......................................................................20

    E. Fourth Objection – The Rate Proposed on the Cram-Down Note is
        Legally Insufficient to Compensate for the Risk of the
        Plan's Failure .........................................................................23

        1. The legal standard for a Cram-Down Interest Rate ..................23

        2. The specific risk of non-payment of Citizens's Claim
           requires an interest rate of at least 8.25% to 9.3% ..................23

F.  Fifth Objection – The Debtors' Insiders Are Permitted to Buy the Properties at Prices 30% Less Than Required to Perform the Plan ...................... 28

G.  Sixth Objection – The Plan Does Not Specify The Amount Of Payments To Be Made To Citizens Pending The End Of Claim Litigation, Which Is Not Fair and Equitable .......................................................... 29

H.  Seventh Objection – The Plan Dictated An Improper Solicitation And Voting Scheme ............................................................................................... 30

I.  Eighth Objection – The Plan Improperly Releases Nondebtors ........................... 31

J.  Ninth Objection – The Plan Requires Payments to Contractually Subordinated Creditors ...................................................................................... 32

K.  Tenth Objection – Highly Contingent and Discretionary Effective  Date ............................................................................................................ 34

L.  Eleventh Objection - The Plan Improperly Classifies Citizens's Deficiency Claim .................................................................................................. 36

M.  Twelfth Objection - The Plan Unfairly Discriminates Against Citizens ....................................................................................................................... 37

N.  Thirteenth Objection – The Plan Does Not Explicitly Retain The Customary Protections That Now Protect Citizens's Credit and Collateral Position, and is Therefore Not Fair and Equitable ................................ 39

O.  Fourteenth Objection – The Plan Is Not Proposed In Good Faith ........................ 40

Citizens Bank of Pennsylvania ("Citizens"), a creditor of each of the debtors (the "Debtors") in these six above-captioned, jointly-administered chapter 11 cases (the "Cases"), by and through its counsel of record, hereby files this objection (the "Objection") to confirmation of the Debtors' *Second Amended Joint Consolidated Plan Of Reorganization* dated June 14, 2011 [D.I. 246] (the "Plan"),[2] and in connection therewith respectfully represents as follows:

## I. SUMMARY OF OBJECTIONS

The Debtors fail to carry their burden of proving that the Plan meets all the requirements of Section 1129 of title 11 of the United States Code (as amended, the "Code").[3] The Plan fails to meet the Code's requirements in at least each of the following respects:

- First, the Plan violates the absolute priority rule and is otherwise not "fair and equitable." Put most simply:

  o Citizens's prepetition claim is $70,823,563.24 (net of all adequate protection payments), and Citizens has voted to reject the Plan;

  o The Debtors' owners retain their control and equity interests under the Plan;

  o Accordingly, the Debtors must, as a matter of law (pursuant to Code Section 1129(b)(2) (A) and (B)), distribute to Citizens on the Effective Date "property of a value, as of the effective date of the" Plan, of at least $70.8 million;

  o Even by the Debtors' own valuation, all of the Debtors' assets have a value of about $55 million as of the Effective Date; and

  o The Debtors, then, cannot meet this most basic and essential legal test for plan confirmation;

- Second, if the Debtors do have assets of a value sufficient to now distribute to Citizens about $70.8 million on the Effective Date (and another $2,000,000 or so to distribute on the Effective Date to the other holders of claims and administrative expenses), Citizens is entitled to pendency interest and its reasonable fees, costs and other charges, here totaling more than $5.0 million. The Plan fails to provide for that sum in any way, and so cannot be confirmed;

---

[2] The Debtors concurrently filed the *Disclosure Statement In Support of Debtors' Second Amended Joint Consolidation Plan of Reorganization* [D.I. 248] (the "Second Amended Disclosure Statement").

[3] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan and Second Amended Disclosure Statement.

- <u>Third</u>, the Plan is not feasible, even with the benefit of the Debtors' very optimistic projections, as required by Code Section 1129(a)(11);

- <u>Fourth</u>, even if, by some calculation, the Debtors' delivery to Citizens on the Effective Date of a new cram-down note secured by assets worth at most $55 million is deemed to constitute the delivery of $70.8 million of value on the Effective Date, the interest rate paid on the deferred payments called for by that note does not fairly compensate Citizens for the time value of money plus the risk of default. The Plan is thus not fair and equitable for this reason as well;

- <u>Fifth</u>, the Debtors admittedly need to generate about $74 million of sales proceeds to make the required Plan payments, but allow their insiders to buy the Properties (together, or one by one) for release prices equal to a fraction of that. That is not fair and equitable;

- <u>Sixth</u>, the Plan does not specify the principal amount on which interest payments on Citizens's claim are to be made until Citizens's claim is Allowed by Final Order and therefore is not fair and equitable in that additional regard;

- <u>Seventh</u>, the Plan improperly permits creditors of one Debtor to vote to accept the Plan of the <u>other</u> Debtors. The Debtors have not been substantially consolidated, and there is no basis for pre-Effective Date consolidation. That voting scheme is not legally permitted and the solicitation process has thus violated Code Sections 1125 and 1129(a)(2);

- <u>Eighth</u>, the Plan improperly grants releases to nondebtor insiders and others and thus violates Codes Sections 1129(a)(1) and 1129(a)(3);

- <u>Ninth</u>, the Plan purports to negate Citizens's rights under subordination agreements in its favor, and thus violates Code Sections 510(a) and 1129(a)(1);

- <u>Tenth</u>, the Plan has an indefinite and highly contingent Effective Date that will occur, or not occur, at the complete discretion of insiders, which makes the Plan unfair and inequitable;

- <u>Eleventh</u>, the Plan improperly classifies Citizens's deficiency claim, and thus cannot be confirmed pursuant to Code Sections 1122(a) and 1129(a)(1);

- <u>Twelfth</u>, the Plan unfairly discriminates against Citizens's deficiency claim, and thus cannot be confirmed pursuant to Code Sections 1122(a), 1123(a)(4) and 1129(a)(2);

- <u>Thirteenth</u>, the Plan fails to make clear whether the many other customary covenants and other provisions that protect Citizens's credit and collateral will be retained, stripped away or somehow modified. The Plan is therefore not fair and equitable in this additional respect; and

- <u>Fourteenth</u>, the Plan is not proposed in good faith, and therefore cannot be

confirmed pursuant to Code Section 1129(a)(3).[4]

## II.      FACTUAL AND PROCEDURAL BACKGROUND

**A.      The Debtors' Credit Obligations to Citizens and Prior Proceedings**

1.      As set forth in various pleadings previously filed by Citizens, the Debtors borrowed $66 million from Citizens in February 2008 (the "Loan") to acquire 22 budget hotels (collectively, the "Properties").  The Debtors' goal was to buy, improve and quickly sell them at a profit.  The Loan terms are set forth in the Credit Agreement dated February 8, 2008 (the "Credit Agreement").  Concurrent with the execution of the Credit Agreement, Citizens and the Debtors entered into the standard ISDA Master Agreement and schedules and confirmations thereto, dated January 30, 2008 (the "Swap Agreement," together with the Credit Agreement, the "Agreements") to hedge against the rise or fall of the prevailing LIBOR rate.

2.      The Debtors' payment and performance of the Agreements were guarantied (the "Guaranty") by two entities affiliated owned and controlled by Mr. Milton Fine:  Fine Capital Associates, L.P., and FFC Partnership, L.P.  (the "Guarantors").

3.      Starting in February 2010, the Debtors stopped paying interest on the Loan and stopped making payments under the Swap Agreement.  The Guarantors similarly failed to make payments according to the Guaranty.  Citizens made demand, tried but failed to find a consensual resolution, and then commenced appropriate legal proceedings.

4.      Citizens has also commenced proceedings against the Guarantors to recover the amounts guarantied by them, which is 35% of the principal balance of the Loan, plus accrued and accruing interest and swap payments, costs of collection and various charges, in an amount now exceeding $33 million.[5]  The Debtors have repeatedly represented to this Court (including

---

[4]      Citizens reserves its right to file additional objections as discovery continues or as the Debtors make further disclosures pursuant to legal process.

[5]      The Guarantors claim to owe no more than 25% of the principal Loan amount, plus accrued and accruing interest, swap payments and various charges, and have asserted other defenses to payment.

in the Second Amended Disclosure Statement) that the Guarantors are holding assets of some sort valued in excess of $17 million, and even now ask the Court to rely on those assets to confirm the Plan, but the Debtors have failed to disclose the location or type of those assets or to provide assurances that those assets, if they do exist at all, will not be further dissipated (having already been spent, lost or otherwise dissipated by about $5 million since 2009).

5. The Guarantors have asked this Court to abstain from granting to Citizens any relief against them, even though the Debtors and their experts repeatedly cite to the Guarantors' credit-worthiness and assets as reasons to confirm the Plan. The Guarantors have also successfully petitioned in state court for a stay of Citizens's state court proceedings against them until this Court resolves Citizens's claims against the Debtors. The Guarantors have, accordingly, strategically used (quite well, it must be admitted) their affiliated Debtors' proceedings here to escape or at least materially delay the just resolution of their own obligations to Citizens, all without needing to take on the burden of their own chapter 11 cases.

6. The Debtors filed voluntary petitions under chapter 11 on December 21, 2010 (the "Petition Date"), on the eve of foreclosures by Citizens.

**B.      The Debtors' Assets and Their Value**

7. Citizens enjoys duly perfected, first priority liens and security interests in all assets of each Debtor, including without limitation each of the 22 Properties, all room receipts and other proceeds thereof, cash and intangibles.

8. In March 2011, the Properties were appraised by the Debtors and by Citizens. The aggregate fair market value of the Properties, according to Citizens's appraiser, National Valuation Consultants, Inc., is $45,500,000 (the "NVC Appraisals"). The aggregate fair market value of the Properties according to the Debtors' appraiser, US Hotel Appraisals, Inc., is $53,200,000 (the "UHA Appraisals," together with the NVC Appraisals, the "Appraisals").

9.      Citizens's appraiser has now re-evaluated the Properties, found no material changes in value since March, and now re-affirms that $45,500,000 value today and as of the Plan's projected Effective Date.

10.     The Debtors have conducted no new valuation.   Accordingly, there are two valuations of the Properties submitted for the Court's consideration in connection with confirmation of the Plan:

| | |
|---|---|
| By the Debtors: | $53,200,000 |
| By Citizens: | $45,500,000 |

11.     The only other asset owned by the Debtors is accrued cash less accrued postpetition liabilities (that is, liabilities not subject to restructuring or extension in these Cases, or "net cash").   The Debtors' estimate of such "net cash" is $1,596,511; Citizens's estimate is $425,753.   Accordingly, as of the Effective Date, the entire possible range of values of <u>all</u> assets of all six estates is as follows:

| | | |
|---|---|---|
| By the Debtors: | All Properties: | $53,200,000 |
| | All Net Cash: | $ 1,596,511 |
| | Total Value of all Assets: | $54,796,511 |
| By Citizens: | All Properties: | $45,500,000 |
| | All Net Cash: | $   425,753 |
| | Total Value of all Assets: | $45,925,753 |

## C.      **Citizens's Claims**

12.     Citizens's claims, as of the Petition Date, were $71,594,103.24, as reflected in proofs of claim duly filed in these Cases.

