# PURCHASE AND SALE AGREEMENT (PSA)

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is made as of July 25, 2011, between BPP ILLINOIS, LLC, a Delaware limited liability company ("Seller"), and LNG LLC, an Oregon limited liability company ("Purchaser").

## WITNESSETH:

1.     Property. In consideration of the mutual promises, covenants, and agreements hereinafter contained, Seller agrees to sell and convey to Purchaser, and Purchaser agrees to buy and take from Seller, upon the terms and conditions hereinafter set forth, that real property currently operated as the Baymont Inn & Suites (O'Hare) hotel located at 2881 Touhy Ave., Elk Grove Village, Illinois 60007, together with all of the improvements and appurtenances thereunto belonging, if any, and the Personal Property (as herein defined) (collectively, the "Property"). The Property's legal description is set forth on Schedule 1 to the Deed (as herein defined).

2.     Purchase Price. Purchaser agrees to pay as the purchase price for the Property the sum of $3,955,511 (the "Purchase Price") on the following terms.

(a)     The sum of $50,000 earnest money (together with any interest earned thereon, the "Deposit") shall be paid by Purchaser to Chicago Title Insurance Company ("Title Company") within two business days after the date hereof.

(b)     The remaining balance of the Purchase Price, subject to closing adjustments and prorations and after crediting the Deposit, shall be paid to Seller (or Seller's designee) in cash or immediately available funds at the Closing (as herein defined).

3.     Deposit. If Closing is completed in accordance with the terms of this Agreement, Seller shall apply the Deposit to the balance of the Purchase Price due at Closing. If Purchaser defaults under this Agreement and fails or refuses to close the sale as provided in this Agreement, then Seller may retain the Deposit as liquidated damages for Purchaser's failure to close this sale in accordance with the terms of this Agreement. If Seller defaults under this Agreement and improperly fails or refuses to close the sale as provided in this Agreement (other than due to the failure to obtain the Court Approval (as herein defined) as provided in Section 17 hereof, (i) the Deposit shall be immediately returned to Purchaser and (ii) Seller shall reimburse Purchaser for its actual out-of-pocket expenses incurred in connection with this Agreement (capped at $50,000).

4.     Brokers' Fees. Each party warrants that it has not dealt with any broker or other person in connection with the sale of the Property in any manner that could give rise to a claim for commission or similar fee, other than Hunter Realty Associates, Inc., who will be paid by Seller. Each party agrees to indemnify and hold the other harmless against and from all claims for real estate commissions and other fees with respect to the procurement and closing of this Agreement made by any person with whom they have dealt other than as provided herein.



5. Due Diligence.

(a) Due Diligence Period. Purchaser shall have until the 45th day after the date of this Agreement (as it may be extended pursuant to Section 17 hereof, the "Due Diligence Period") within which to perform any studies or inspections it deems necessary or desirable on the Property, including any environmental studies, and to terminate this Agreement within the Due Diligence Period if any conditions are deemed unsatisfactory to Purchaser or if Purchaser is unable to obtain financing to purchase the Property on terms acceptable to Purchaser, in which event the Deposit shall be refunded to Purchaser, and both parties hereto shall be relieved of all obligations hereunder, other than those that specifically survive termination. After the Due Diligence Period, Purchaser shall have no right to terminate this Agreement. If Purchaser does not terminate this Agreement on or before the expiration of the Due Diligence Period, Title Company shall hold the Deposit solely for Seller's benefit pending the occurrence of the Closing applying it as payment by Purchaser towards the Purchase Price, and shall deliver the Deposit to Seller if this Agreement is terminated after the expiration of the Due Diligence Period due to a default by Purchaser or Purchaser improperly failing or refusing to close the sale as provided in this Agreement.

(b) Testing. Purchaser shall not perform any invasive or destructive testing or sampling of the Property (including drilling or boring) without the prior written consent of Seller, which consent will not be unreasonably withheld. Purchaser shall repair any damage caused to the Property by Purchaser's inspections. Upon request, Purchaser will immediately provide true and complete copies to Seller or its designee of any and all inspection reports, environmental studies, test results, photographs, engineering studies, or videos prepared by or on behalf of Purchaser with respect to the Property pursuant to this Agreement. Except as may be required by Purchaser's lender for this transaction, Purchaser shall not release or disclose to any person any information related to the Property obtained or observed by Purchaser in its inspection of the Property under this Agreement.