13.     Prior to the Debtors' projected August 1, 2011 Effective Date, the Debtors have made or will make adequate protection payments and payments required by Code Section 362(d)(3) in the aggregate amount of $770,540.   Putting aside for the moment the "Pendency Charges" to which Citizens is entitled on account of the retention of the Debtors' equity by their owners (as discussed below), and giving full credit to all adequate protection payments as against

its prepetition claim, the net amount of Citizens's prepetition claim is thus $70,823,563.24 (the "Prepetition Claim").

14.    While the Prepetition Claim has not yet been allowed by Final Order, the Debtors have agreed to seek confirmation of the Plan on the basis that such Prepetition Claim would be allowed.[6]

**D.    The Debtors' Plan**

15.    The Debtors' Plan places claims against and interests in the Debtors in the following classes:

> Class 1: Allowed Priority Claims
> Class 2: Secured Tax Claims
> Class 3: Lender Secured Claim
> Class 4: Conditional Lender Deficiency Claim
> Class 5: Franchisor Claim
> Class 6: General Unsecured Claims
> Class 7: Subordinated Claims
> Class 8: Equity Interests

16.    Some provisions of the Plan that have particular legal import here are as follows:

- The Debtors propose to pay interest on the secured portion of Citizens's Prepetition Claim at 5% per annum (Plan 4.3.2(i)) and on Citizens's deficiency claim at 2.8% per annum.  Plan 4.3.3(i).

- The amount of Citizens's Prepetition Claim to be paid by the Plan, and on which all of the Debtors' projections are based, is set at $70,460,947.  Plan 4.3.2(i).  Even after deduction of all adequate protection payments to be made by the Debtors through their projected August 1, 2011 Effective Date, that is

---

[6]    See Disclosure Statement Hr'g Tr. 76:19-23, 101:16-23 June 13, 2011 (Debtors' Counsel: "As I've commented before and as I'll state now, without qualification, without waiver, without any kind of out, [Citizens's] claim for plan confirmation purposes, or rather the plan should be assessed for feasibility at the full amount of their proof of claim. . . . No, they don't need to have a finally allowed claim by final non-appealable order."); see also Motion to Strike Hr'g Tr. 17:10-21 Mar. 24, 2011("THE COURT: So putting things off later is simply going to -- it's actually going to take your time away from confirmation because we're going to have to go through a claims estimation process before we can get to confirmation.  Debtors' Counsel: Actually, Your Honor, I was envisioning doing a plan that doesn't allow or disallow their claim. But in any event, if Your Honor wants a quick adversary proceeding filed -- THE COURT: You mean you would allow them to vote their entire amount of their claim for the plan? Debtors' Counsel: Well, the plan would provide for a secured claim X and a secured claim Y.").  Of course, that agreement is with full reservation of the Debtors' continued right to litigate, the cost of which both further impairs Plan feasibility (on account of the Debtors' own continued cost) and drives up even more the Pendency Charges that must be paid to Citizens (on account of Citizens's defense costs).

short of the actual amount of Citizens's Prepetition Claim by $360,000.[7] And, as described below, that shortfall grows by more than $5,000,0000 as of July 31, 2011 because Citizens is entitled to pendency interest, fees and other charges if equity and control is retained by the Debtors' insiders (that $5,000,000 amount grows with continued litigation expense and also by continuing accrued interest at the per diem rate of $10,803.26.)

- The Debtors propose to pay to their ultimate 10% co-owner, Interstate, distributions for credit to Interstate's prepetition claim, administrative period accruals and other amounts going forward, even though both the Debtors and Interstate have previously agreed that all such amounts must be paid to Citizens on account of its own claims (pursuant to an undisputed subordination agreement). Plan 6.8.1.

- Similarly, the Debtors propose to pay to insider and 90% ultimate co-owner, FFC, distributions on account of its administrative period accruals and other amounts going forward, even though both the Debtors and FFC have likewise agreed that all such amounts must be remitted to Citizens. Plan 6.9.

- The interest (but not the principal) on Citizens's cram-down loan is proposed to be supported by a $500,000 letter of credit that purports to be "constantly and automatically replenished upon any draw" (the "Interest Letter of Credit"), to be provided by a (to-be-named) nationally recognized institution at the request of the "Plan Funder," an entity owned and controlled by Mr. Milton Fine.

- There is no other credit support offered to Citizens by FFC, Interstate, the Plan Funder or anyone else.

- The owners of the Debtors' equity pay nothing to keep their equity.

- Likewise, there is no contribution or other support from the Guarantors of any type.

## III.    OBJECTIONS TO CONFIRMATION

### A.    Standards for Confirmation and the Burden of Proof

17.    "The proponent of the plan has the burden of establishing that the plan meets all the requirements of the Code." In re Lakeside Global II, Ltd., 116 B.R. 499, 505 (Bankr. S.D. Tex. 1989). Here, the Debtors do not and cannot meet several of the requirements for

---

[7]    Citizens's original proofs of claims filed on February 4, 2011, in each of the Debtors' cases listed Citizens's Claim in an amount not less than $71,230,947.12. On May 6, 2011, Citizens filed pleadings, including the *Affidavit of Mark VanOsdol* [Adv. Proc. D.I. 12], which detailed Citizens's Prepetition Claim as being in the amount of $71,594,103.24. On July 6, 2011, Citizens filed amended proofs of claim in each of the Debtors' cases listing Citizens's Prepetition Claim in that amount of $71,594,103.24.

confirmation under Section 1129(a) and Section 1129(b), which must be satisfied due to the fact that Citizens rejects the Plan and Citizens's Claim is admittedly impaired.  Thus, confirmation of the Plan must be denied.

**B.**     **First Objection - The Plan Violates The Absolute Priority Rule And Is Not Fair and Equitable**

18.     A plan must be "fair and equitable" in all respects to be confirmed over the objection of a dissenting creditor class.  In re Pacific Lumber Co., 584 F.3d 229, 244 (5th Cir. 2009).  A central component of that requirement is the so-called absolute priority rule.  "Section 1129(b) requires that, in order to confirm a cram-down plan, the bankruptcy court must find that the plan is 'fair and equitable,' that is, the plan must provide that, with respect to any nonaccepting class, no junior class will receive or retain any value under the plan unless or until such nonaccepting class is paid in full."  In re Good, 428 B.R. 235, 242 (Bankr. E.D. Tex. 2010). In other words, confirming a plan over the objections of a creditor class requires that such class receive on the plan's effective date "property of a value" equal to at least the full amount of such creditors' claims.  11 U.S.C. § 1129(b)(2); see In re SJT Ventures, LLC, 441 B.R. 248, 255 (Bankr. N.D. Tex. 2010).  (As described more fully below, the "fair and equitable" standard also requires the payment of pendency interest and charges where the equity interests are retaining value of any type.  That requirement is discussed more fully below as Citizens's "Second Objection" to confirmation.)

19.     The Plan proposes to leave all the equity of the Debtors (and thus control of the four-year liquidation program) with the existing equity holders (the "Equity Holders").  Therefore, an interest that is junior to Citizens's Claim is plainly retaining property.[8]  However,

---

[8]     The Equity Holders undeniably retain property under the Second Amended Plan based on their control of the Reorganized Debtor, regardless of the worth of the equity interests in the Reorganized Debtors retained.  See In re Introgen Therapeutics Inc., 429 B.R. 570, 586 (Bankr. W.D. Tex. 2010) ("[C]ourts have similarly held that there is value in the retention by the equity security holder of control of the reorganized company. . . .  [T]he fact that the interest may, in a net worth sense, be worthless does not

Citizens is not receiving, and in fact cannot receive, property having a value equal to the full amount of its Prepetition Claim on the Effective Date because the fair value of all of the Debtors' assets on the Effective Date is, at most, $55 million. Even if the Debtors were to simply hand over to Citizens everything they have, that would, at best, support Citizens's $55 million secured claim, leaving no support (as of the Effective Date, when this test is required to be met) for the $16 million deficiency claim, on account of which Citizens is separately entitled to receive, on the Effective Date, an additional $16 million of property.

20.     Thus, even giving the Debtors the benefit of every doubt (that is, using the Debtors' valuation in every respect), the best they can do on the Effective Date is to issue a "fully secured" cram-down note of $55 million and a "hope note" for the $16 million balance. If all goes perfectly as hoped, that "hope note" might come to have some value. But on the required test date in August 2011, it could at best be supported only by all of the Debtors' hope, and nothing more.

21.     Here, however, the Debtors do not do even that. The Equity Holders are retaining at least some of the upside potential as to the Properties, and all control. That is, they keep even some of the "hope." That is, the Debtors do not even propose to surrender all of their $55 million to Citizens.

22.     Rather, Citizens receives only a four-year note secured by those assets worth $55 million, so Citizens keeps all the downside risk of the $55 million in assets and not the upside. While the parties could debate how much of the $55 million is represented by the cram-down note and how much is not, that debate is academic -- the "fully secured" note has a value equal to

mean that there is no value or property retained.... It is the control of the reorganized entity which is a valuable asset. Other courts have held that even indirect control may qualify as a prohibited property interest.") (quotations and citations omitted); see also In re Coltex Loop Central Three Partners, L.P., 138 F.3d 39, 44-45 (2d Cir. 1998) (where stockholders could not have gained access to a plan distribution "but for their prior equity position," the distribution violates the absolute priority rule).

some fraction of the $55 million that supports it, and there is no value on the Effective Date that leaks down to the "hope note" junior to that. The Plan is fatally flawed.

23.     This Plan defect turns on a fairly fundamental aspect of bankruptcy law.  The absolute priority rule provides that "a plan of reorganization may not allocate any property whatsoever to any junior class on account of their interests or claims in a debtor unless such senior classes receive property equal in value to the full amount of their allowed claims …. "  In re Pacific Lumber Co., 584 F.3d 229, 244, n.20 (5th Cir. 2009) (citing 7 Lawrence P. King et al., Collier on Bankruptcy ¶ 1129.04[4][a], at 1192-93 (15th ed. Ev. 2008)).