(c) Disclaimers. If Purchaser does not terminate this Agreement by giving written notice of such termination to Seller within the Due Diligence Period, then Purchaser shall be deemed to have accepted the Property with any and all faults, defects, or conditions of the Property thereon. Because Seller has given Purchaser access to the Property during the Due Diligence Period to allow Purchaser and any reputable contractor or consultant on Purchaser's behalf to inspect the Property, the soil, water and subsurface, and all buildings, improvements, fixtures, machinery, equipment and electrical, plumbing and mechanical systems thereon to Purchaser's full satisfaction in order to determine the condition of the same, irrespective of whether Purchaser actually has fully availed itself of the opportunity to inspect the Property, Purchaser shall be conclusively presumed to have satisfied itself as to the usefulness and the legal limitations of the Property, as to its need of repairs, as to the nature of neighboring properties, as to its structural soundness, as to the condition of any buildings, improvements, fixtures, machinery and equipment and any plumbing, electrical, heating, or mechanical systems, as to soil, water and subsurface conditions, as to what can be done by way of alterations, and as to the possible existence and the effect of restrictions, easements, rights-of-way, ordinances, laws and rules and regulations of the public authorities, whether federal, state or local. During the Due Diligence Period, Seller will also give Purchaser access to all records for the Property in Seller's possession, whether physically located at the Property or otherwise, which concern the

physical condition of the Property, if any, and any other information Seller actually has in its possession which is readily available concerning the condition of the Property. To the extent in Seller's possession, Seller shall, within 7 days after the date of this Agreement, provide to Purchaser the due diligence materials listed on Exhibit C hereto, and shall inform Purchaser of those items which are not in Seller's possession or otherwise available. Seller represents and warrants that, to its knowledge, all such due diligence materials to be provided by it pursuant to this Section 5 will be accurate and complete in all material respects.

Purchaser shall keep the Property free of liens arising from the conduct of Purchaser and its designees, contractors, or consultants or agents, and shall indemnify Seller against any claims, damages, liabilities or costs (including reasonable attorneys' fees) resulting from Purchaser's or Purchaser's designees' entry and activities upon the Property prior to the Closing. Purchaser acknowledges that, after the expiration of the Due Diligence Period, its obligations under this Agreement are not contingent upon Purchaser receiving financing. Purchaser takes the Property in its present condition, "AS IS, WHERE IS" with all faults, without reliance upon any representation, warranty, opinion or statement of Seller, or any agent of Seller, not contained in this Agreement and, further, Purchaser affirmatively represents that neither Seller nor anyone on behalf of Seller has expressly or impliedly made or given any such representation, warranty, opinion or statement to Purchaser or anyone on Purchaser's behalf not specifically provided in this Agreement. Purchaser acknowledges that the provisions of this Section are a material part of the consideration to be received by Seller under this Agreement, and that Seller has agreed to the Purchase Price by reason of such understanding. These disclaimers by Seller and this representation by Purchaser shall survive termination or Closing, as applicable.

6.    Environmental. From and after the Closing, Seller retains no liability, obligation, or responsibility to Purchaser from, arising out of, or relating to any conditions or activities at or involving the Property under any Environmental Law (as herein defined), and Purchaser accepts the Property "AS IS, WHERE IS" with all faults. Purchaser hereby waives, releases, and covenants not to bring, aid, or permit to be brought any demand, claim, lawsuit, or any other type of administrative or judicial action, against Seller which Purchaser may now or hereafter have which arises from or relates to the operation or violation of any Environmental Law on the Property or any other property. The provisions of this Section shall survive Closing. For the purposes of this Section, "Environmental Laws" shall include, but not be limited to, all federal, state, and local laws, regulations, ordinances, orders, or any other legal or administrative requirements of whatever nature, whether currently existing or hereafter amended or enacted, pertaining to the protection of the environment, the protection of the health or safety of persons or natural resources, or contamination or pollution to the environment, to include without limitation the Federal Comprehensive Environmental Response, Compensation, and Liability Act, as amended, and the federal Resource Conservation and Recovery Act, as amended.