24.     Under similar circumstances, for example, the court in In re Lakeside, 116 B.R. at 502-5 considered a proposed plan that would, during its roughly four year term, rely on a projected future sale or refinancing in order to make a large balloon payment at the end of the plan period to fully pay the secured creditor.  The court found that, in addition to several other deficiencies, the plan violated the absolute priority rule.  Id. at 514.  The key is that possible increases in value later do not meet the Code's requirement of full value on the effective date. The court explained:

> Commercially comparing the position of a buyer from the market who is willing to pay [the present appraised value] for [the over-encumbered property], knowing that he suffers the risk of a decline in value and the possibility of getting the full benefit of any increase in value along with the rental income stream in the interim *with the position of a secured creditor who gets the same income stream and only the downside risk but does not get the whole upside*, seems to this court by definition has to be worth more because the market value person gets something that the secured creditor does not which is the upside.  If all that is commercially being given the secured claimant is rentals plus a buyout at the end of [roughly four years], that is always going to be worth less than the current market value of the property sold to a third party today, especially if the secured creditor is under secured.  . . .  It would seem to this court that somehow the secured creditor must be sufficiently compensated from something other than interim rental income payments plus a buyout [roughly four years post-confirmation].  . . .  Since this is what the plan proposes while

> leaving value with residual claimants who are to become the new owners and because the plan proposes to pay all unsecured claimants in full in cash at the effective date of the plan, it violates the absolute priority rule and cannot be confirmed.

Id. (emphasis added).

25.     Therefore, as a matter of law and logical necessity, the cram-down note supported by value of at most $55 million may or may not be "property of a value" of Citizens's $55 million secured claim.  But in any event there is no serious argument that the <u>same</u> $55 million of Properties could <u>also</u> be "property of a value" on the Effective Date equal to the <u>additional</u> $15.8 million deficiency claim.  The plan is therefore fatally flawed and confirmation must be denied.

## C.     <u>Second Objection - The Plan Does Not Pay Citizens Required Pendency Interest and Other Charges</u>

26.     The Debtors do not propose to pay Citizens pendency interest and the reasonable fees, costs and other charges arising during the pendency of these Cases (collectively, "<u>Pendency Charges</u>").  The Pendency Charges, as of July 31, 2011, will be in excess of $5.0 million and continue to accrue.[9]

27.     A matter of law, because the Equity Holders retain all equity in and exclusive control over the Reorganized Debtors, the Debtors must honor Citizens's valid contractual rights during the pendency period in order to confirm their Plan, and to do so the Debtor must pay the Pendency Charges to Citizens on the Effective Date.

---

[9]     The Pendency Charges as of July 31, 2011 consist of the following:

| | |
|---|---|
| ▪ Interest on the Prepetition Claim at the contractual rate applicable after expiration of the swap contract through July 31 (at 6% per annum) | $2,611,671.57 |
| ▪ Postpetition fees and other charges incurred as of June 30, 2011 | $1,986,128.09 |
| ▪ Estimated postpetition fees and charges to be incurred during the period of July 2011 | <u>$   500,000.00</u> |
| | <u>$5,079,900.00</u> |

28. The requirement that the Debtor pay Pendency Charges is grounded in the prescription of Code Section 1129(b) that, where equity is retained, fairness and equity require the Debtors to pay the full amount to which Citizens would have been due if not for the commencement of these cases. "[I]t is clear that a creditor's contractual right to interest retains validity during the pendency of chapter 11 reorganization. . . . So while claim allowance may be tantamount to entry of a judgment, a chapter 11 creditor's contract rights are not merged into that judgment. . . . A plan proponent must therefore reckon with those contract rights. … And if a cram-down is attempted, the proponent must also reckon with the requirement that the plan's payment provision be 'fair and equitable.'" In re Dow Corning Corp., 244 B.R. 678, 686-87 (Bankr. E.D. Mich. 1999).

29. While both requirements are aspects of the requirement that a cram-down plan be fair and equitable, the obligation to pay Pendency Charges is related to, but not the same as, the absolute priority rule. Id. at 694. ("[T]here is more to "fairness" than the absolute priority rule. . . . And it is no less true today, as demonstrated by the fact that the list of requirements under § 1129(b)(2) is not exhaustive. . . . Thus even if the matter of contract interest cannot properly be categorized as an 'absolute priority' issue, it still fits within the more general 'fair and equitable' rubric." Id. at 694 (citing Markell, Owners, Auctions, and Absolute Priority, 44 Stan. L.Rev. at 71–72 (describing the absolute priority rule as only one of "many factors," albeit a "famous" one, taken into consideration when determining whether a plan is "fair and equitable").

30. Citizens is, of course, not over-secured. But its entitlement to Pendency Charges, under the cram-down requirements of Section 1129(b) because of equity's retention of its equity, is illustrated by reference to Code Section 506(b)'s similar requirement that oversecured creditors must be paid Pendency Charges:

- Sections 1129(b)(2)(A) and (B) require Citizens to receive, on the Effective Date, "property of a value" equal to the full amount of its claim.

- Section 506(b) similarly requires the payment of Pendency Charges if the creditor's claim is secured by "property the value of which" is greater than the amount of such claim.

31.    Given that symmetry, it is not surprising that courts recognize that, to be "fair and equitable," a cram-down plan preserving equity for equityholders likewise requires the payment of Pendency Charges.

32.    Bankruptcy Judge Spector explained this rule and its origins in detail in <u>Dow</u>:

> The term 'fair and equitable' has roots extending back to the 1800s, when '[t]he primary vehicle for [railroad] reorganization was the equity receivership.' . . . In these reorganizations, which entailed a foreclosure and judicial sale of the railroad's encumbered assets to a newly formed entity, unsecured creditors frequently received little or nothing on their claims, notwithstanding the fact that shareholders of the 'old' railroad obtained an ownership interest in the new one. . . .
>
> Junior creditors who were squeezed out in this fashion challenged the validity of the judicial sale based on fraudulent conveyance law. 'Although the Supreme Court recognized the … legitimacy of [such challenges] . . . as early as 1868, bondholders and stockholders continued to ignore the rights of unsecured creditors by adopting reorganization plans that excluded these creditors.' . . . In the wake of <u>Northern Pac. Ry. v. Boyd</u>, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913), however, 'reorganizations would never be the same.'
>  . . . .
> [In <u>Boyd</u>, the] Court stated as a general proposition that "a transfer by stockholders from themselves to themselves cannot defeat the claim of a non-assenting creditor."
> . . . .
> As this brief recitation would suggest, a major purpose of the fairness requirement was to ensure that the proposed reorganization respected the rights of different classes of creditors, both *inter sese* and, especially, vis-à-vis the rights of the corporate debtor's shareholders. . . . . The principle, which became known as the 'rule of . . . absolute priority,' . . . 'requires that creditors of a debtor . . . receive payment of their claims in their established order of priority, and that they receive payment in full before lesser interests . . . may share in the assets of the reorganized entity.'
> . . . .
> In <u>Consolidated Rock Prodcs. Co. v. DuBois</u>, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941), the Supreme Court invoked this rule on behalf of creditors asserting a right to postpetition interest

at the contract rate. The plan under consideration in that §77B reorganization case called for the debtor entities – a parent corporation and its two wholly owned subsidiaries – to transfer their assets to a newly formed corporation. . . . Holders of the subsidiaries' outstanding bonds would be required to surrender them in exchange for bonds and stock issued by the new company. . . . Stock in the new company was also to be issued to the parent company's shareholders.

. . . .

The Court was asked to assess 'the fairness . . . of [the] . . . plan.' . . . It was decidedly unimpressed:

> The instant plan runs afoul of [the absolute priority rule] . . . . [T]he bondholders for the principal amount of their 6% bonds receive an equal face amount of new 5% income bonds and preferred stock, while the preferred stockholders receive new common stock. True, the relative priorities are maintained. But *the bondholders have not been made whole*. They have received an inferior grade of securities, *inferior in the sense that the interest rate has been reduced,* a contingent return has been substituted for a fixed one, the maturities have been in part extended and in part eliminated by the substitution of preferred stock, and their former strategic position has been weakened. Those lost rights are of value. *Full compensatory provision must be made for the entire bundle of rights which the creditors surrender.*
>
> . . .
>
> 'No offer is fair which does not recognize the prior rights of creditors . . . .' . . . [W]hile creditors may be given inferior grades of securities, their superior rights must be recognized. Clearly, those prior rights are not recognized, in cases where stockholders are participating in the plan, if creditors are given only a face amount of inferior securities equal to the face amount of their claims. They must receive, in addition, compensation for the senior rights which they are to surrender. <u>If they receive less than *full compensatory treatment*, some of their property rights will be appropriated for the benefit of stockholders without compensation</u>.

. . . .

Thus <u>DuBois</u> makes clear that under pre-Code law, the 'fair and equitable' standard precluded shareholders of a solvent debtor from retaining ownership unless they recognized, or 'fully compensated for,' a creditor's right to interest at the contract rate. . . . .

Dow Corning, 244 B.R. at 688-90 (citations omitted); see also, In re Coram Healthcare Corp., 315 B.R. 321, 344 (Bankr. D. Del. 2004) ("payment of post-petition interest before any distribution to equity holders in a chapter 11 case is not prohibited by the Code and, in fact, may be required."); see generally In re Dow Corning Corp., 456 F.3d 668, 677-83 (6th Cir. 2006).

33.     Pendency Charges accrue at the contract rate established by the applicable Loan documents.  See In re Good, 413 B.R. 552, 559 (Bankr. E.D. Tex. 2009) ("[T]he rational for use of the contract rate is straightforward: A debtor with the financial wherewithal to honor its contractual commitments should be required to do so.") (citing Dow Corning, 244 B.R. at 695 (Bankr. E.D. Mich. 1999)).  This Section 1129(b) requirement is analogous to the requirement under Section 506(b) that an over-secured creditor's pending interest is to be paid at the contract rate, as both statutes are grounded in the same concept that creditors must receive the benefit of their full bargains before junior positions receive anything.  Cf. In re Trinity Meadows Raceway, Inc., 252 B.R. 660, 668 (Bankr. N.D. Tex. 2000) (citing Bradford v. Crozier (In re Laymon), 958 F.2d 72, 74 (5th Cir. 1992); Southland Corp. v. Toronto-Dominion (In re Southland Corp.), 160 F.3d 1054, 1059-60 (5th Cir. 1998)).[10]

34.     The Debtors cannot pay, in cash or over time, the Pendency Charges, and so the Plan does not provide for them.  This violates Code Section 1129(b)(2)(A) and (B) and is a further reason confirmation must be denied.

**D.      Third Objection - The Plan Is Not Feasible**

35.     The Plan, as submitted, is not feasible.  First, and as explained more fully below, the Plan is based on unrealistic and overly optimistic projections and even at that has no margin

---

[10]     Note, however, that neither requirement arises from the "best interest test" of Section 1129(a)(7), which in turn implicates the liquidation part of the Code and particularly Section 726(a)(5), which by contrast is used to award interest at the legal rate where confirmation litigation arises in the different "solvent debtor" context.

for error. Second, the Plan's optimistic projections are based on several material errors, any one of which alone is sufficient to cause it to fail <u>even if</u> all projections are met.