7.    Survey. During the Due Diligence Period, Purchaser shall have the right to have the Property surveyed at Seller's expense. If the survey shows any discrepancies or conflicts in boundary lines and encroachments which might materially decrease the value of the Property based on its current use which Seller is unable or unwilling to cure, then Purchaser's sole remedy shall be to terminate this Agreement by notice to Seller, given no later than expiration of the Due Diligence Period, whereupon the Deposit shall be refunded to Purchaser, otherwise the defects

shall be deemed to be waived. Within 5 days after the date of this Agreement, Seller will order, at Seller's expense, an ALTA survey undertaken for the Property, and will provide copies of such survey to Purchaser no later than 30 days thereafter.

8.  Evidence of Title. Promptly after the date hereof, Seller shall deliver to Purchaser a title insurance commitment for an ALTA Owner's Form policy in an amount equal to the Purchase Price, which shall commit to insure good and indefeasible fee simple title to the Property in Purchaser upon Closing, subject to the Permitted Exceptions (as herein defined). Purchaser shall have one week following receipt of such commitment (or any amended commitment if defects are found) within which to deliver to Seller a notice setting forth any defects in title, other than the Permitted Exceptions, which render title unmarketable; otherwise, Purchaser shall be conclusively presumed to have approved the title to the Property. Seller shall have 3 business days after receipt of such notice to notify Purchaser as to whether Seller will cure, prior to Closing, any such defects identified in Purchaser's notice which cause title not to be indefeasible and, if not cured in such time, Purchaser's remedy shall be to either terminate this Agreement or to waive such defects by notice in writing given to Seller. In the event this Agreement is so terminated, Purchaser shall be entitled to a refund of the Deposit, and the parties shall be discharged from all further obligation or liability under this Agreement.

9.  Closing.

(a)  Closing Date. The date for closing the sale and purchase of the Property (the "Closing") shall be the 10th day after expiration of the Due Diligence Period (the "Closing Date"); provided, however, that if such date is a non-business day, then the Closing Date shall be the first business day thereafter.

(b)  Escrow Instructions. Closing shall be held at the office of Title Company. Title Company is hereby authorized and instructed to act in accordance with the provisions of this Agreement which, together with Title Company's standard escrow provisions, to the extent not inconsistent with this Agreement, shall constitute Title Company's escrow instructions. Seller and Purchaser agree not to unreasonably withhold their approval of Title Company's standard escrow instructions to the extent they are consistent with the terms of this Agreement. In the event of any conflict between the terms of this Agreement and the terms of Title Company's standard escrow provisions, the terms of this Agreement will control.

(c)  Closing Deliveries. At Closing, the parties will execute and deliver such affidavits and other closing documents reasonably necessary to transfer title to the Property in accordance with this Agreement which Title Company may reasonably require, in addition to such other closing deliveries as are specifically required in this Agreement.

10.  Conveyance of Property; Assumption of Contracts.

(a)  Deed. Seller shall deliver to Purchaser at Closing an executed special warranty deed in recordable form conveying fee simple title to the Property to Purchaser (the "Deed"). The Deed shall be in the form of Exhibit A hereto. Marketable title to the Property shall be conveyed by Seller to Purchaser free and clear of all liens, encumbrances, covenants,

conditions, restrictions and easements, subject, however, to the following permitted exceptions (collectively, the "Permitted Exceptions"):

      (i)      Current taxes and assessments which are a lien not yet delinquent;

      (ii)      Any matter of record or not of record that in any way affects title to the Property which resulted from the acts or omissions of Purchaser;

      (iii)      Applicable laws, regulations, zoning regulations and ordinances, whether federal, state or local; and

      (iv)      Easements, rights-of-way, reservations, covenants and restrictions of record.

      (b)      Assumption of Contracts. At Closing, Seller and Purchaser shall execute a Bill of Sale, Assignment and Assumption Agreement in the form attached as Exhibit B hereto (the "Assignment Agreement"), whereby Purchaser assumes those certain contracts relating to the Property as more particularly described in Schedule 1 to the Assignment Agreement. Seller makes no representation or warranty as to whether any consent is required in connection with the assignment of such contracts, and Purchaser shall be responsible for obtaining, or failing to obtain, any such consent. Seller shall assist Purchaser with the assignment/assumption of all such contracts to ensure a smooth transition.