### 1. **The Feasibility Standard**

36.    "The feasibility test set forth in section 1129(a)(11) requires the Bankruptcy Court to determine whether the Plan is workable and has a reasonable likelihood of success. . . . To establish the feasibility of a plan, the debtor must present proof through *reasonable projections* that there will be sufficient cash flow to fund the plan. Such projections *cannot be speculative, conjectural or unrealistic*." <u>In re Idearc Inc.</u>, 423 B.R. 138, 167 (Bankr. N.D. Tex. 2009) (emphasis added). "The purpose of section 1129(a)(11) is to prevent confirmation of *visionary schemes* which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." <u>In re Smitty Inv. Group, LLC</u>, Case No. 07–00020–TLM, 2008 WL 2095523, at *5 (Bankr. D. Idaho May 16, 2008) (<u>quoting</u> <u>Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)</u>, 761 F.2d 1374 (9th Cir.1985)) (emphasis added). Furthermore, while a debtor is not required to show certainty that the plan is feasible, a debtor is not given the benefit of every doubt and is prohibited from shifting its confirmation burden to a plan objector to show that a plan is not feasible. <u>See</u> <u>In re General Electrodynamics Corp.</u>, 368 B.R. 543, 551 (Bankr. N.D. Tex. 2007).

37.    Thus, the inquiry is whether the "plan proponent has sufficiently established its post-confirmation viability, and its ability to meet its future obligations" with "concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." <u>In re Trans Max Technologies, Inc.</u>, 349 B.R. 80, 92 (Bankr. D. Nev. 2006) (citations and quotations omitted).

38.    Most courts, including those in the Fifth Circuit, consider the following factors in determining feasibility:

- the debtor's ability to service debt under the plan's proposed terms;

- the earning power of the debtor after the reorganization;

- the past performance of the debtor's business operations;

- the ability of the debtor's management; and

- the economic picture for the debtor's industry.

See Matter of T-H New Orleans Ltd. P'ship, 116 F.3d 790, 801 (5th Cir. 1997) (listing factors);

see also Smitty, 2008 WL 2095523, at *5; Lakeside, 116 B.R. at 506.

39.     As summarized below, and as will be proven at trial, the Debtors fail to carry their

burden to show that the proposed plan is feasible on several counts.

### 2.     The Debtors' Projections are Extremely Optimistic and Hyper-Sensitive, With No Room for Error

40.     The Debtors' Plan is predicated on (a) realizing aggressive yearly revenue growth

of 10% in the first year, 6% in the second year, 5% in the third year, and 4% in the fourth year,

amounting to over 27% compounded growth, and (b) achieving a series of Property sales

realizing the approximate gross aggregate amount of $75 million, which is about 40% more than

their own appraiser's $53.2 million valuation.  See Second Amended Disclosure Statement, p.

43.

41.     The following are just some of the facts demonstrating the extreme optimism and

sensitivity of the Debtors' projections:

- *Aggressive Revenue Projections*:  The Debtors assume room revenue, in total, will grow at a rate above the projections of leading national lodging experts, and, individually, room revenue at 17 of the 22 hotels will exceed national projections for economy hotels; moreover, the Debtors assume room revenue will exceed their own appraiser's projections by 11.0% in the first full year of the Plan, and increase incrementally each year until the fourth year of the proposed plan, when the Debtors projected revenue will exceed their appraiser's projections by 25.1%.

- *Unrealistic Projections of Sale Proceeds*: Since the projected gross sale proceeds are derived directly from applying to the projected revenue a room

revenue multiplier ("RRM") (which is itself subjective), heightened scrutiny of the Debtors' RRM is warranted; the Debtors assume a base year average RRM of 2.95, which is significantly higher than Citizens's appraiser's average of 2.45; the Debtors' RRM in the base year is higher than the market for assets of the age, quality and condition, location and historical minimal to negative net income; in addition, the Debtors project that RMM will increase or remain the same every year; therefore, the aggressiveness of the RRM in the base year permeates throughout the four years of projections, resulting in inflated anticipated gross sale proceeds; and, while one, two, or even five Properties might realize the Debtors' anticipated sales prices, the Plan needs ALL 22 Properties to sell at or above these optimistic projections in order to succeed – this is practically impossible.

- The Plan assumes a robust economy that will continue to grow unabated. Should this not materialize, the assumptions for revenue growth are unlikely to materialize. Already, there are signs of a weakening in the economy as several key indicators remain sluggish. Several economists have started to opine on the ability of the economy to sustain current growth levels. While there are varying opinions as to the state of the economy, GDP in the first quarter of 2011 was down from the prior two quarters. Moreover, while there have been seven consecutive quarters of positive GDP growth, the rate of growth is less than typical following a recession. (All of this, of course, proves how difficult it is to predict the economy, and why a plans premised on such a prediction to achieve a 40% leap in value based on vibrant economic growth are not confirmed.)

- The Plan's anticipated net proceeds from Property sales are a multiple of the projected trailing 12 months of gross room revenue for each Property, the aggregate of which is projected to be $69,922,417 over four years (the "Projected Net Proceeds"). Therefore, there are two levers to manipulate each Property's projected sale price: the Property's projected monthly room revenue and the subjective RRM. See Second Amended Disclosure Statement, Art. VIII.E and Exhibit C. The smallest tweak in the multiplier can have a dramatic effect on the projected sale price of a Property.

42. Even if there are no hiccups and the projections were all met, there is no room for even a minor mis-step or bad news. However, feasibility requires some reasonable margin of error. See Lakeside, 116 B.R. at 507 ("When virtually all the income generated from the property [and sales thereof] is required to satisfy the debtor's obligation under the plan, it is difficult to conceive of how a plan could be feasible under the Code.") (quotations omitted).

43. Moreover, there is nothing in the Plan that requires the Properties to be sold in any order. This is significant, as seven Properties operated at a loss in 2010, and had to have

their operations funded by the positively cash flowing entities. Moreover, the two most profitable Properties in 2010 are the first two properties projected to be sold under the Plan. If the Debtors continue to attempt to sell the profitable Properties first, their long term ability to cover all post-confirmation obligations becomes more dubious.

### 3.     <u>The Debtors' Have a Poor Track Record in Projecting Performance</u>

44.     The Debtors' historical projection track record (2008-2010) is poor. During its first three years of operations, the Debtors missed their projections 83% of the time.

45.     This makes needing to hit every aspect of drum-tight projected performance all the more legally problematic. Section 1129(a)(11) dictates that a lack of "concrete evidence of a sufficient cash flow to fund and maintain both [the Debtors'] operations and obligations under the plan" renders the Plan unconfirmable. <u>See</u> <u>Trans Max</u>, 349 B.R. at 92; <u>In re Lighthouse Lodge, LLC</u>, No. 09-52610-SLJ, 2010 WL 5156263, at (Bankr. N.D. Cal. Dec. 14, 2010) (finding debtor's projections unsupported by the market, missing expenses and aggressive when compared the debtor's historical performance, and denying confirmation of the debtor's plan to hold and sell the property in three years in order to pay creditors); <u>In re Boston Generating, LLC</u>, 440 B.R. 302, 324 (Bankr. S.D.N.Y. 2010) ("Small changes in assumptions result in substantial differences in value."); <u>Idearc</u>, 423 B.R. at 167 ("projections cannot be speculative, conjectural or unrealistic"); <u>In re Investors Florida Aggressive Growth Fund, Ltd.</u>, 168 B.R. 760, 765 (Bankr. N.D. Fla. 1994) ("Plans which extensively rely on sale or refinance of real property that constitutes a debtor's primary or sole significant asset, and where that asset has been a marginal performer to date, are inherently speculative and invite close judicial scrutiny of the assumptions underlying the plan.").

46.     <u>Lakeside Global</u> is an example of a case where the plan relied on aggressive future appreciation. There, the Court noted that a balloon payment exceeding $9 million was "to

be generated ... primarily from the proceeds of a sale or refinancing of the two income producing assets, the proceeds of which *hopefully are to come from some source, as yet unknown*." Lakeside, 116 B.R. at 508 (emphasis added). The Court explained:

> The owners seek to put the lienholders on hold over their objections for over three more years in the hope that the market will improve, allowing the lower ranked residual owners to sell the investment at a profit....The court is not reasonably convinced that the market will so dramatically improve that it is legally proper to keep the lienholders in suspense while the investors bide for time. This court has consistently critically analyzed projections by experts testifying on behalf of hopeful plan proponents who represent that the market will improve such as to provide the realty with values in excess of the liens and far above current estimates.

Id. at 508. The Court concluded that the plan was not feasible, as "it is not likely that the lienholders will be paid the present value of their interest in the property, considering general economic conditions surrounding this debtor." Id. at 508. The Plan here is no different: it is based on the hope that the market and economy will improve, with Citizens bearing all the risk if either does not, and requiring a dramatic increase in asset values (40%, based on the Debtors' own valuation; 60% based on Citizens's valuation) to just barely meet its obligations.

**4.**     **The Plan Assumes that Nothing Bad will Ever Happen, Contrary to Common Sense and These Debtors' Own History**

47.     The Debtors, with 22 Properties in 6 states and needing to have everything go exactly right for four years, have shown that in real life bad things do happen and businesses require a healthy amount of true equity to deal with downturns and unanticipated events. For example, one of the historically more profitable Properties, Wauwatosa, Wisconsin, is now the subject of a condemnation proceeding, with all the uncertainly that involves. Another property, Cedar Rapids, Iowa, lost its major 2010 customer at the beginning of the year and is experiencing a decline of 15% when compared to the same period (January – May) of 2010.

48. Further, even <u>if</u> there are no unanticipated events over four years at 22 Properties with more than 2,333 rooms, and even if the projections are met perfectly, several errors made in the Debtors' assumptions underlying their projections are <u>each</u> fatal.

49. Those errors include the following

- *Overstated Initial Cash Balance*:  In addition to the aggressive projections of future cash flow, the Debtors' projected initial cash balance is severely overstated by approximately $1.17 million; this overstatement is made up of several miscalculations, including underestimated administrative and unsecured claim obligations and unaccounted-for tax accruals.  This cash deficiency puts the proposed plan in a cash flow hole that cannot be overcome by even the most aggressive projections.

- *Failure to account for Capital Expenditures*: Given the stated industry norms of 6% - 8% of revenue for FF&E needs and the deferred maintenance needs of the Properties, the proposed plan has a cash shortfall of $3.7 million ($4.7 million less $1.0 million funded at close); combined with the apparent intention of the Debtors to not catch up deferred capital expenditures or provide for sufficient spending on a go-forward basis, the Debtors' ability to achieve the required sale premiums on every Property, even if market conditions improve, is not feasible.