      11.      Personal Property. Included in the purchase of the Property are those items of furniture, machinery, equipment and other personal property owned by Seller associated with and located at the Property (collectively, the "Personal Property"). Title to the Personal Property will be transferred by Seller to Purchaser at Closing by the Assignment Agreement, free and clear of all liens other than the Permitted Exceptions, "AS IS, WHERE IS" with all faults, and with no warranties, express or implied, as to condition or fitness for any use.

      12.      Prorations at Closing. Real and personal property taxes assessed for the year of Closing shall be prorated as of the Closing Date, which proration shall be based upon the latest tax bills available; all taxes first becoming delinquent in any period prior to Closing shall be paid by Seller and all taxes first becoming delinquent in any period subsequent to Closing shall be paid by Purchaser. Payments on special assessments of record first becoming delinquent subsequent to Closing shall be assumed by Purchaser. Utilities shall be read and determined as of Closing. Revenues from and expenses attributable to the Property from and after 12:01 am (Central time) on the Closing Date shall be allocated to Purchaser, and such revenues and expenses prior to 12:01 am (Central time) on the Closing Date shall be allocated to Seller.

      13.      Possession. Seller shall deliver possession of the Property to Purchaser at the time of Closing.

      14.      Destruction of Property. The risk of loss or damage to the Property shall be borne by Seller until Closing, during which time Seller shall continue to insure the Property against loss, damage or destruction by fire with extended coverage endorsement. In the event of such loss, damage or destruction occurring prior to Closing, the parties shall have the following options:

(a)     If the damage to the Property, as determined by the adjuster, exceeds 25% of the Purchase Price, then either party may elect to terminate this Agreement by giving the other party written notice of such election within 5 days after the occurrence of such damage, loss or destruction, or the Closing Date, whichever is sooner, whereupon the Deposit shall be refunded to Purchaser, and the parties shall have no further rights or obligations hereunder, other than those that specifically survive termination; or

(b)     The parties shall proceed with Closing the purchase and sale of the Property, and Seller shall, at Seller's option, either (i) allow Purchaser a credit against the Purchase Price equal to the loss or damage sustained by the Property, as determined by the insurance adjuster for Seller's carrier, or (ii) assign to Purchaser all of Seller's rights in and to the insurance recovery due by reason of such loss or damage to the Property, with no reduction in the Purchase Price.

This Section shall constitute Purchaser's exclusive rights and remedies in the event of loss, damage or destruction of the Property.

15.     Expenses. Except as otherwise provided herein, the parties shall be liable for expenses as follows:

(a)     Real Estate Transfer Tax. Seller and/or Purchaser (as is customary for the county where the Property is located, as determined by Title Company) shall pay real estate transfer tax due as a result of this transaction under applicable local law.

(b)     Recording Fees. Purchaser shall pay any and all recording fees required by this transaction (e.g., for recording the Deed or a new mortgage in favor of Purchaser's lender), but Seller shall pay any and all recording fees required to provide title to the Property as required by this Agreement.

(c)     Title Insurance. Seller shall pay the cost of obtaining basic title insurance as required hereunder for an owner's policy, and Purchaser shall pay the cost of any additional, extended or special coverage or endorsements, and for a loan/lender's policy, if required.

(d)     Survey. Seller shall pay the cost of any survey work ordered under this Agreement.

(e)     Sales Tax. Seller and/or Purchaser (as is customary for the county where the Property is located, as determined by the Title Company) shall pay any sales tax due as a result of the transfer of Personal Property in connection herewith.

(f)     Due Diligence. Purchaser shall pay all costs associated with its due diligence hereunder.

(g)     Franchise and Related Fees. Purchaser agrees that, immediately after the Closing, Purchaser shall operate the Property as a Baymont Inn & Suites (or other Wyndham-branded) hotel. In connection therewith, Purchaser shall sign, at or prior to Closing, a new franchise agreement for the property with Baymont Inn & Suites (or other Wyndham brand). Purchaser shall pay all fees in connection with obtaining such franchise agreement for the

Property, including any all costs for any improvements, repairs or alterations required by said franchisor. So long as Purchaser complies with this Section 15(g), Purchaser shall not pay any fees, expenses, charges or damages, if any, incurred in connection with any termination of Seller's existing franchise agreement associated with the current operation of the Property as a hotel, which (if any) shall be borne solely by Seller.