- As stated above, the Debtors underestimate Citizens's claim by approximately $300,000; and the Debtors' cash flow model is premised on a 2.8% interest rate on Citizens's deficiency cram-down note; if even a 5% rate is applied to that note, the cash flow model is short by another $750,000.

50. Further, the Debtors' hope to pay Citizens in full is based (and fully dependent) on complete confidence that the economy will improve indefinitely.  Plans which depend on a projected or hoped-for upswing in the economy or the business market are inherently suspect and rarely confirmed.  For example, in <u>Smitty</u>, the debtor's plan contemplated "a significant and intentional delay as it proposed to hold the real property for sale *until the real estate market rebounded*." <u>Smitty</u>, 2008 WL 2095523, at *1, 3 (emphasis added and quotations omitted).  The court found the "Plan hinge[d] fully on a dramatically improving real estate market" and "there [was] insufficient evidence remaining before [it] to support a finding of feasibility" and denied confirmation.  <u>Id.</u> at *11.  <u>See also</u> <u>In re Horseshoe Nail Ranch, L.P.</u>, Case No. 06-41556,

Memorandum Opinion and Order Regarding Proposed Confirmation of Chapter 11 Plans, at *19 (Bankr. E.D. Tex. Dec. 12, 2007) (denying confirmation of a plan in part based on feasibility because success of the debtor's plan depended entirely on its ability to sell the real property and its sales record to date did not inspire confidence in the Court).

51.     Courts are loathed to equate management's (or their own) views as to the chances for continued growth of the economy with the "concrete evidence" necessary to prove feasibility. <u>See, e.g.</u>, <u>In re Chemtura Corp.</u>, 439 B.R. 561, 581 (Bankr. S.D.N.Y. 2010) ("Since the speed (and in the views of some, the fact) of the economic recovery is uncertain, it is inappropriate to be as confident as the [Debtors are] as to future growth in the American economy."); <u>In re Zenith Electronics Corp.</u>, 241 B.R. 92, 104 (Bankr. D. Del. 1999) (noting that "significant risks inherent in its future" must be accounted for when making financial projections to support a plan of reorganization); <u>In re Made in Detroit, Inc.</u>, 299 B.R. 176 (Bankr. E.D. Mich. 2003) (a plan "cannot be based on 'visionary promises;' it must be doable. . . . Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are visionary promises. The test is whether the things which are to be done after confirmation *can be done as a practical matter* under the facts.") (citations omitted and emphasis added).

52.     <u>General Electrodynamics</u> is another case where the court found the debtor's projections to be very "tight." 368 B.R. at 551-52. There, the court was not prepared to put the creditors to the risk that debtor would be unable to overcome any cash deficiencies in light of, among other things, the "possible fluctuations always inherent in the economy." <u>Id.</u> Thus, the court found "confirmation of the Plan will, as likely as not, be followed by a need for further restructuring or Debtor's liquidation" and denied confirmation. <u>Id.</u> at 552. Judge Gerber's caution in <u>Chemtura</u> seems to be well taken especially in today's turbulent market: the "present

economic uncertainties [do not] permit an analysis that is so subject to assumptions that are so optimistic." 439 B.R. at 583.

**E.**     **Fourth Objection – The Rate Proposed on the Cram-Down Note is Legally Insufficient to Compensate for the Risk of the Plan's Failure**

53.     The Debtors propose that the going-forward rate on the cram-down secured note be 5.0% and 2.8% on the deficiency note.[11]   Those rates are legally insufficient, rendering the Plan not fair and equitable.

**1.**     **The legal standard for a Cram-Down Interest Rate**

54.     While often debated, Citizens believes that the formula approach adopted by the Till plurality remains persuasive in determining the required return for cram-down purposes.  See In re Mirant Corp., 334 B.R. 800, 821-22 (Bankr. N.D. Tex. 2005) (citing Till v. SCS Credit Corp., 541 U.S. 465, 478-79, 124 S. Ct. 1951, 158 L.Ed.2d 787 (2004)).  Thus, the formula for determining the present value of Citizens's Claim should "be a risk-free rate plus an adjustment for risk."  See Mirant, 334 B.R. at  821-22.

55.     "Although some courts require the application of a specific method for calculating cram-down interest, in the Chapter 11 context, the Fifth Circuit has repeatedly declined to do so. . . . .   As the court explained in T–H New Orleans, a bankruptcy court's calculation of the post-confirmation interest rate involves a fact specific determination of the risk level in a particular case."  Good v. RMR Investments, Inc., 428 B.R. 249, 253-54 (E.D. Tex. 2010) (citing T-H New Orleans, 116 F.3d 790; Heartland Fed. Savings & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II), 994 F.2d 1160 (5th Cir.1993)).

56.     In re Renegade Holdings Inc., the court aptly explained the analysis underlying a court's present value determination of a plan's treatment of secured and unsecured claims:

---

[11]     As noted below (at fn 12), Citizens does not opt for the deficiency rate, if that option is available to it, but does not know whether the Plan purports to leave that decision to Citizens.

The concept of present value is based upon the recognition that a dollar in hand today is worth more than a dollar due some time in the future. The difference between these two values is referred to as the time value of money. Lost opportunity to put the money to profitable use, the possibility of inflation, and the risk of non-payment explain this difference in value. Present value analysis involves an attempt to compensate for the time value of money, i.e., compensate for the delay in receiving payment. The present value calculation is a mathematical exercise which takes into account the magnitude of future income streams, as well as their timing. The discount rate used to reduce these future income streams to present value can be utilized in a bankruptcy context as an interest rate to ensure payment of the present value of a principal balance over time.

429 B.R. 502, 523-24 (Bankr. M.D.N.C. 2010).

57.     The Court's present value analysis is the same regardless of whether Citizens's claim is deemed one fully secured claim, or a secured claim and an unsecured claim.[12]  First, the statutory language requiring that Citizens be paid the full present value of its claim does not contain a substantial difference for secured or unsecured claims.  See In re Westwood Plaza Apartments, Ltd., 255 B.R. 194, 196 (Bankr. E.D. Tex. 2000); compare 11 U.S.C. § 1129(b)(2)(B)(i) with 11 U.S.C § 1129(b)(2)(A)(i)(II).  Second, "[t]he District Court [of the Eastern District of Texas] specifically held that the same analysis utilized in determining the appropriate interest rate for a secured claim should be utilized for an unsecured claim." Westwood, 255 B.R. at 196.

58.     The Court must fix the cram-down rate in light of the specific risks attributed to non-payment of Citizens's cram-down note.  See SJT Ventures, 441 B.R. at 255 ("a significant

---

[12]     The Plan is not entirely clear on that point.  Citizens believes that whether or not a claim is bifurcated into a secured and deficiency claim is a matter of law once collateral has been valued (as it has been here, at a range between $45.5 million and $53.2 million (plus the amount of cash collateral), and not a matter of whether Citizens takes some action to "trigger" that (as perhaps described by Section 4.3.2(ii) of the Plan)). In any event, Citizens does not hereby pull any such "trigger," whatever that may be, leaving (as Citizens believes appropriate, outside the context of Code Section 1111(b)) the decision to the Court as to whether Citizens enjoys only a secured claim here.  Citizens does accept the Debtors' offer, as it were, to enjoy a fully secured claim for purposes of credit bidding on the Properties and whatever other protections that may be accordingly afforded to it.

objective of a bankruptcy court when determining an appropriate rate of cram-down down interest is to arrive at a rate of interest that "reflects the present value of the [creditor's] claim and accounts for the specific level of risk") (citing T-H New Orleans, 116 F.3d at 801); In re Maluhia Eight, LLC, Case No. 10-30986-HDH-11, 2010 WL 4259832, at *3 (Bankr. N.D. Tex. Oct. 22, 2010) ("The Court is concerned with the treatment of secured claims under the plans and that too much risk is placed on the secured creditors who are asked, in essence, to allow the Debtors to gamble with their money with little upside return.").

59.     Articulated by the Till plurality, factors that influence the degree of risk include (a) the circumstances of the estate, (b) the nature of the security, and (c) the duration and feasibility of the reorganization plan.  See Till, 541 U.S. at 479.  Also relevant, according to the Till plurality, are (d) the probability of plan failure, (e) the rate of collateral depreciation, (f) the liquidity of the collateral market, and (g) the administrative expenses of enforcement.  See Renegade, 429 B.R. at 526 (quoting Till, 541 U.S. at 484).  "Additional 'risk factors to consider include the debt service coverage ratio, the loan-to-value ratio, and the quality of any guarantors.'"  In re 20 Bayard Views, LLC, Case No. 09-50723-ESS, Memorandum Decision on Confirmation of Third Amended Plan of Reorganization, at 43 (Bankr. E.D.N.Y. Mar. 7, 2011) (quoting In re Griswold Bldg. LLC, 420 B.R. 666, 693 (Bankr. E.D. Mich. 2009); citing In re Gramercy Twins Assocs., 187 B.R. 112, 124 (Bankr. S.D.N.Y. 1995) (noting that "the relatively high loan to value ratio in this case, which is approximately 85%, increases the risk factor"); In re Deep River Warehouse, 2005 WL 2319201, at *11 (observing that "[r]isk is increased significantly when the loan to value ratio is 100%, but a high grade tenant positively affects that risk")).

60.     The Till Court "declined to specify any particular range of adjustment as appropriate, but noted that 1% to 3% had been common, and that 'eye-popping' interest rates

would not be proper adjustments, as such a rate suggests that the plan of reorganization is not feasible and should not be confirmed." Renegade, 429 B.R. at 526 (quoting Till, 541 U.S. at 480-81). The Court further noted, however, that if after evaluations of the Plan the Court felt that a high interest rate was appropriate, the Plan probably should not be confirmed. This approach, however, "does *not* provide, as a matter of law, a specific range of interest rates." See Mirant, 334 B.R. at 824 (emphasis added).

**2.** **The specific risk of non-payment of Citizens's Claim requires an interest rate of at least 8.25% to 9.3%**

61. As the formula suggests, the Court should start with a risk-free rate, 3.25%[13], and add an adjustment for risk. The Till factors here dictate a rate much higher than the rate proposed by the Debtors:

(a) Circumstances of the Estate. The Debtors will continue to be controlled by Mr. Milton Fine. Mr. Fine is a so-called "market timer," who tries to buy hotels in front of a market up-swing. If the up-swing happens, he will make a profit. If the market does not, a bankruptcy stay or other litigation is the business tool available to bridge the softer market until the timing for sales is better. Under his control, the existing Guarantors are conducting a war of attrition and have failed to pay a penny on their existing Guaranty despite the Debtors' payment default 18 months ago. Four other related hotel companies owned by Mr. Fine have also been litigating plan confirmation and other issues with their lender for almost a year. Dealing with Mr. Fine's entities is fraught with litigation and legal promises are kept only by court order, and things get horribly expensive when circumstances (including the economy generally) do not go as hoped. There is nothing about these "circumstances" that predict low risk.