(h) Other Fees and Expenses. As to all other closing costs and expenses, each party shall pay its respective expenses, taxes, charges and liabilities incurred in connection with or arising out of the exercise of their respective rights or obligations under this Agreement and the transfer of title from Seller to Purchaser. The parties shall split equally (or otherwise as is customary in Cook County, Illinois) any escrow fees charged by Title Company.

16.    Default; Remedies. If Seller has performed or is ready, willing and able to perform all obligations required by this Agreement and Purchaser shall fail or refuse to perform this Agreement within the time and in the manner provided, then Seller may elect to terminate this Agreement by giving written notice thereof to Purchaser, and upon giving such notice, Seller shall be entitled to receive the Deposit as liquidated damages, the parties recognizing that Seller's actual damages in the event of Purchaser's default will be difficult to ascertain. Either party may seek specific performance of this Agreement in the event of default by the other party.

17.    Court Approval. Notwithstanding anything to the contrary in this Agreement, the obligation of Seller to consummate the transactions contemplated hereby is subject to Seller's receipt of a final court order approving the sale of the Property to Purchaser on the terms and conditions set forth herein (the "Court Approval"). Seller will use commercially reasonable efforts in seeking to obtain the Court Approval as soon as possible after the date of this Agreement, and will file, within 2 business days after the date of this Agreement, an application with the court seeking the Court Approval. In the event the Court Approval is not obtained, for any reason, prior to the 30th day after the date of this Agreement, the Due Diligence Period shall be extended by one day for each day of delay beyond such 30th day. In the event the Court Approval is not obtained, for any reason, prior to the 45th day after the date of this Agreement, either Purchaser or Seller may terminate this Agreement without liability or recourse to either party (in which case Purchaser will receive the Deposit back in full). Purchaser agrees to cooperate with Seller in such efforts to obtain the Court Approval.

18.    Time of the Essence. Time shall be of the essence with respect to the performance by the parties of their respective obligations hereunder.

19.    Notices. Any notice which may be or is required to be given pursuant to the provisions of this Agreement shall be in writing and either hand delivered or sent by prepaid overnight courier or United States certified mail, addressed as follows:

Seller, to:    BPP Illinois, LLC
c/o FFC Capital Corporation
625 Liberty Ave., Suite 3110
Pittsburgh, PA  15222
Attn: Fred L. Branovan

Purchaser, to:    LNG LLC
                  4804 NW Bethany Blvd.
                  Suite I2, Room 166
                  Portland, OR 97229
                  Attn: Anil Patel

                  Chicago Title Insurance Company
                  603 Stanwix St., Suite 1900
Title Company, to:   Pittsburgh, PA 15222
                  Attn: William Weinheimer

20.    Further Assurances.    In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by either party at Closing, each party agrees to perform, execute and deliver, but without any obligation to incur any additional liability or expense, on or after the Closing any further deliveries and assurances as may be reasonably necessary to consummate the transactions contemplated hereby or to further perfect the conveyance, transfer and assignment of the Property to Purchaser.

21.    Miscellaneous.

(a)    Benefit. This Agreement shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and permitted assigns.

(b)    Entire Agreement; Amendment. This Agreement contains the entire agreement of the parties with respect to the transactions contemplated hereby, and may not be amended or modified in whole or in part except with the consent of both of the parties hereto in writing.

(c)    Assignment. Purchaser shall not assign or otherwise transfer this Agreement or its rights or obligations hereunder without the express written consent of Seller.

(d)    Invalidity and Waiver. If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and, to the greatest extent legally possible, effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

(e)    Governing Law. This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the laws of the State of Illinois, without regard to its conflict of law principles.

(f)    Confidentiality. Until Closing, Purchaser shall keep confidential, and not publicly disclose, any and all information provided by Seller hereunder or otherwise obtained by Purchaser, or the terms and conditions of this Agreement, other than in connection with Purchaser's due diligence and financing efforts.

(g)    Construction. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and agree that the normal rule of construction - to the effect that any ambiguities are to be resolved against the drafting party - shall not be employed in the interpretation of this Agreement or amendments hereto.

(h)    No Third Party Beneficiary. The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

(i)    Attorneys' Fees. In the event any party hereto employs an attorney in connection with claims by one party against the other arising from the operation of this Agreement, the non-prevailing party shall pay the prevailing party all reasonable fees and expenses, including attorneys' fees, incurred in connection with such claims.

(j)    Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement. To facilitate execution of this Agreement, the parties may execute and exchange counterparts of the signature pages by facsimile or electronic transmission.