(b) Nature of the Security. The Properties are worth somewhere between $45.5 million and $53.2 million, and need to be converted into value as of the Effective Date of $71 million. They are old and tired, and the proposed reserve for repairs is a fraction of what the industry dictates as normal.

(c) Duration and Feasibility of the Plan. As explained above, the Plan is completely dependent on a steady and uninterrupted improvement in the United States economy. The Plan uses a four-year sell-off period because, simply, no less than four years of compounded growth in the economy (and thus the hoped-for value of the Properties), is required to tie out sufficient gross sales proceeds to the

---

[13] The United States prime rate, according to the Wall Street Journal Online, is 3.25% as of the date hereof [Effective Date: 12/16/2008]. See http://online.wsj.com/mdc/public/page/2_3020-moneyrate.html.

amount of Citizens's claim.  Compounding that sensitivity, most of the Properties are projected to be sold off towards the end of this period, where the uncertainty is greatest.  The highly speculative nature of the Plan, and the requirement that the economy grow for four years without pause, would require a very heavy upward adjustment in the <u>Till</u> rate to overcome the risk that the future of this country's economy may not be quite as consistently robust as these Debtors would hope.

(d)     <u>Probability of Plan Failure</u>.  There are some chapter 11 plans considered speculative when predicting 100% payment on a secured claim from a business plan to sell many properties over a four year period without any negative event. Here, the Debtors go even further, and are betting Citizens's collateral on avoiding negative events while waiting for enough national economic growth to realize not only 100% of collateral value but a 40% -80% premium on top of that. Citizens's research has turned up no case that has permitted a plan to go forward on that assumption, regardless of rate.  Accordingly, the risk of plan failure is high and, while no rate could properly compensate for that risk, the upward <u>Till</u> adjustment for this factor alone would need to be extreme.

(e)     <u>Rate of Collateral Depreciation</u>.  These are older hotels, and the Debtors propose to spend only a small fraction of what national experts consider to be necessary for their maintenance and repair.  The rate of depreciation is thus likely to be high, and there is no equity cushion to protect against that risk.

(f)     <u>Liquidity of the Market</u>.  The market for economy hotels has fluctuated widely in recent years, and while guesses could be made as to market for them in future years, those guesses are merely that, and not assurances of a ready market at any price.

(g)     <u>Administrative Expenses of Enforcement</u>.  Here, there is, unfortunately, concrete evidence of the cost of enforcing promises made by these entities.  Citizens has already incurred millions of dollars of cost in six states to attempt to enforce its rights under the 2008 Agreements.  Given the dogged nature of what seems to be a war of attrition waged by the Guarantors, millions more may be required.  This risk factor here seems to be extreme by any measure.

(h)     <u>Loan to Value Ratio</u>.  As the Court knows, a 100% loan to value ratio is seen as exceptionally risky, well beyond any commercial interest rate.  Here, the loan to value ratio is admittedly somewhere about 134% at best, making it impossible to find any legal or market reference to find fair compensation for that risk.

(i)     <u>Quality of Guarantors</u>.  See above as to the expenses of enforcement.

62.     After accounting for the risk premiums associated with this Plan, it is obvious that

5% per annum is insufficient to compensate Citizens in full and therefore the Plan is not fair and

equitable.

**F.**     **Fifth Objection – The Debtors' Insiders Are Permitted to Buy the Properties at Prices 30% Less Than Required to Perform the Plan**

63.     As described, the 22 Properties must be sold for gross prices of about $74 million to pay off Citizens's Prepetition Claim, even before interest (and assuming that the Pendency Charges are paid <u>in cash</u> on the Effective Date).

64.     Notwithstanding that, the Debtors have set minimum sale prices, including for sales to insiders, at a very substantial discount to that. Plan 4.3.4. There can be only two reasons for that: the Debtors also do not really believe that they can achieve the 40% to 60% appreciation from today's values necessary to perform the Plan, or, if any of the Properties do materially appreciate, the Debtors can easily flip them to their insiders (already in the hotel business) at steep discounts, leaving Citizens holding the (short) bag. Or both.

65.     The danger of this Plan feature is compounded by the fact that the Plan has no covenants of any sort. So, for example, if Property 16 must be sold at $3.8 million to track the minimum Plan performance, and it is sold at $2.8 million, that is not a default. Further, if 21 of 22 Properties are sold in Year 1 to insiders for $47 million when $67 million was required for Plan performance, that is not a default. Even if the only remaining Property, appraised at $3.0 million, would need to be sold for $30.0 million, Citizens would need to wait the full 48 months to be able to act and suffer its fate.[14]

66.     This Plan feature, while stark in its illustration that all risk is pushed onto Citizens, is consistent with the owners' intention of trying at all costs to achieve lender

---

[14]     The Debtors will no doubt argue that Citizens could "control its fate" by credit bidding. That is wrong for two reasons. First, Citizens is given only 5 business days to receive the Debtors' sale proposal, evaluate all updated environmental and other risks, obtain an updated appraisal and then get internal approvals (all, of course, required for a national bank). That "credit bid" right is thus ephemeral. Second, even if Citizens did credit bid, that does not change the fundamental problem – the Properties can be sold at prices that reflect reality but not even close to what is needed to achieve the Plan, all without consequence for four years.

exhaustion rather than proposing something that comports with fundamental fairness and thus the Code.

**G.     Sixth Objection – The Plan Does Not Specify The Amount Of Payments To Be Made To Citizens Pending The End Of Claim Litigation, Which Is Not Fair and Equitable**

67.     At the Disclosure Statement Hearing, Citizens complained that the Plan permitted the Debtor to delay indefinitely the starting date for interest payments to Citizens on the crammed-down loan.  The Debtor promised to fix that defect.  They added some language requested by Citizens, but did not fully fix the defect.

68.     The Plan provisions governing this issue are as follows:

- Payments under the Plan are required to be made only on account of "allowed claims."  See, e.g., Plan 4.3.3(iv) ("The Lender Secured Claim, to the extent allowed, shall be interest … .  The Reorganized Debtors shall make monthly payments to the Lender of said interest … ."), 4.4.3(i) and 4.4.3(ii).

- The Debtors did require that they must make the first payment of interest on October 1, 2011 (assuming an Effective Date in August 2011).  Plan 4.4.3(iv) and 4.4.3.(i).

69.     As the Court knows well, the Debtors have raised "lender liability" and similar defenses to Citizens's claim, and have resisted Citizens's efforts to quickly resolve those defenses.  As of today, Citizens's Prepetition Claim is therefore not "Allowed" and per the Plan will not be Allowed until the Debtors' litigation is resolved by Final Order.  Plan 1.2 (definition of "allowed").

70.     The Debtors do not disclose anywhere in the Plan the principal balance on which interest is to be paid pending final allowance.

71.     In arguing for more time and flexibility to litigate, however, the Debtors did promise to treat Citizens's Prepetition Claim as if it had been Allowed until such time that final allowance occurs.  See Disclosure Statement Hr'g Tr. 76:19-23, 101:16-23 June 13, 2011 (Debtors' Counsel: "As I've commented before and as I'll state now, without qualification,

without waiver, without any kind of out, [Citizens's] claim for plan confirmation purposes, or rather the plan should be assessed for feasibility at the full amount of their proof of claim. . . . No, they don't need to have a finally allowed claim by final non-appealable order.").

72.     Assuming that the required Pendency Charges are paid on the Effective Date in cash, as Citizens submits is required by applicable case law, the Citizens Prepetition Claim as filed (and awaiting final allowance) is $70,823,563.24. That is the appropriate starting point for the calculation and payment of cram-down interest pending final allowance of Citizens's Prepetition Claim. (Of course, if the Pendency Charges are not paid in cash, that amount will be added to the cram-down note and, if by Final Order the principal amount of Citizens's cram-down note is reduced, the interest difference would be properly deducted from the payments due to Citizens going forward.)

**H.     Seventh Objection – The Plan Dictated An Improper Solicitation And Voting Scheme**

73.     The Code requires, of course, that creditors of a debtor vote to accept or reject that debtor's plan. 11 U.S.C. § 1126(a); Fed. R. Bankr. P. 3017(a). There is no law or rule permitting anyone else to cast ballots.

74.     While the Plan provides for the substantive consolidation of the Debtors on the Effective Date (Plan 6.6), there is no legal basis for consolidation prior to that time, and in any event such relief has not been requested.

75.     Notwithstanding that, the Plan permits the creditors of any one Debtor to accept or reject the Plan of the other Debtors. Plan 7.5. There is no legal basis for that. And, given that improper solicitation has already occurred, it is a defect that cannot be cured.

76.     Citizens reserves all rights to also object to confirmation of the Plan on any other bases (such as the requirement imposed by Code Section 1129(a)(10) of an accepting impaired class) relating to this illegal solicitation and voting scheme. In any event, this illegal solicitation

and voting scheme already violated Code Sections 1126(a) and 1129(a)(1) and (2), rendering confirmation improper.

I.      **Eighth Objection – The Plan Improperly Releases Nondebtors**

77.     The Plan requires Citizens (and others) to release FFC Capital Corporation, each individual who at any time served as an officer, director, manager or managing member of one or more of the Debtors, and certain others (collectively, the "Nondebtor Release Parties") from any alleged liability for "an action or omission taken in the Bankruptcy Case, or with respect to a Claim in the Bankruptcy Case, or with respect to this Plan." See Plan 9.6. In addition, the proposed Plan exculpates the Nondebtor Release Parties "for any actions or inactions taken by the following in, or arising against the following as a result of, the Bankruptcy Case, the Disclosure Statement, and the Plan." See Plan 9.7. Likewise, the Plan (at section 9.1) expands the "discharge" provided to the Debtors by Code Section 1141(d)(1) to also apply to the undefined universe of whoever may be, from time to time, the "successor" or "assign" of any of the Debtors. (These provisions are hereinafter referred to as the "Insider Releases.")

78.     These Insider Releases are illegal. "The Fifth Circuit has held that a nondebtor release violates section 524(e) when the affected creditor timely objects to the provision." In re Wool Growers Cent. Storage Co., 371 B.R. 768, 776 (Bankr. N.D. Tex. 2007) (citing Feld v. Zale Corp. (In re Zale Corp.), 62 F.3d 746, 761 (5th Cir.1995)); see also In re Bernhard Steiner Pianos USA, Inc., 292 B.R. 109, 116 (Bankr. N.D. Tex. 2002) (holding that a plan that releases a nondebtor could not be confirmed over creditor objections). The nonconsensual release of nondebtors is not something to be taken lightly because such a release "lends itself to abuse." See In re Multiut Corp., 449 B.R. 323, (Bankr. N.D. Ill. 2011) ("A nondebtor release should only be approved in rare cases because it is a device that lends itself to abuse." ); Wool Growers, 371 B.R. 768 (Bankr. N.D. Tex. 2007) (nonconsensual third-party release included in corporate

debtor's proposed plan prevented court from confirming plan, though release was necessary to insiders' agreement to make $2,625,000 contribution to debtor's reorganization, and though plan had overwhelming creditor support).