[Signatures appear on next page.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**Seller:**

BPP ILLINOIS, LLC

By: _____
Fred L. Branovan, President

**Purchaser:**

LNG LLC

By: _____
Anil Patel, Managing Member

## JOINDER BY TITLE COMPANY

Title Company has executed this Agreement in order to confirm that it has received and shall hold the Deposit required to be deposited under this Agreement and the interest earned thereon, in escrow, and shall disburse the Deposit, and the interest earned thereon, pursuant to the provisions of this Agreement.

July 25th, 2011

CHICAGO TITLE INSURANCE COMPANY

By: _____

Name: William J Weinheimer

Title: Escrow officer

Mail after recording to:

_____

_____

Attn:_____

## SPECIAL WARRANTY DEED

**THIS SPECIAL WARRANTY DEED** ("Deed") is made as of _____ __, 2011 by BPP ILLINOIS, LLC, a Delaware limited liability company ("Grantor"), to LNG LLC, an Oregon limited liability company ("Grantee").

### WITNESSETH:

That Grantor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto Grantee, in fee simple, all of that certain land situate, lying and being in the County of Cook, State of Illinois, and being more particularly described on Schedule 1 attached hereto, together with all improvements situated thereon and all rights, titles and interests appurtenant thereto (the "Property").

THIS CONVEYANCE IS SUBJECT TO: The exceptions described on Schedule 2 attached hereto.

TO HAVE AND TO HOLD the aforesaid Property.

Grantor does hereby covenant with Grantee that, except as noted above, at the time of delivery of this Deed, the Property was free from all encumbrances made by Grantor, and that Grantor will warrant and defend the same against the lawful claims and demands of all persons claiming by, through and under Grantor.

The Property described herein is conveyed AS IS, WHERE IS AND WITH ALL FAULTS.

[Signatures appear on the following page.]

**IN WITNESS WHEREOF,** as of the day and year first above written, Grantor, intending to be legally bound hereby, has caused this Deed to be duly executed, delivered and sealed.

BPP ILLINOIS, LLC

By:_____
             Fred L. Branovan, President

COMMONWEALTH OF PENNSYLVANIA    )
                                       )
COUNTY OF ALLEGHENY                 )

I, the undersigned, a Notary Public of the state and county aforesaid, certify that Fred L. Branovan personally came before me this day and acknowledged that he is the President of BPP Illinois, LLC, a Delaware limited liability company, and that he, in that capacity, being authorized to do so, executed the foregoing on behalf of the Grantor.

**WITNESS** my hand and Notarial Seal this ____ day of _____, 2011.

[NOTARY SEAL]

_____
                     Notary Public

My Commission Expires:

_____

## DESCRIPTION OF PROPERTY

[to be inserted]

## **PERMITTED EXCEPTIONS**

[to be inserted]

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment Agreement") is made and entered into as of _____ ___, 2011 between (i) BPP ILLINOIS, LLC, a Delaware limited liability company ("Assignor"), and (ii) LNG LLC, an Oregon limited liability company ("Assignee"), pursuant to the terms of that certain Purchase and Sale Agreement dated as of July 25, 2011 between Assignor and Assignee (the "Agreement"). Capitalized terms used herein which are defined in the Agreement shall have the meanings assigned to them therein unless otherwise defined herein.

1.  For good and valuable consideration, receipt of which is hereby acknowledged, Assignor does hereby sell, convey, transfer, assign and deliver to Assignee, and its successors and assigns, free and clear of any liens other than the Permitted Exceptions, all of Assignor's right, title and interest in and to (i) the Personal Property and (ii) the contracts listed on Schedule 1 hereto (collectively, the "Assumed Contracts").

2.  Assignee does hereby accept the foregoing sale, conveyance, transfer, assignment and delivery of the Personal Property and the Assumed Contracts, and does hereby assume and agree to pay, perform and discharge, when lawfully due, all obligations of Assignor under the Assumed Contracts incurred after the closing date only

Each of Assignor and Assignee hereby covenants that, from time to time after delivery of this Assignment Agreement, at the other's request and without further consideration, such party shall do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, any and all such further acts, instruments and other things or writings reasonably requested by the other party in order to evidence and effectuate the consummation of any of the transactions contemplated by this Assignment Agreement.