79. The Plan plainly violates Section 524(e).[15] In turn, such violation is a violation of the confirmation requirements of Sections 1129(a)(1) and (2) and render the Plan not confirmable.

## J.   Ninth Objection – The Plan Requires Payments to Contractually Subordinated Creditors

80. The Plan provides for full payment to Interstate on its prepetition claim. Further, the proposed plan provides prohibited for payments to be made to FFC and other prohibited payments to Interstate going forward. The subordinated parties each have a valid and enforceable agreement[16] with Citizens and the Debtors that provides that, so long as an event of default had occurred under the Credit Agreement, and Citizens remains unpaid (such prepetition defaults no longer are subject to any other type of "cure" if the Plan is confirmed), the subordinated parties will not receive any monies which may be then or thereafter owing to those subordinated parties. See Subordination Agreements, section 7. Therefore, the payments to the subordinated parties dictated by the Plan violate the Subordination Agreements.

---

[15]   As the Wool Growers court points out, "[s]ome courts have allowed non-consensual nondebtor releases provided certain factors were satisfied." 371 B.R. at 777 (citing In re Master Mortgage Inv. Fund, Inc., 168 B.R. 930, 934 (Bankr. W.D. Mo. 1994)). These courts typically decide whether to allow a nonconsensual release based on the following factors: "(1) identity of interest between the debtor and the third-party, (2) substantial contribution of assets to reorganization, (3) release is necessary to the reorganization, (4) majority of affected creditors have overwhelmingly accepted plan treatment, and (5) plan provides payment of all, or substantially all, of affected classes' claims." Id. Here the Nondebtor Release Parties have contributed nothing to the proposed plan, release of the Nondebtor Release Parties is not necessary, the proposed plan is certainly not "overwhelmingly accepted," and the proposed plan's treatment of rejecting creditors is heavily contested. Therefore, even if the Court were to consider approving the Insider Releases in some other context, the factors weigh heavily against such releases here.

[16]   See Collateral Assignment and Subordination of Asset Management Agreement (the "FFC Subordination Agreement"), dated February 8, 2008, among the Debtors, FFC and Citizens; and the Collateral Assignment and Subordination of Asset Management Agreement (the "Interstate Subordination Agreement") dated February 8, 2008, among the Debtors, Interstate and Citizens (together, the "Subordination Agreements").

81. The Bankruptcy Code provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). This language has been construed as obliging the "bankruptcy court, in order to effectuate its duty to do equity, [to] enforce lawful subordination agreements according to their terms and prevent junior creditors from receiving funds where they have explicitly agreed not to accept them." In re Hinderliter Indus., Inc., 228 B.R. 848, 849-50 (Bankr. E.D. Tex. 1999) (quoting In re Credit Indus. Corp., 366 F.2d 402, 410 (2d Cir. 1966)). This obligation extends to "dealing with enforcement of subordination agreements within the context of a confirmation hearing," In re Best Prods. Co., 168 B.R. 35, 65 (Bankr. S.D.N.Y. 1991), because a "plan which provide[s] for a distribution to [contractually subordinated] classes without paying the allowed amount of senior unsecured claims would violate the absolute priority rule per se." See In re Gen. Homes Corp., 134 B.R. 853, 864 (Bankr. S.D. Tex. 1991) (confirming plan that paid nothing to noteholders subordinated by agreement); In re BearingPoint, Inc., No. 09-10691, 2009 WL 7906745, at *8 (Bankr. S.D.N.Y. Dec. 22, 2009) (finding plan "fair and equitable" as to the rejecting classes because the plan maintained the relative priority among the classes, specifically, holders of junior noteholder claims met the requirements of Section 1129(b)(2)(B) because the plan enforced the contractual subordination).

82. Citizens notes that a recent decision held that Section 510(a) issues in and of themselves should not hold up plan confirmation. In re TCI 2 Holdings, LLC, 428 B.R. 117, 140 (Bankr. D. N.J. 2010). Citizens believes that TCI was wrongly decided and contrary to the great weight of decided cases, and in any event not squarely on point because decided in the context of the complaining creditor having made the Code Section 1111(b) election (and thus treated as fully secured in any event even if not for the demanded relief). Here, of course, no one is arguing that Citizens is over-secured.

83.    However, even if the Court here were to follow what Citizens believes is the wrong holding in TCI, even TCI itself would not support confirmation of this Plan in regard to this issue.  Nothing in the TCI plan would have precluded the enforcement of the objecting party's rights against the subordinated creditors in other proceedings.  Indeed, it was noted there that the senior creditor had already commenced such proceedings, and the Court's rulings did nothing to preclude the continuation of those proceedings.

84.    Here, in contrast, the Debtors do seek to do exactly that.  At Plan section 9.2 (ii) and (iii), the Debtors ask this Court to "permanently enjoin" Citizens from, among other things, "collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly … any property to be distributed under the Plan" … or seeking attachments or other protections to which Citizens is entitled.  This goes well beyond anything approved by any other court, and renders the Plan unconfirmable as extending unwarranted protections to non-debtors and impairing Citizen's contractual rights against third parties.

85.    The Plan thus violates Code Section 510(a), and such violation is in turn a violation of the confirmation requirements of Code Sections 1129(a)(3).  Therefore, the proposed Plan cannot be confirmed.

## K.    Tenth Objection – Highly Contingent and Discretionary Effective Date

86.    The Plan cannot become effective until the so-called "Plan Funder" makes the "Plan Funding," which is a cash infusion of $1,500,000 used entirely to pay the Franchisor, administrative claims and a 50% payment to holders of general unsecured claims other than Citizens.  Plan 6.1 and 10.1.

87.    The Plan Funder is also obligated to establish two letters of credit, one in favor of the Franchisor (Plan 6.7), and one in favor of Citizens to secure the payment of interest on the cram-down note (Plan 6.3).

88.     The Plan Funder also absolutely guaranties the full payment of all interest on Citizens's cram-down note.  Plan 6.3.  If one makes assumptions that adopt the Debtors' $53.2 million valuation of the Properties, the aggregate amount of interest to be paid on Citizens's cram-down note will be about $10,177,000 just through the duration of the four-year sell-out period.  Those assumptions are as follows, for purposes of this computation only:

- The Debtors' requested 5% interest rate is adopted, and extended to both the secured and hope cram-down notes;

- The Debtors' Properties are sold at the mid-year point of each Plan year in which they are required to be sold (that is, if four Properties must be sold in Plan year 1, four Properties will be sold at dates averaging the mid-point of such year);

- Each of the 22 Properties has approximately the same value - $2,418,182 (that is, $53.2 million divided by 22) (an assumption required because the Plan does not dictate the order of sale); and

- The net proceeds of each sale are 96% of such value (that is, all costs of sale other than agreed commissions are ignored for this purpose).[17]

89.     The Plan Funder is required to cause a "nationally recognized financial institution" (yet un-named) to post a so-called "evergreen" letter of credit to assure that payment of interest, which is subject to automatic replenishment by the institution "upon any draw."  Plan 6.3.

90.     Citizens respectfully has some doubt whether any "nationally recognized financial institution" will ever issue such an evergreen letter of credit.[18]

---

[17]     This hypothetical leaves an unpaid principal balance of about $19,750,000 still due on the cram-down notes at the end of four years.  Per the Plan, that interest continues to accrue and be paid (and to be guarantied) indefinitely; however, for simplicity's sake, this modeling assumes that the Debtors or their affiliates step in and pay off the note at the end of 48 months to stop the perpetual payment of the guarantied interest.

[18]     Of course, the Debtors could argue that the "nationally recognized" institution's obligation to replenish and renew is _itself_ conditioned on some _other_ events (such as the Plan Funder posting additional collateral, for example), which may or may not happen as it sees fit at the time.  However, as undisclosed conditions such as that would make  a mockery of this supposed pillar of the Plan's feasibility, Citizens will not speculate as to what, if any, undisclosed conditions there may be to the institution's promised direct obligation to Citizens.

91.     That uncertainty, and the highly questionable issue of whether the Debtors will ever satisfy this condition to Plan effectiveness, renders the Plan not fair and equitable and it should thus not be confirmed.

**L.      Eleventh Objection - The Plan Improperly Classifies Citizens's Deficiency Claim**

92.     The Debtors are separately classifying Citizens's Deficiency Claim and the General Unsecured Claims without a business justification independent of their desire to confirm the Plan.

93.     "Section 1122(a) provides that only 'substantially similar' claims may be classified together. Section 1123(a)(4) further provides that a plan must 'provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.'" Horseshoe Nail Ranch, Memorandum Opinion and Order Regarding Proposed Confirmation of Chapter 11 Plans, at * 16 (Bankr. E.D. Tex. Dec. 12, 2007) (finding the Debtor has offered no rational basis for its separate classification of a deficiency unsecured claim "other than a desire to treat [the claim holder] differently than similarly situated creditors, and concluding that the debtor's plan did not fully comply with §1122(a)).

94.     Section 1122 of the Bankruptcy Code contemplates "some limits on classification of claims of similar priority [and that a] fair reading of both subsections [of § 1122(a)] suggests that ordinarily substantially similar claims, those which share common priority and rights against the debtor's estate, should be placed in the same class." See Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1278 (5th Cir. 1991) (quotations and citations omitted). "In examining the parameters of that general rule, the Court articulated 'the one clear rule that emerges from otherwise muddied caselaw on § 1122 claims classifications: thou shalt not classify similar claims differently in order to gerrymander

an affirmative vote on a reorganization plan.'" <u>In re Save Our Springs (S.O.S.) Alliance, Inc.</u>, 388 B.R. 202, 234 (Bankr. W.D. Tex. 2008) (<u>citing</u> <u>Greystone</u>, 995 F.2d at 1279). "[C]lassification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of Claims." <u>Greystone</u> 995 F.2d at 1279. "Most courts have looked to see if there is some business or economic reason independent of the debtor's need to separately classify a claim to confirm a plan." <u>Save Our Springs</u>, 388 B.R. 202 at 235.

95.      Here, the Debtors state that they must pay half of Class 6 General Unsecured Claims on the Effective Date in order to  retain vendors.  In addition, the Debtors claim that if Citizens gains control of the Properties, Citizens would likely change Property vendors or modify vendor terms.  (The Debtors have protested loudly every time Citizens has suggested that it would do the same thing as the Debtors.)  These claims are not rooted in business judgment - it is the Debtors' way of ensuring that General Unsecured Claims vote to accept the Plan.  In reality, the Properties are scheduled for sale one way or the other, and the Debtors are not a true "going concern."  Therefore, the threat of change in the vendor/Property relationship cannot be a valid business reason (and, in fact, change might be healthy for some Properties' bottom line).