Notwithstanding anything contained in this Assignment Agreement to the contrary, the terms and provisions of the Agreement (including without limitation any representations or warranties, and disclaimers thereof) shall survive the delivery of this Assignment Agreement as provided in the Agreement. This Assignment Agreement shall, in all events, be construed so that none of the assumed obligations shall be expanded, increased, broadened or enlarged as to rights or remedies which third parties would have had against Assignor or Assignee had this Assignment Agreement no t been executed and delivered. This Assignment Agreement neither expands upon nor limits the rights, benefits, responsibilities, liabilities and obligations of Assignor and Assignee provided in and under the Agreement.

[Signatures appear on the following page.]

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment Agreement to be executed as of the date first written above.

**Assignor:**

BPP ILLINOIS, LLC

By: _____
      Fred L. Branovan, President

**Assignee:**

LNG LLC

By: _____
      Anil Patel, Managing Member

-2-

<u>Schedule 1</u>

## ASSUMED CONTRACTS

     1.     ResCentral Application & Terms and Conditions (undated) between Seller and Wyndham/Baymont relating to central reservation center.

     2.     Independent Website Service Agreement dated as of November 25, 2008 between FFC Capital Corporation, as agent for Seller, and L.E.T. Group, Inc. relating to website services.

     3.     Intellectual Property Site License and Support Agreement dated February 1, 2008 between Seller and Micros Systems, Inc. relating to OPERA PMS system, as amended.

     4.     Location Agreement dated May 1, 2011 between Seller and Innflux, LLC relating to internet access.

     5.     Hotel Revenue Management Consulting Agreement dated June 4, 2009 between Seller and Wyndham Worldwide relating to revenue management consulting services.

     6.     Energy Services Agreement dated April 29, 2010 between Seller and Centerpoint Energy Services, Inc. relating to purchase of natural gas.

     7.     Customer Supply Agreement, including Fixed Price Pricing Attachment, dated March 9, 2011 between Seller and FirstEnergy Solutions Corp. relating to purchase of electricity.

     8.     Hotel/Motel Bulk Services Agreement dated July 5, 2011 between Seller and Comcast of Illinois VI, LLC relating to cable communications bulk services.

     9.     Hotel/Motel Directory Agreement dated May 2, 2008 between Seller and North American Directory Services, LLLP relating to guest room directories.


     Each of the foregoing agreements is an Assumed Contract only to the extent relating to the Property.

Exhibit C

## DUE DILIGENCE LIST

To the extent relating to the Property and in Seller's possession:

a. A complete list of the Personal Property showing which Personal Property is Leased (if any) and which is owned;

b. A complete list and copies of all Service Contracts;

c. A complete list and copies of the Permits;

d. A copy of the License Agreement;

e. Copies of the last two (2) years of quality assurance reports prepared by or on behalf of, or received from, the Licensor and any material correspondence, reports, or similar documents containing recommendations for improvements to the Property or Hotel operations;

f. Operating statements ("Operating Statements") showing all material income and expenses of the Hotel for the last three (3) calendar years and the current year through the last day of the preceding calendar month of the date of execution of this Agreement;

g. A current list of all Reservations for the Hotel ("Reservation List") showing guest names, room rates, period of reservation and advance deposits. (Reservations means all advance bookings, reservations, contracts or similar arrangements for occupancy or use of guest rooms or other facilities or service of the Hotel (including room contracts of any nature, written or verbal));

h. A list of all employees of the Hotel, including employee name, position, date of hire, compensation and date and amount of last raise, and a complete list and copies of any employment agreements with such employees;

i. The most recent real and personal property tax statements for the Real Property, and the Personal Property inclusive of the last four years;

j. Copies of all casualty and liability insurance policies insuring the Property or operations of the Hotel, with a schedule of the premiums for such policies;

k. Franchise inspection reports for the past two (2) years;

l. Engineering studies with respect to the Real Property; Hotel's electrical, plumbing, and HVAC systems;

m. Geological or soils reports;

n. Environmental site assessments or other environmental reports;

o. Original and "as built" construction plans and specifications;

p. All modifications plans and specifications;

q. All building permits, conditional use permits, variances and related governmental authorizations obtained in connection with construction of the Improvements;

r. ALTA or other surveys of any of the Real Property;

s. All maintenance reports.

t. All certificates of compliance.