96.      The Debtors further allege that the unrealized guaranty of the Guarantors makes Citizens's Deficiency Claim dissimilar from the General Unsecured Claims.  This is another distinction without a legal difference.  In light of the absence of Plan contributions from the Guarantors, the Court cannot give weight to Citizens's possible recovery from the Guarantors when considering the treatment of Citizens's Deficiency Claim.

97.      Thus, the separate classification of the unsecured claims of Class 4 and Class 6 is void of a business justification and in violation of  Code Section 1122.

**M.      <u>Twelfth Objection - The Plan Unfairly Discriminates Against Citizens</u>**

98. Code Section 1123(a)(4) requires that Citizens's Class 4 deficiency claim must receive treatment of a value commensurate with the value afforded to the similarly situated Class 6 General Unsecured Claims.

99. In other words, Citizens's deficiency claim must "receive treatment which allocates value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor." In re MCorp Financial, Inc., 137 B.R. 219, 234 (Bankr. S.D. Tex. 1992) (citing Matter of Sandy Ridge Development Corp., 889 F.2d 663 (5th Cir. 1989)). "At a minimum . . . the unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so." Idearc, 423 B.R. at 171 (citing In re Johns-Manville Corp., 68 B.R. 618 (Bankr. S.D.N.Y. 1986) (segregating two similar claims into separate classes and providing disparate treatment for the classes is unfairly discriminatory)); See In re Mortgage Inv. Co. of El Paso, Tex., 111 B.R. 604, 615 (Bankr. W.D. Tex. 1990) (finding unfair discrimination because debtors had no demonstrable reason for the immediate payment in full of the unsecured trade creditors and the immediate payment in full of another class of unsecured creditors up to $250,000, versus a partial payment on account of secured creditor's unsecured claim over an extended period, other than to ensure acceptance of the plan); In re Meadow Glen, Ltd., 87 B.R. 421, 427 (Bankr. W.D. Tex. 1988) (accord).

100. Here, due to the disparate treatment of the deficiency claim (receiving *nothing* upon the Effective Date and receiving payment if and only if the Secured Claim is paid in full) vis-à-vis the treatment of the General Unsecured Claims (receiving *half* in cash upon the Effective Date and possibly the remainder later if Citizens's Secured Claim and deficiency claim are paid in full), the Plan unfairly discriminates. See Plan 4.4. Thus, the Debtors' Plan violates Code Section 1129(b)(1).

**N. Thirteenth Objection – The Plan Does Not Explicitly Retain The Customary Protections That Now Protect Citizens's Credit and Collateral Position, and is Therefore Not Fair and Equitable**

101. Citizens appreciates that the Plan, as proposed and if confirmed, would modify certain specified provisions of the existing Credit Agreement (such as the interest rate). The Plan fails to specify, however, whether the many other customary covenants and other protections designed to protect Citizens's credit and collateral positions would be retained, deleted or somehow modified.

102. In a cram down, the secured lender is entitled to sufficient covenants to protect its interests from the risks of the debtor's proposed plan. See In re Kellogg Square P'ship, 160 B.R. 343, 368 (Bankr. D. Minn. 1993) ("In exchange for the forced entry into that loan, the creditor is entitled to demand both pecuniary and non-pecuniary terms that are sufficient to shelter it from the risks inherent in the debtor's proposal."); In re Seatco, Inc., 257 B.R. 469, 482-84 (Bankr. N.D. Tex. 2001) (only approving crammed down loan after debtor added "sufficient covenants to protect [the secured lender's] interests in its collateral" following the debtor's original proposal which voided most of the covenants that had protected the secured lender's lien rights under the prepetition loan). Additionally, the crammed down secured creditor is entitled to demand "market-standard terms" to protect its interests. See Kellogg Square, 160 B.R. at 368-69 (a creditor is "entitled to insist on the execution of new security instruments, with content equivalent to what the parties would reasonably negotiate on a loan origination *at the present time*") (emphasis added); id. at 368 (proposed plan not fair and equitable because secured lender "entitled to demand market-standard terms as to all of the other points for which the debtor's proposed security deviates from current norms"). The creditor's right "to this treatment stems from the basic nature of the debtor's remedy under Chapter 11: to obtain legal enforceability for a new complex of binding contractual relationship with all of its creditors, which supplant those

which obtained before its bankruptcy filing." Id. (citing In re Ernst, 45 B.R. 700, 702 (Bankr. D. Minn. 1985)). Moreover, to the extent the covenants are modified from those contractually agreed to in the loan documents and the modifications are otherwise "fair and equitable," the secured lender is entitled to an additional risk premium for any added risks. In re Sherwood Square, 107 B.R. 872, 885 (Bankr. D. Md. 1989).

103. As the Plan fails to specify which covenants, representations and other protections would remain intact and which would be modified, and if modified in which particular manner, Citizens by necessity reserves its further right to object on this and any related bases. In its present form, however, the Plan does not explicitly retain all of the protections which Citizens presently enjoys, and on which the evidence on issues such as cram-down rate is based, and the Plan is thus not fair and equitable.

## O.     Fourteenth Objection – The Plan Is Not Proposed In Good Faith

104. The inherent risks that the Debtors will not achieve unprecedented revenue growth and that the Properties will not appreciate approximately 40% above the Debtors' own appraised value falls entirely on Citizens. Moreover, the Plan provides Citizens with no protections against the failure of either of these assumptions (both of which must occur entirely as projected to barely provide Citizens full payment).

105. Even above and beyond the several more particularized Plan defects described above, mere technical compliance with all the requirements of Code Section 1129(b) would not assure that the plan is "fair and equitable." See In re D&F Constr., Inc., 865 F.2d 673, 675 (5th Cir. 1989).

> Section 1129(b)(2) sets minimal standards plans must meet. However, it is not to be interpreted as requiring that every plan not prohibited be approved. A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is "fair and equitable."

Id.

106.     To be "fair and equitable," "[a] proponent seeking confirmation of a plan on a nonconsensual basis must convince the Court that the terms of the plan treat the dissenting class fairly and do not unduly shift the risk of reorganization." In re Montgomery Court Apartments of Ignham County Ltd., 141 B.R. 324, 346 (Bankr. S.D. Ohio 1992); Lakeside Global, 116 B.R. at 511 (under the plan, the creditor ran the ultimate risk of the reorganization's failure with no upside potential, and such a result was not fair and equitable and violated the absolute priority rule); In re EFH Grove Tower Associates, 105 B.R. 310, 313 (Bankr. E.D.N.C. 1989) (finding that the creditor would have been forced to fund the costs of the debtor's reorganization under the proposed plan, and that was simply not fair - the costs of the debtor's reorganization should be borne by those who stand to gain from the reorganization).  As explained by the EFH Grove Tower court:

> Basically, the debtor is attempting to alter the prebankruptcy bargain which existed between it and its primary creditor. Restructuring relationships is the essence of chapter 11 reorganizations, but this court will not approve such a one-sided rearrangement as that proposed by the debtor.  *The primary creditor has little to gain from the debtor's proposed plan, yet the risks that the plan imposes upon the primary creditor are substantial. The debtor and its extended financial family, on the other hand, derive significant benefits from the plan, but accept only minimal risks.*

105 B.R. at 313 (emphasis added).  See also In re Consul Restaurant Corp., 146 B.R. 979, 989 (Bankr. Minn. 1992) (finding that plan was not fair and equitable where the proposed distribution would "substantially shift the risk of failure of the plan from a junior class to a senior dissenting class for no legitimate purpose"); In re Miami Center Assocs., Ltd., 144 B.R. 937, 942 (Bankr. S.D. Fla. 1992) (given the risks associated with the loan, it was questionable whether the secured creditor would receive the value of its total secured claim and this type of attempted risk shifting was meant to be prevented by the absolute priority rule).

107.     Moreover, "[a] plan that is not fair and equitable with respect to an impaired secured creditor cannot be confirmed on the basis that such inequity is necessary to protect junior creditors."  D&F Construction, 865 F.2d at 676 (here, that mandate would apply to the holders of interests).   "If market conditions are such that an effective plan of reorganization cannot be developed that is fair and equitable to dissenting creditors, [the secured creditor] is entitled to foreclose on its liens."  Id.

108.     The Debtors' proposed Plan does not "promote the rehabilitative objectives and purposes of the Bankruptcy Code," nor does it have a reasonable chance of success. The livelihood of no employees is at risk.  The only question is who gets to sell the hotels.  The goal of the Debtors' owners is not rehabilitation of a troubled enterprise but an all-out effort by a well-heeled market-timer to cause lender exhaustion by war of attrition, hoping to outlast Citizens and delay any payment as long as possible from the debtor-affiliated Guarantors who have hitch-hiked along on their stay.  This tactic is simply wrong and, in combination with the balance of this Objection, the Court should find a lack of good faith in the Debtors' proposal of the Plan and deny confirmation.

**WHEREFORE**, Citizens respectfully requests that the Court sustain this Objection, deny confirmation of the Plan, and grant Citizens such other and further relief as is just and proper.

Dated:  July 19, 2011                                  Respectfully submitted,

                                        **STUTZMAN, BROMBERG, ESSERMAN &**
                                        **PLIFKA, A PROFESSIONAL CORPORATION**

                                        By:  _/s/ Sander L. Esserman_

                                        Sander L. Esserman
                                        Texas Bar No. 06671500
                                        Jacob L. Newton
                                        Texas Bar No. 24046523
                                        2323 Bryan Street
                                        Suite 2200
                                        Dallas, TX 75201

                                        --and--

                                        William R. Baldiga (*pro hac vice*)
                                        BROWN RUDNICK LLP
                                        Seven Times Square
                                        New York, NY 10036
                                        T:  (212) 209-4800
                                        F:  (212) 209-4801

                                        James W. Stoll (*pro hac vice*)
                                        BROWN RUDNICK LLP
                                        One Financial Center
                                        Boston, MA 02111
                                        T:  (617) 856-8200
                                        F:  (617) 856-8201

                                        *Counsel for Citizens Bank of Pennsylvania*

<u>**CERTIFICATE OF SERVICE**</u>

      The undersigned hereby certifies that on this 19th day of July 2011, I caused a true and correct copy of the foregoing *Objection of Citizens Bank of Pennsylvania's to Confirmation of Debtors' Second Amended Plan* to be served (i) electronically by the Court's ECF system on parties in this case subscribing to the same, and (ii) by U.S. first-class mail, postage prepaid, on the parties listed on the Official Limited Service List on file in this case as of May 31, 2011.

                                          */s/ Rachael L. Smiley*
                                           Rachael L. Smiley